# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. **CR01-4060 MWB** |
| vs. | |
| BRETT CHRISTIAN KAMERUD and CORY BAKER KAMERUD, | **REPORT AND RECOMMENDATION** |
| Defendants. | |

———————————

*I.* *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.* *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . 3

*III.* *SUMMARY OF THE EVIDENCE* . . . . . . . . . . . . . . . . . . . . . 11
    *A. Trial Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        *1.*   *Russell Brick* . . . . . . . . . . . . . . . . . . . . . . . . 11
        *2.*   *Robert Tinklepaugh* . . . . . . . . . . . . . . . . . . . 16
        *3.*   *Jason Vonhaden* . . . . . . . . . . . . . . . . . . . . . . 17
        *4.*   *Kurt Undine* . . . . . . . . . . . . . . . . . . . . . . . . 17
        *5.*   *Bridget McClure* . . . . . . . . . . . . . . . . . . . . . 19
        *6.*   *Stacey Bitz* . . . . . . . . . . . . . . . . . . . . . . . . . 20
        *7.*   *Robert Weinmeister* . . . . . . . . . . . . . . . . . . 22
        *8.*   *Steve Marquardt* . . . . . . . . . . . . . . . . . . . . 23
        *9.*   *Michael Hill* . . . . . . . . . . . . . . . . . . . . . . . . 24
        *10.*  *Craig Price* . . . . . . . . . . . . . . . . . . . . . . . . . 24
        *11.*  *Troy Boone* . . . . . . . . . . . . . . . . . . . . . . . . 25
        *12.*  *Billy Oldenkamp* . . . . . . . . . . . . . . . . . . . . 26
        *13.*  *Cynthia Orton* . . . . . . . . . . . . . . . . . . . . . . 29
        *14.*  *Cari Romeo* . . . . . . . . . . . . . . . . . . . . . . . . 30
        *15.*  *Ross Kelly* . . . . . . . . . . . . . . . . . . . . . . . . . 30
        *16.*  *Ryan Rathert* . . . . . . . . . . . . . . . . . . . . . . 30
        *17.*  *Jenny Menzel* . . . . . . . . . . . . . . . . . . . . . . 31
        *18.*  *Brian Locke* . . . . . . . . . . . . . . . . . . . . . . . 31

**B. Section 2255 Hearing Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
    **1.**    **Russell Brick** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
    **2.**    **Jenny Menzel** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
    **3.**    **Stacey Bitz** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**
    **4.**    **Geoff Baldridge** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**
    **5.**    **Debra Menzel** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**
    **6.**    **Bill Menzel** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**
    **7.**    **Larry Wenger** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**
    **8.**    **Ross Kelly** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**
    **9.**    **Brett Kamerud** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**
    **10.**   **Kimberly Ackerson** . . . . . . . . . . . . . . . . . . . . . . . . . . **41**
    **11.**   **Wendy Kamerud** . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**
    **12.**   **Brian Kamerud** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**
    **13.**   **Cory Kamerud** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**
    **14.**   **Douglas Roehrich** . . . . . . . . . . . . . . . . . . . . . . . . . . **44**
    **15.**   **Martha McMinn** . . . . . . . . . . . . . . . . . . . . . . . . . . . **47**

**IV. ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**
  **A. Identification of Issues Presented** . . . . . . . . . . . . . . . . . . . . . . . . **49**
  **B. Standards for Relief Pursuant to Section 2255** . . . . . . . . . . . . . . . **50**
  **C. Ineffective Assistance of Counsel** . . . . . . . . . . . . . . . . . . . . . . . . **52**
  **D. Failure of Counsel to Prepare Properly for Trial** . . . . . . . . . . . . . **54**
    **1.**    **Brett Kamerud's argument** . . . . . . . . . . . . . . . . . . . **54**
    **2.**    **Cory Kamerud's argument** . . . . . . . . . . . . . . . . . . . **69**
  **E. Failure of Cory's Trial Counsel to Present a Defense** . . . . . . . . . . **69**
  **F. Failure to Cross-Examine Prosecutions's Witnesses** . . . . . . . . . . . . **73**
  **G. Denial of Sixth Amendment Right to Testify** . . . . . . . . . . . . . . . . **76**
    **1.**    **Brett Kamerud's argument** . . . . . . . . . . . . . . . . . . . **76**
    **2.**    **Cory Kamerud's argument** . . . . . . . . . . . . . . . . . . . **81**
  **H. Failure to Have Menzel Drug Evidence Excluded at Trial** . . . . . . . . **82**
  **I. Failure to Ensure Brett was Present at Deposition of Agent Price** . . . . . **83**
  **J. Failure to Challenge the Superseding Indictment** . . . . . . . . . . . . . . **86**
  **K. Failure to Argue Prosecutorial Misconduct** . . . . . . . . . . . . . . . . . **95**
  **L. Conflict of Interest of Cory's Trial Counsel** . . . . . . . . . . . . . . . . . **98**
  **M. Failure to Have Cory's Prior Conviction Excluded from Evidence** . . . . **99**
  **N. Failure to Negotiate a Plea** . . . . . . . . . . . . . . . . . . . . . . . . . . . **100**

**V. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **103**

2

# I. INTRODUCTION

On September 7, 2004, the defendant Brett Kamerud ("Brett") filed a motion for relief pursuant to 28 U.S.C. § 2255, challenging his conviction on a charge that he conspired to distribute methamphetamine. Doc. No. 221. On December 6, 2004, the defendant Cory Kamerud ("Cory") filed his own motion pursuant to section 2255, challenging his conviction on the same charge. Doc. No. 229. These motions now are fully submitted, and will be considered by the court.

# II. PROCEDURAL BACKGROUND

Brett and Cory Kamerud are brothers from Aberdeen, South Dakota. On July 19, 2001, the grand jury returned a one-count indictment charging that between June 2000 and August 2000, they conspired to distribute and possess with the intent to distribute 500 grams or more of methamphetamine. They both pled not guilty to the charge. Trial was scheduled to commence October 1, 2001. Attorney Douglas Roehrich ("Roehrich") was appointed to represent Brett, and attorney Martha McMinn ("McMinn") was appointed to represent Cory. After a detention hearing on August 8, 2001, both defendants were released from custody pending trial.

On August 25, 2001, officers found Brett and Cory sitting in a vehicle parked under an overpass in Aberdeen, South Dakota. Jenny Menzel, a juvenile female, was sitting in the driver's seat. Officers observed an open container of alcohol in the vehicle, and in a subsequent search of Menzel's purse, they found a large quantity of methamphetamine and some drug paraphernalia. The occupants of the vehicle were arrested on state methamphetamine charges. Because of this incident, the plaintiff (the "Government") in the federal case moved to revoke the Kameruds' pretrial release. On September 10, 2001, trial of this case was continued to October 29, 2001. After a revocation hearing on September 27,

2001, Brett and Cory were allowed to remain out of custody on modified conditions of release.

On October 11, 2001, the Government filed a notice of its intent to seek enhanced penalties against both Brett and Cory pursuant to 21 U.S.C. § 851, based on allegations that they both had prior felony drug distribution convictions.

On October 24, 2001, the grand jury returned a one-count superseding indictment. In the superseding indictment, the date of the termination of the conspiracy was extended by one year, from August 2000 to August 2001, which had the effect of including in the conspiracy the incident in Aberdeen, South Dakota, on August 25, 2001. Also, an allegation was added that the Kameruds "distribute[d] and possesse[d] with intent to distribute . . . methamphetamine to one or more persons under twenty-one years of age." This was to include alleged sales of methamphetamine to Billy Oldenkamp, a juvenile cooperating witness, and to Jenny Menzel.

After two short continuances, one of which was requested by the Kameruds, trial was scheduled to commence on November 26, 2001. McMinn filed two motions for the issuance of subpoenas to a total of seven witnesses, and the motions were granted.[1] McMinn also filed seven applications for writs of habeas corpus ad testificandum, all of which were granted.[2] On November 16, 2001, the Government moved to continue the trial, and McMinn resisted the motion on Cory's behalf. The motion was set for hearing, but the hearing was cancelled when the Government withdrew its motion. The case went to trial as scheduled on November 26, 2001.

---

[1]*See* Doc. Nos. 89 & 92. The witnesses subpoenaed by McMinn on Cory's behalf were Ross Kelly, Krista Oldenkamp, Kim Ackerson, Jenny Menzel, Missy Bumpous, Michael Bumpous, and Ryan Rathert.

[2]*See* Doc. Nos. 52, 54, 56, 68, 70, 74, and 76. The witnesses named in the writs were Jenny Menzel, Robert Gasco, and Cari Romeo. (More than one application was filed for the production of Gasco and Romeo).

On the morning of trial, the Kameruds were arraigned on the superseding indictment, after which, with the consent of the parties, the undersigned U.S. Magistrate Judge presided over jury selection. Trial proceeded immediately thereafter before the Honorable Ronald E. Longstaff. On November 29, 2001, the jury returned verdicts finding both Brett and Cory guilty of conspiracy to (1) "distribute methamphetamine," (2) "possess with intent to distribute methamphetamine," and (3) "possess with intent to distribute methamphetamine to one or more persons under twenty-one years of age," but not guilty of conspiracy to "distribute methamphetamine to one or more persons under twenty-one years of age." Doc. No. 107.

On December 27, 2001, Brett filed a motion for judgment of acquittal and a motion for new trial. The motions were resisted, and on January 22, 2002, Judge Longstaff denied the motions. On January 29, 2002, Cory filed motions for judgment of acquittal and for new trial. The motions were resisted, and on February 25, 2002, Judge Longstaff denied the motions. The case then was reassigned to the Honorable Mark W. Bennett for sentencing. On May 8, 2002, Judge Bennett sentenced both Brett and Cory to 240-month mandatory minimum sentences. Doc. Nos. 170 & 172. Both Brett and Cory appealed.

On April 23, 2003, the Eighth Circuit Court of Appeals affirmed the convictions. *United States v. Kamerud*, 326 F.3d 1008 (8th Cir. 2003). In its opinion, the court summarized the facts in the case as follows:

> In June and August 2000, the Kameruds and two other individuals, Russell Brick and Stacey Bitz, trafficked methamphetamine from Sioux City, Iowa, to Aberdeen, South Dakota. On about twelve occasions, the group got methamphetamine in Sioux City from a supplier named Kurt Undine, then traveled back to Aberdeen to redistribute some of the methamphetamine and consume some of it. Although the Kameruds did not personally make the trip each time, they always contributed some of the money for each of the purchases Brick ultimately made from Undine. In all, the group purchased between 680 and 850 grams of methamphetamine, or between 2 and 2 ½

ounces on each trip. When the methamphetamine reached Aberdeen, the Kameruds would weigh out portions of their purchases for resale before consuming some of the drugs themselves.

*Id.*, 326 F.3d at 1012.

In their appeals, the Kameruds contended the evidence was insufficient to show they had conspired to distribute methamphetamine. They argued the evidence merely showed they were drug users who had a buyer/seller relationship with Russell Brick, and their resale of drugs was not pursuant to any agreement with Brick, but merely a means to finance their own personal use. The court rejected this contention. *Id.*, 326 F.3d at 1012-13. The Kameruds also claimed the evidence was insufficient to prove the conspiracy involved 500 grams or more of methamphetamine, arguing the amount they consumed personally should not be included in the total. The court held, "the Kameruds were charged with conspiracy to distribute methamphetamine, however, not possession with intent to distribute, so the amount consumed for personal use should be included in the total." *Id.*, 326 F.3d at 1013.

Brett contended separately that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), required the appellate court "to distinguish between a district court's inclusion of personal use amounts as relevant conduct for sentencing purposes, and the inclusion of personal use amounts in the proof submitted to a jury when asking them to find a conspiracy to distribute a specific amount of a controlled substance." *Id.* The court decided it did not need to address that argument because there was no *Apprendi* error. The Kameruds both received 240-month sentences, which were within the prescribed statutory maximum even if the jury had not been asked to find a specific drug quantity. *Id.*

The Kameruds raised numerous other pretrial, trial, and sentencing issues, all of which the court reviewed for plain error because the issues had not been raised or

preserved in the district court. *Id.* The Kameruds both contended the Government failed to charge multiple conspiracies even though the evidence proved two separate conspiracies, one involving the events of the summer of 2000, and a second involving events which occurred in 2001. The court held there was no plain error because the Kameruds had not requested a jury instruction on multiple conspiracies, and they could not show any prejudice because even if there were two conspiracies, the Kameruds were parties to both. *Id.*

Cory made five separate claims. First, he contended the original indictment and superseding indictment were defective because they cited 21 U.S.C. § 841(b)(1)(B), a statutory penalty provision which required proof of just 50 grams or more of a mixture or substance containing methamphetamine, even though he was charged with a conspiracy involving 500 grams or more of methamphetamine, the amount required for a violation of 21 U.S.C. § 841(b)(1)(A). The court found no plain error, holding, "The government necessarily proved a violation of § 841(b)(1)(B) by proving the greater amount required under § 841(b)(1)(A), and the 240-month sentence Cory received fell within the statutory maximum allowed under § 841(b)(1)(B), the penalty provision actually recited in the indictments. In other words, Cory can show no prejudice resulting from the government, in essence, 'over-proving' a violation of § 841(b)(1)(B)." *Id.*, 326 F.3d at 1014. Second, Cory claimed the Government was required to renew its intent to seek an enhanced sentence under 21 U.S.C. § 851 after filing the superseding indictment, but it did not do so, and in any event, he was unaware of the original section 851 notice because it was provided to his attorney, not to him personally. The court held neither of these arguments had merit. *Id.* Third, Cory claimed a violation of the Speedy Trial Act, 18 U.S.C. § 3161(c)(2). The court held there was no plain error on this issue. *Id.* Fourth, Cory argued the Government violated the Jencks Act, 18 U.S.C. § 3500, by not disclosing the

transcript of grand jury testimony by a trial witness, Officer Troy Boone.  The court held this argument had no merit.  *Id.*, 326 F.3d at 1015.

Finally, Cory contended one of the jury instructions was inconsistent with the verdict form.  On the verdict form, the jury found him guilty of conspiracy to (1) distribute methamphetamine, (2) possess with intent to distribute methamphetamine, and (3) possess with intent to distribute methamphetamine to one or more persons under twenty-one years of age, but found him not guilty of conspiracy to distribute methamphetamine to one or more persons under twenty-one years of age.  Cory contended the jury did not understand the instructions, and therefore did not give each charge separate consideration, because the instructions required all objects of the conspiracy to be found as part of one element of the crime of conspiracy, but the jury found an agreement as to just three of the four objects of the conspiracy.  The court held, "To the extent Instruction # 8 required all objects of the conspiracy to be proven as one element of the crime of conspiracy, it was incorrect.  Although all elements of a conspiracy must be proven to find a defendant guilty, all objects of the conspiracy need not be proven."  *Id.*, 326 F.3d at 1015-16.  The court further held, "The jury unanimously agreed on three of the four objects of the conspiracy, even though proof of just one of the four would have been sufficient to support the conviction."  *Id.*, 326 F.3d at 1016.

Brett also made several of his own separate claims.  First, he argued the district court plainly erred in failing to instruct the jury with Eighth Circuit Pattern Jury Instruction 506F, entitled "Conspiracy: Multiple Offenses."  The court held this was not plain error.  *Id.*  Next, he contended "the prosecutor committed misconduct by improperly vouching for the credibility of the government's cooperating witnesses, misrepresenting to the jury the extent of the charging and sentencing deals offered to two cooperating witnesses, interfering with Brett's right to present evidence, and failing to provide a transcript of Officer Boone's grand jury testimony."  The court rejected these claims.  *Id.*

After considering all of Brett's and Cory's arguments, the Eighth Circuit Court of Appeals affirmed their convictions.

On September 7, 2004, Brett filed a motion in this court pursuant to 28 U.S.C. § 2255. Doc. No. 221. In Judge Bennett's initial review order on Brett's motion, he summarized Brett's claims as follows:

> In his motion, defendant [Brett] Kamerud challenges the validity of his conviction and sentence on the following grounds: (1) that Title 21 of the United States Code is unconstitutional because the court is without jurisdiction to enforce penalties outside of Washington, D.C.; (2) that the superseding indictment violated Article III, § 2, Cl. 4, as well as the 5th, 6th, and 10th Amendments, of the United States Constitution; (3) that the prosecutor committed misconduct by presenting perjurious testimony to the grand jury and at trial; (4) that his trial counsel was ineffective in failing to investigate in twenty-four separate matters; (5) that the prosecutor engaged in numerous other acts of misconduct that constituted a violation of the Due Process Clause of the United States Constitution.

Doc. No. 266. Judge Bennett dismissed claim (1) as procedurally defaulted. However, Judge Bennett held that claim (4), as a claim of ineffective assistance of counsel, was appropriate for presentation in a section 2255 motion, and because Brett asserted that his appellate counsel was ineffective in failing to raise claims (2), (3), and (5), those claims also were appropriate for presentation in a section 2255 motion. Judge Bennett referred claims (2) through (5) to the undersigned "for review of the record and the pleadings, the conduct of any necessary evidentiary hearings, the hearing of any oral argument that may be necessary, and the submission . . . of a report and recommended disposition of the case."

On December 6, 2004, Cory filed a motion pursuant to 28 U.S.C. § 2255. Doc. No. 231. In his initial review order on Cory's motion, Judge Bennett summarized Cory's claims as follows:

In his motion, defendant [Cory] Kamerud challenges the validity of his conviction and sentence on the following grounds: (1) that his trial counsel was ineffective in failing to investigate and in refusing to hire an investigator; (2) that his trial counsel was ineffective in failing to assert that the government had violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to provide certain exculpatory materials during discovery; (3) that his trial counsel was ineffective in failing to file a motion in limine or a motion to suppress to exclude evidence seized from Jenny Menzel; (4) that his trial counsel was ineffective in failing to note a conflict of interest in the public defender's representation of a defense witness; (5) that his trial counsel was ineffective in failing to present a valid theory of defense; (6) that his trial counsel was ineffective in failing to negotiate a plea for him; (7) that his trial counsel was ineffective in misleading him about his right to testify; (8) that the prosecutor committed misconduct by presenting perjurious testimony at trial; (9) that the prosecutor committed misconduct by failing to provide certain exculpatory materials during discovery in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (10) that the prosecutor committed misconduct by failing to notify the court of a conflict of interest that the public defender had in representing of a defense witness; and (11) that the mandatory sentence he received violates the Fifth, Sixth, and Eighth Amendments.

Doc. No. 268. Judge Bennett held that claims (1) through (7), as claims of ineffective assistance of counsel, were appropriate for presentation in a section 2255 motion, and with respect to the remaining four claims, "the court reads [Cory] Kamerud's motion to assert ineffective assistance of counsel as his cause for his default on each of these claims." Judge Bennett referred all eleven of these claims to the undersigned "for review of the record and the pleadings, the conduct of any necessary evidentiary hearings, the hearing of any oral argument that may be necessary, and the submission . . . of a report and recommended disposition of the case."

On January 11 and 15, 2007, the undersigned held a hearing on the Kameruds' section 2255 motions. Brett and Cory were present in person throughout the hearing. Attorney Jay E. Denne represented Brett, attorney Pamela A. Wingert represented Cory, and Assistant United States Attorney Shawn S. Wehde represented the Government. The Kameruds both testified. They also presented testimony from eleven other witnesses. The Government presented testimony from two witnesses.

On April 16, 2007, Brett and Cory filed separate post-hearing briefs. Doc. Nos. 375 & 376, respectively. The Government filed separate responsive briefs on June 18, 2007. Doc. Nos. 381 & 382. Brett and Cory filed separate reply briefs on July 27, 2007. Doc. Nos. 387 & 388, respectively. The motions are now fully submitted and the record is closed.

## III. SUMMARY OF THE EVIDENCE

### A. Trial Evidence

#### 1. Russell Brick

The first witness called at trial was Russell Brick. On August 23, 2000, Brick and Stacey Bitz were involved in a traffic stop in Sioux City, Iowa, and were caught with a large quantity of methamphetamine. Brick subsequently agreed to cooperate with law enforcement in hopes of receiving a reduced sentence. Brick is from Aberdeen, South Dakota. He had served time in the South Dakota prison system for distribution of LSD, and at the time of the trial in November 2001, he was serving a federal sentence for methamphetamine trafficking.

In Brick's direct testimony, the prosecutor brought out that Brick was facing a 151-month sentence on the federal charges, but his sentence had been reduced to 60 months because of his cooperation. Brick was aware that he might be eligible for a further reduction in his sentence based on his testimony against the Kameruds.

Brick testified he has known Cory Kamerud since grade school, and Brett Kamerud since 1995. He met Kurt Undine of Sioux City, Iowa, while they were in prison together in South Dakota. They agreed that when they both got out of prison, Undine would supply methamphetamine to Brick. When Brick was released from prison in December 1999, he "hooked up with Brett and Cory Kamerud, [and] Stacey Bitz." Tr. 18.[3] At that time, Cory was living with his parents, and Brett and Bitz were living together in a house Brett was renting in Aberdeen. After awhile, Cory and Brett moved in together in a basement apartment in Aberdeen.

Brick told Brett, Cory, and Bitz that he had met someone in prison who could provide them with methamphetamine at a good price. At first they did not believe him, but one day near the end of June 2000, they all were talking about giving a friend a ride to Sioux City, and Brick told them he would contact his acquaintance in Sioux City, to see if they could get some methamphetamine while they were there. Brick phoned a telephone number in Sioux City that Undine had given him and left a message. Undine called back. Brick asked Undine if he would sell Brick some methamphetamine, and Undine responded that he could get Brick whatever he wanted. Bitz drove Brett and Brick to Sioux City, where they met Undine at a convenience store. Undine took them to Bridget McClure's house (McClure was Undine's girlfriend), where Undine, Bitz, Brick, and Brett went to the basement to sample Undine's methamphetamine. Brick bought two eightballs of methamphetamine for $100 each. Brett purchased a half ounce of methamphetamine for $400, and a quarter pound of marijuana. Bitz, Brett, and Brick then returned to Aberdeen.

Throughout the summer of 2000, Brick and Bitz made about twelve trips to Sioux City to purchase drugs from Undine, about once each week. Bitz usually drove her vehicle, with Brett or Cory, or both of them, coming along. On their return trips to Aberdeen, Bitz hid the drugs in her panties in case they were stopped by law enforcement.

---

[3]References to "Tr." are to the transcript of the trial.

12

Brick bought about an ounce of methamphetamine each trip. Brett and Cory each purchased either an ounce or a half ounce each trip. Brett came along on the first five trips, but stopped coming because he "was getting too paranoid." Tr. 30. Cory came along on two trips, once in about the middle of the summer and once toward the end of the summer. According to Brick, McClure was present when both Brett and Cory purchased drugs in Sioux City. Tr. 61. On trips where either Brett or Cory did not come along, they would send money with someone else to buy methamphetamine for them. When Brick and Bitz returned from Sioux City with drugs, they would go to Brett and Cory's apartment, where the drugs would be weighed and distributed.

According to Brick, during the period from late June to August 23, 2000, customers came to the Kameruds' apartment on a daily basis to purchase methamphetamine from Brick, Brett, and Cory. Brick spent most of his time during this period at the Kameruds' apartment. Brick identified three of the Kameruds' customers as Jenny Beckel, Trent Kavosnika, and Ross Kelly. Tr. 36, 81.

For a short period of time during the summer of 2000, Brick was in custody on other charges. When he was released, he discovered that some methamphetamine he had left at the Kameruds' apartment was gone. Brick needed to sell the methamphetamine to pay Undine for drugs that Undine had fronted to him. Brick got into an argument with Brett about the missing drugs. Brett told him that he, unlike Brick, was a professional at selling drugs. To prove his point, Brett showed Brick a stack of currency that, according to Brett, totaled $5,000.

Most of the drug purchases made by Brick and his associates in Sioux City during the summer of 2000, were purchases directly from Undine, but on two occasions when Undine was not available, Bridget McClure handled the transactions. On the first of these occasions, in about the middle of the summer, Brick and Cory, accompanied by Bitz, purchased two-and-a-half ounces of methamphetamine from McClure. One ounce was for

Brick, one ounce was for Brett, and a half ounce was for Cory. Brick was a hundred dollars short for his purchase, but he persuaded McClure to sell him the drugs anyway by telling her that he had spoken with Undine about being short and Undine had approved it. This was not the truth. Tr. 59-60.

Brick's last trip to Sioux City to purchase drugs was on August 23, 2000. As was customary, Bitz drove Brick to Sioux City in her car. Brick had $800 from Brett to purchase a half ounce of methamphetamine and a half ounce of crack cocaine, and $800 from Cory to purchase an ounce of methamphetamine. Bitz drove Brick to a motel room, where they purchased the methamphetamine from Undine. They were unable to purchase the crack cocaine because Undine did not have any available. After Brick and Bitz left the motel, Bitz drove the wrong way on a one-way street, and they were stopped by the police on a traffic charge. Ultimately, the police found methamphetamine on Bitz, and she and Brick were arrested. At the time of the Kamerud trial, Brick was still in custody from this arrest.

Brett's attorney, Douglas Roehrich, cross-examined Brick. Brick testified he was twenty-three years old. He began using alcohol and marijuana at age fourteen, and meth-amphetamine at age seventeen. He was convicted of distributing LSD when he was eighteen years old, and was sent to prison. After he was paroled, he began using marijuana and methamphetamine again, but he lied about it to his parole officer. He was caught and his parole was revoked. After he again was paroled from prison, he went to live with his father, who found Brick a job. Brick used the money he earned from his job to buy drugs. He also stole power tools from his father and pawned them to get money to buy more drugs. He stole some business checks from his father and wrote them to a friend, who cashed them and gave the money to Brick to buy more drugs. Brick lied to his father about all of this.

Roehrich offered into evidence Brick's federal plea agreement. Def's Tr. Ex. B. Brick acknowledged that he knew if he had not cooperated with the Government, he would have faced a 151-month sentence. By the time of his testimony at the Kamerud trial, Brick's sentence had been reduced to 60 months. Brick was hoping for a further reduction based on his testimony. He knew that he would have to provide substantial assistance to the Government if he were to have any hope of receiving a further reduction in his sentence. He understood his plea agreement provided that any testimony he gave at trial would have to be truthful or he would not receive a reduction in his sentence. However, he also acknowledged that he had lied to his parole officer and to his father. Roehrich concluded his cross-examination by pointing out that neither Brett nor Cory was with Brick when he was arrested in Sioux City on August 23, 2000.

Cory's attorney, Martha McMinn, also cross-examined Brick. She questioned Brick about his South Dakota LSD distribution conviction. She pointed out that under Brick's plea agreement, he agreed to plead guilty to possession of methamphetamine with intent to distribute, and not to conspiracy. She discussed with Brick the nature of the relationship between Brett and Bitz, and between Brick and Bitz. Brick stated that Bitz originally was Brett's girlfriend, but about halfway through the trips to Sioux City in the summer of 2000, Bitz became his (Brick's) girlfriend. Brick testified he did not know if Brett ever found out about his relationship with Bitz. Brick acknowledged, however, that he and Brett got into an argument during one of the trips they took to Sioux City, and Brett asked him if he "was sleeping with his old lady." Tr. 82.

Brick told McMinn that Trent Kavosnika, Jenny Beckel, Ross Kelly, Jason Goggles, a "Jeff," a "Wade," and a "Shannon" all stopped by the Kamerud apartment that summer to buy drugs. Tr. 86. McMinn asked Brick whether his drug usage had affected his memory, and Brick replied that it had not. Tr. 81.

McMinn then showed Brick the following handwritten statement:

15

> I, Russell J. Brick, do swear of my own free will and not
> under durress [sic] or threat of bodily injury that I in no way
> did deliver or had intent to deliver or distribute or conspire to
> distribute with said defendants: Brett Kamerud Cory Kamerud
> in U.S.D.C. No. CR. 01-4060DEO Indictment, 500 grams or
> more of a mixture or substance containing methamphetamine
> at any time space entered into endictment [sic] or at any other
> time future past or present. Nor did I intend to deliver,
> conspire to deliver with any intent to distribute said metham-
> phetamine in my case No. CR00-4107-MWB filed in
> U.S.D.C./Northern District of Iowa Western Division on
> February 28, 2001 to Brett Kamerud and Cory Kamerud, nor
> did they have prior knowledge of said criminal charges against
> me.

Def. Tr. Ex. A. The statement was signed by Brick and witnessed by Brett. The statement had a signature line for "C.O. Tinklepaugh," but no signature by Tinklepaugh. McMinn asked Brick if the statement was true, and he responded that it was not. She asked him why he signed the statement if it was not true. Brick explained that he was brought to Sioux City to testify against the Kameruds before the federal grand jury, and he was taken to the Elk Point jail in South Dakota. He mistakenly was placed in the same cell block as the Kameruds. Brett saw Brick and asked what he was doing there, and then took a punch at him. To protect himself, Brick assured Brett he was not cooperating with the Government. When Brett asked him to write out a statement, he agreed, and proceeded to write what Brett told him to write. He was afraid if he did not comply, other prisoners would learn that he was cooperating with the Government and would make things difficult for him.

## 2. *Robert Tinklepaugh*

The next witness called by the Government was Robert Tinklepaugh, a jailer at the Elk Point jail. Tinklepaugh was shown the handwritten statement signed by Russell Brick, Def's Tr. Ex. A, and stated he had never seen the document before.

### 3.    *Jason Vonhaden*

The Government's next witness was Jason Vonhaden, the jail administrator at the Elk Point jail.  Vonhaden testified that Brick and the Kameruds were housed in the same cell block for a short period of time because of a paperwork mistake.  He had no knowledge of the handwritten statement by Brick.

### 4.    *Kurt Undine*

The Government's next witness was Kurt Undine.  Undine was serving a 150-month federal sentence for conspiracy to distribute methamphetamine.  He originally faced a sentencing range of 360 months to life, but he received a reduced sentence based on cooperation he provided to the Government pursuant to a plea agreement.  He was testifying against the Kameruds in hopes of receiving a further reduction in his sentence.

The prosecutor questioned Undine about his extensive criminal record.  Undine had two prior felony convictions for possession of methamphetamine, one prior conviction for theft, one prior conviction for burglary, several misdemeanor drug convictions, and numerous convictions on shoplifting charges.  Undine admitted that for many years, he had been a daily user of methamphetamine and had sold drugs to support his habit.

Undine was released from the South Dakota State Penitentiary on May 24, 2000, after serving a sentence on drug charges.  While in prison, he met and became friends with Russell Brick.  He told Brick he could provide him with methamphetamine at a "cheap" price, and he gave Brick a contact number where he could be reached.  After Undine and Brick both were released from prison, Brick contacted him and made arrangements to come to Sioux City to purchase methamphetamine.  Undine ordinarily only entered into large quantity drug transactions, but he sold methamphetamine to Brick in small quantities because of their friendship.  These transactions usually were for one or two ounces.  With most of his customers, Undine required payment in advance, but because of their

friendship, he made an exception for Brick and fronted drugs to him. Over the course of that summer, Undine conducted between eleven and thirteen drug transactions with Brick.

Brick usually came to Sioux City with Stacey Bitz. Bitz and Brett Kamerud came along on the first transaction. Cory Kamerud was present for two or three of the later transactions. During these transactions, Brick, Bitz, Brett, and Cory all would inject some of the methamphetamine before leaving Sioux City. On a few occasions, Undine was not around for a transaction, so his girlfriend, Bridget McClure, would deliver the drugs and collect the money for him.

Undine testified that at first, he had understood Brick was to be alone when he came to Sioux City to buy drugs. When Undine brought this up with Brick, Brick told him he needed to bring other people with him for these transactions because it was their money and they did not trust him.

On August 23, 2000, just before Brick and Bitz were arrested in Sioux City, Undine sold them two-and-a-half ounces of methamphetamine. They also had asked to purchase some cocaine, and had the money to do so, but Undine did not sell them any.

On cross-examination, Roehrich questioned Undine about his extensive criminal record, including convictions on drug, burglary, and theft charges. Undine admitted that after he was released from prison on May 24, 2000, he immediately began dealing drugs again. When he was indicted on federal charges, he agreed to cooperate with the Government.

Undine explained his understanding of the United States Sentencing Guidelines. He knew he originally faced a potential guideline sentencing range of 360 months to life. Undine entered into a plea agreement with the Government, Def's Tr. Ex. C, in the hope of receiving a reduced sentence. Undine knew that if he had not cooperated with the Government, he would have faced a sentence of at least 30 years in prison. By the time

of his testimony at the Kamerud trial, his sentence already had been reduced to 150 months.

McMinn asked one question on cross-examination: "Mr. Undine, after Russell Brick was arrested, did you ever see Cory Kamerud again?" Tr. 146. Undine answered, "No." *Id*.

### 5. *Bridget McClure*

The Government's next witness was Bridget McClure. McClure was 29 years old and was from Sioux City. She began using methamphetamine at age seventeen. She had a ten-year-old simple assault conviction, but no other record. She was awaiting sentencing after pleading guilty to the federal drug conspiracy charges pursuant to a cooperation plea agreement. She acknowledged that without a motion by the Government to reduce her sentence, she faced a sentence of between ten years and life in prison.

McClure has known Kurt Undine for about ten years. When Undine was released from prison in May 2000, he stayed in various motel rooms in the Sioux City area until McClure "hooked up with him" and he moved into her basement. Tr. 149. In late June 2000, she became aware that Undine was using methamphetamine, and she started using methamphetamine with him. She also helped him to sell methamphetamine.

About that time, McClure met Russell Brick, who had come to Sioux City from Aberdeen, South Dakota, to buy methamphetamine from Undine. Undine told McClure that he and Brick had been in prison together. Brick was accompanied on the trip by Stacey Bitz.

McClure was aware of four to six trips by Brick to Sioux City to buy methamphetamine from Undine. On two of these occasions, Undine was gone, so McClure handled the transactions for him. On the first transaction, Brick came to her house and bought "like an ounce and a half" of methamphetamine, but was "like a hundred dollars short." Tr. 153. Brick argued with her, and told her "to get ahold of Kurt [Undine]."

Tr. 154. In the second transaction, on or about July 4, 2000, Brick was accompanied by Bitz, Brett, and Cory. She sold them about an ounce of methamphetamine. McClure did not know Brett or Cory at the time, but later she was able to identify Brett from a photograph, although she was not able to identify Cory.

On cross-examination, Roehrich offered into evidence McClure's federal plea agreement. Def's Tr. Ex. D. McClure acknowledged that she knew if she did not cooperate with the Government, she would face a sentence of at least ten years in prison. She also understood that if she had no information to help the Government, she would not be eligible for a departure motion. She admitted she was testifying in the hope that the prosecutor would file such a motion.

### 6. *Stacey Bitz*

The Government's next witness was Stacey Bitz. Bitz was born and raised in Aberdeen, South Dakota, and was 24 years old. She graduated from high school in 1995. She had two convictions for driving while under the influence and three convictions for possession of marijuana. At the time of her testimony, she was under indictment on federal drug charges stemming from her arrest with Russell Brick in Sioux City on August 23, 2000. She had pled guilty to those charges and was awaiting sentencing. She faced a sentence of between 70 and 87 months, and she was cooperating with the Government in the hopes of getting a reduced sentence. She admitted she was a methamphetamine user, and that she has been Brick's girlfriend for a couple of months before their arrest.

Bitz heard Brick tell Brett and Cory that he had a source of supply in Sioux City. Beginning in June 2000, and continuing to August 23, 2000, Bitz and Brick regularly traveled from Aberdeen to Sioux City in Bitz's car to buy methamphetamine from Brick's source, Kurt Undine. They made about ten to twelve of these trips. Undine sometimes

was not available in Sioux City, and when that happened, they bought the drugs from Bridget McClure. Bitz accompanied Brick on all but one of the trips. Brett and Cory each came along three or four times, but after awhile, Brett refused to come along because he was afraid they would get pulled over by the police. Ross Kelly also came along once or twice. Brick, Brett, and Cory provided the money to buy the drugs.

On their return trips to Aberdeen, Bitz usually carried the methamphetamine in her panties to avoid detection if they were stopped by the police. After returning to Aberdeen, they usually went to the Kameruds' apartment to use some of the methamphetamine and divide up the drugs. Brick, Brett, and Cory all would use some of the drugs they had purchased, and then sell the rest. Ross Kelly, Quincy Carter, Kevin Rickster, Jason Goggles, and Geoff Baldridge were some of their customers. Tr. 178-79. According to Bitz, Brett was good at selling enough drugs to get his money back, but Brick and Cory were not.

On August 23, 2000, after buying methamphetamine from Undine, Brick and Bitz were arrested by Sioux City police officers for driving the wrong way on a one-way street. The officers discovered the methamphetamine, and arrested Brick and Bitz. Bitz was released on bond. After her release, Bitz made contact with Brett and Cory, and they continued to use methamphetamine together. Brett had been Bitz's boyfriend for three or four years after she had gotten out of high school, and they reestablished this relationship a couple of months after Bitz was released on bond. Bitz testified that Brett and Cory continued to sell methamphetamine until she went into custody again in June 2001. Throughout this time period, Brett never had a job. Cory sometimes worked at a hotel, and Bitz worked at a roofing company.

On cross-examination, Roehrich offered into evidence Bitz's "noncooperation" federal plea agreement, which she signed on May 14, 2001. Def's Tr. Ex. E. Bitz testified that after Brick and Undine began to cooperate, she decided she also would

cooperate. She knew if she did not cooperate with the Government, she faced a sentence of between 70 and 87 months in prison. She admitted she was testifying in the hopes of receiving a reduced sentence. She also admitted she had told several lies to the police when she was first arrested. Roehrich then stated, "So you lied that night, but today you're telling the truth." Tr. 194. She responded, "Yeah." *Id*.

On cross-examination, McMinn pointed out that in Bitz's plea agreement, she admitted that she had driven to Sioux City with Brick on several occasions to obtain methamphetamine, but she had never mentioned Brett or Cory. On redirect examination, the Government pointed out that when Bitz signed her plea agreement, Brett and Cory had not yet been charged.

### 7. *Robert Weinmeister*

The Government's next witness was Robert Weinmeister, a South Dakota Highway Patrol officer. On August 25, 2001, while patrolling in Aberdeen, Weinmeister observed some headlights underneath an overpass in an area that was closed for road construction. He waited for the vehicle to come out, and when it did not, he drove up to it. He determined that it was a Ford Taurus registered to someone named Menzel. He approached the vehicle and saw that there were three occupants. He spoke with them and learned the driver was Jenny Menzel, Brett Kamerud was sitting in the front passenger seat, and Cory Kamerud was sitting in the rear passenger area. Weinmeister took Menzel back to his patrol car and ticketed her for failure to obey a traffic control device and not having her driver's license in her possession.

While Weinmeister was ticketing Menzel, he called for assistance. Trooper Steve Marquardt arrived about ten minutes later. Marquardt took his dog around the vehicle, and the dog alerted for drugs. Marquardt searched the vehicle, and found drugs and drug

paraphernalia in a purse located in the center console. All three occupants of the vehicle were placed under arrest.

On cross-examination, Roehrich established that the items seized from the vehicle were located in a female's purse. McMinn had no questions for the witness.

### 8. *Steve Marquardt*

The Government's next witness was Steve Marquardt, a South Dakota Highway Patrol officer. Marquardt testified he arrived at the scene of the Menzel arrest exactly ten minutes after he was contacted by Trooper Weinmeister. When he arrived, a female was sitting in Weinmeister's vehicle and two males were sitting in the Menzel vehicle. Marquardt walked his drug-detection dog around the vehicle, and the dog alerted to the rear door seam of the right rear door. Marquardt had the two males get out of the vehicle, and he searched them and found nothing. He then searched the vehicle, and found a purse on the transmission hump in the front seat area. In the purse, he found eight individually-packaged bags containing illegal drugs, eight syringes, a knife, a spoon, a scale, and a box cutter.

On cross-examination, Roehrich confirmed that the drugs and the paraphernalia all were found in the female's purse, and nothing was found in searches of the two males. Roehrich also brought out that the state charges against the Kameruds arising out of this incident were dismissed. In response to questions from McMinn, Marquardt testified that Aberdeen has a population of about 26,000, and Cory Kamerud was wearing lightweight clothing at the time of his arrest and was not wearing a coat. On redirect, Marquardt testified that although the charges against the Kameruds were dismissed, they later were reinstated and were pending at the time of the Kamerud trial.

## 9.    *Michael Hill*

The Government's next witness was Michael Hill, a Drug Enforcement Administration officer assigned to the Tri-State Drug Task Force in Sioux City, Iowa. He testified as an expert witness, and explained how methamphetamine is manufactured, used, and distributed.

## 10.    *Craig Price*

The next witness for the Government was Craig Price, an employee of the South Dakota Division of Criminal Investigation in Aberdeen, South Dakota. Price testified by deposition.

In June 2001, Price participated in surveillance of Brett's and Cory's apartments in Aberdeen.[4] On June 8, 2001, he observed Stacey Bitz and Billy Oldenkamp come and go from Brett's apartment on different occasions, both together and separately. On one occasion, Oldenkamp arrived at the apartment in a vehicle belonging to a "William Menzel." On another occasion, he observed Cory leave his apartment and go to Brett's apartment. During the surveillance, he also observed a number of individuals make short visits to Brett's apartment.

Later in June, Price was called to assist the Aberdeen Police Department after Brett and Cory had been evicted from their apartments and the landlord had found suspected drug paraphernalia in the apartments. The items included a jar taken from Cory's apartment that contained pseudoephedrine; a snort tube, also taken from Cory's apartment, that contained residue amounts of pseudoephedrine and methamphetamine; and a plastic tube taken from Brett's apartment that contained residue amounts of methamphetamine and marijuana.

---

[4]At that time, Cory was living in the basement apartment, but Brett had moved to an upstairs apartment.

Price also testified about sending items seized during the search of the Menzel vehicle on August 25, 2001, to the laboratory for analysis. He testified that because of the way the baggies had been handled, fingerprint analysis of the baggies would have been useless. According to the laboratory, the baggies contained a total of 5.65 grams of pseudoephedrine and methamphetamine. Price testified that based on his training and experience, a gram bag of methamphetamine would sell in Aberdeen for between $90 and $110.

Price also was involved in a consent search of Jenny Menzel's residence after her arrest on August 25, 2001. During a search of her room, he found baggies with the corners cut off, which was consistent with their having been used in the packaging of controlled substances. On cross-examination by Roehrich, Price stated that during the search of Menzel's room, he also found letters from Billy Oldenkamp, and notebooks that were consistent with the types of records used in the distribution of methamphetamine.

Price testified he was involved in debriefing Billy Oldenkamp in July 2001, and again on August 25, 2001.

## 11. _Troy Boone_

The Government's next witness was Troy Boone, an employee of the South Dakota Division of Criminal Investigation assigned to the Tri-State Drug Task Force in Sioux City. Boone participated in the debriefings of Russell Brick, Stacey Bitz, Kurt Undine, and Bridget McClure. He testified that these witnesses all identified Brett Kamerud and Cory Kamerud from driver's license photographs. On cross-examination by Roehrich, Boone acknowledged that he had debriefed Billy Oldenkamp.

## 12.    _Billy Oldenkamp_

The Government's next witness was Billy Oldenkamp.  Oldenkamp was 17 years old, and was in the custody of South Dakota juvenile authorities.  He had last been arrested on July 9, 2001, when he failed to check in with his supervising juvenile officer and left the state.  At the time of his arrest, he was in possession of various drugs.  After his arrest, Oldenkamp provided a statement to Agent Craig Price, but about a week later, he wrote a letter to Price recanting his statement.  Later, in October 2001, Oldenkamp provided another statement to law enforcement in exchange for an agreement by South Dakota state authorities to drop their efforts to move pending juvenile charges against him to adult court.  Oldenkamp understood that if he had been transferred to adult court, he likely would have been required to go to prison instead of remaining in the custody of juvenile authorities.

Oldenkamp testified he has been involved in the use of illegal drugs since age 10.  He has used methamphetamine, OxyContin, heroin, and LSD.  He also has taken medication for ADHD and to help him sleep.  To fund his illegal drug habit, he has sold various drugs.  Over the years, he has had a number of different customers and sources of supply.  He was not taking any drugs or medication at the time of his testimony.

Oldenkamp started "hanging out" with Stacey Bitz in February 2001.  Tr. 270.  Bitz also would hang out with Brett Kamerud, Cory Kamerud, and Russell Brick.  Oldenkamp already knew Cory because about a year-and-a-half earlier, for about three months, both Oldenkamp and Cory had lived with Oldenkamp's sister in an apartment in Sioux City.  Oldenkamp met Brett through Cory.

Oldenkamp testified that the Kameruds, Brick, and Bitz made trips to Sioux City to obtain methamphetamine, "probably about I believe in 2000, around there, '99."  Tr. 272.  On two or three different occasions, Oldenkamp saw Brett and Cory provide Bitz and Brick with money to purchase drugs.  He saw Bitz and Brick come back from getting drugs

in Sioux City five to ten times. Brett, Cory, Bitz, and Brick told Oldenkamp that Brick and Bitz would go to Sioux City to get the drugs, but usually with Brett's and Cory's money. Oldenkamp was told they went about once a week.

Bitz received an eightball for transporting the drugs, and whoever put in money would get their cut of the drugs. Brett, Cory, and Brick would use some of the drugs they purchased and would sell the rest. Brett would sell about half the drugs he received, but Cory would use most of his.

Oldenkamp saw both Brett and Cory sell methamphetamine. He testified he was Brett's main customer, and he identified Bitz, Larry Wenger, Jeff Bolcher,[5] and Jason Goggles as others customers of Brett's. Tr. 281-285.

Shortly before Brick and Bitz were arrested in Sioux City on August 23, 2000, Oldenkamp was arrested. He was released from custody in February 2001. In about March, he started hanging out again with Brett and Cory, mainly at Brett's and Cory's apartments. After awhile, he started using methamphetamine again, some of which he got from Brett and Cory. He testified he got methamphetamine "quite a bit" from Brett, but only about ten times from Cory. Tr. 279. In total, during this time period, he got about three or four ounces from Brett, and "not even a quarter ounce" from Cory. Tr. 280. Oldenkamp continued to get drugs from Brett and Cory until July 9, 2001, when he again was arrested.

During this period of time, Oldenkamp also was a supplier of methamphetamine to Brett and Cory. He provided Brett with "four ounces or so," and he provided Cory with "probably about a half ounce." Tr. 282.

During his testimony, the following exchange occurred with the prosecutor:

> Question:     Do you know a person by the name of Jeff Bolcher?

---

[5]From the record, it appears that references at the trial to a "Jeff Bolcher" are to Geoff Baldridge.

27

| Answer: | Yes, I do. |
| Question: | And who was he to any of these people? |
| Answer: | I believe he met Brett in prison or something like that. |

*Id.* Immediately after this exchange, Roehrich asked for a sidebar conference. Tr. 283. Roehrich objected to the fact that Oldenkamp had testified Bolcher had met Brett in prison. The prosecutor stated the witness had been instructed not to mention that fact, and explained, "I'm not dealing with a scientist here." *Id.* Judge Longstaff told Roehrich he would do whatever Roehrich requested to address the problem. Roehrich asked the judge to strike the statement from the record and tell the jury to disregard the testimony. The judge complied with this request. Tr. 284.

Roehrich cross-examined Oldenkamp. Oldenkamp testified that sometime between February and July 2001, he was hiding from the police when he swallowed 62 hits of LSD. This was shortly after he had been high on methamphetamine. After that, he hallucinated for about two months straight. On July 11, 2001, while in a South Dakota jail, Oldenkamp gave a statement to Agent Craig Price. He later wrote a letter to Price stating that everything he said in his statement was untrue. Def's Tr. Ex. F. After that, in October 2001, Oldenkamp gave another statement, this time to Officer Boone. This statement was in exchange for an agreement by South Dakota state juvenile authorities that they would not waive charges pending against him in juvenile court to adult court. Oldenkamp knew that in adult court he would face a sentence of up to 40 years in prison, while in juvenile court he would simply be monitored until he reached age 21. According to Oldenkamp, the statement he made to Boone was true. Tr. 290.

Oldenkamp admitted to Roehrich that he did not like the Kameruds. He did, however, like Jenny Menzel. In fact, he wrote her a love letter on July 18, 2001. Def's Tr. Ex. G. In a second letter to Menzel, on August 2, 2001, Def's Tr. Ex. H, Oldenkamp

expressed jealousy and rage toward Brett. Oldenkamp testified he had no memory of writing the letter. Oldenkamp's testimony on this subject was highly evasive.

Roehrich proceeded to cross-examine Oldenkamp about other subjects, and seriously eroded his credibility. Tr. 295-300. McMinn also strongly questioned Oldenkamp, ending her cross-examination by extracting an admission from Oldenkamp that he was hallucinating during the same time period when, according to his testimony, the Kameruds were selling drugs. Tr. 300-310.

### 13. *Cynthia Orton*

Cynthia Orton, a fingerprint analyst, testified for the Government. She testified she was not able to identify any fingerprints from the evidence submitted to her in this case.

At this point, the Government rested its case. Tr. 321.

Before presenting evidence on behalf of Cory Kamerud, McMinn advised the court of a witness problem. She stated,

> Jenny Menzel was – she's a juvenile. Her mother was notified
> Monday that she needed to be here today [Wednesday]. They
> were given where they could stay, who to contact. I just got
> a phone call from Jenny Menzel who said her mother told her
> it was tomorrow, and so they didn't come.

Tr. 325. Judge Longstaff advised the parties that he was scheduled to be back in Des Moines, Iowa, that evening, and asked for suggestions. McMinn asked if she could submit an affidavit from Menzel in lieu of her testimony, but the prosecutor objected. Judge Longstaff suggested two other possible ways to address the problem: (1) McMinn could submit the affidavit, but make Menzel available for cross-examination by telephone; or (2) the parties could take Menzel's testimony by telephone. Tr. 326, 347. McMinn decided to have Menzel testify by telephone, and both Roehrich and the prosecutor eventually agreed to this procedure.

McMinn had reserved her opening statement at the beginning of the case, but then she waived opening statement before presenting her evidence.

## 14.   *Cari Romeo*

As Cory's first witness, McMinn called Cari Romeo, age 22. At the time of her testimony, Romeo was serving a sentence in the South Dakota Women's Prison for theft by deception. She has known Cory and Brett since 1999, and Russell Brick since age 14. She testified Brick had a poor reputation for truthfulness, and would blame others when he got in trouble.

Romeo was Cory's on-and-off girlfriend beginning in January 2000. She moved in with him in February 2001. She never saw Cory dealing drugs, and never saw people coming to his apartment to buy drugs.

She met Billy Oldenkamp after she moved in with Cory. She bought some drugs from Oldenkamp. She has known Stacey Bitz since 1999, and saw her visit Brett's apartment frequently. Romeo did not get along with Brett or Bitz. She met Jenny Menzel, and had the impression Menzel was Oldenkamp's girlfriend.

On cross-examination, Romeo admitted she has been using drugs since age 14, and she has seen Cory use methamphetamine.

## 15.   *Ross Kelly*

McMinn next called Ross Kelly as a witness. Kelly testified that Russell Brick's reputation for truthfulness was "nonexistent." Tr. 345.

## 16.   *Ryan Rathert*

Cory's next witness was Ryan Rathert, who testified that Brick had a reputation for not being truthful.

## 17.  *Jenny Menzel*

Cory's next witness was Jenny Menzel, who testified by telephone from South Dakota. She testified the drugs found in her purse on August 25, 2001, belonged to her, and had not been provided to her by Cory or Brett Kamerud. That evening, she had fought with her parents, and ran out of the house with her purse. She had not recalled that the drugs were in the purse. She had no plans to use the drugs with Cory or Brett.

Menzel used to date Billy Oldenkamp. She recalled that Oldenkamp went into custody on her birthday, July 5, 2000. She received a letter Oldenkamp wrote to her on August 2, 2001. Def's Tr. Ex. H. Oldenkamp was angry at her because she was involved with Brett Kamerud.

On cross-examination by the Government, Menzel testified that she was 17 years old. She had been Brett Kamerud's girlfriend since the middle of July 2001. She admitted she used methamphetamine until the day she was arrested, August 25, 2001, but she denied that she ever used drugs with Brett or Cory. Roehrich did not ask her any questions.

## 18.  *Brian Locke*

Cory's last witness was Brian Locke, an employee of the Brown County Sheriff's office in Aberdeen, South Dakota. He testified Brown County records reflected that Billy Oldenkamp was in the Brown County juvenile detention center from July 5, 2000, to July 7, 2000, and then was released to the State Training School. Tr. 363-64. Oldenkamp was again admitted to the Brown County juvenile detention center on July 17, 2001, and then was released on July 27, 2001. Tr. 365.

After this testimony, all parties rested. Roehrich called no witnesses on behalf of Brett Kamerud.

## B. Section 2255 Hearing Evidence

### 1.    Russell Brick

At the hearing on the defendants' section 2255 motions, Brett Kamerud's attorney, Jay Denne, called Russell Brick as his first witness.  Denne showed Brick a DEA report of an interview with Brick on January 9, 2001, Def. Hr. Ex. JJ, and asked Brick if the report was accurate.  Brick pointed out several errors in the report.  Denne then showed Brick a transcript of his testimony before the grand jury, Def. Hr. Ex. II, and asked if it was complete and accurate.  Brick responded that it was.

Brick testified he did not know Billy Oldenkamp.  He did not recall taking any trips to Sioux City without Brett's knowledge.

Brick acknowledged that he had had a romantic relationship with Stacey Bitz in 2000, and she had lied to him when she told him she had broken up with Brett.  On one of Brick's trips to Sioux City with Brett, Brett asked Brick if he was sleeping with Bitz, and Brick told Brett that he was.  Brick explained that Bitz had told him she and Brett had broken up.

On cross-examination by the prosecutor, Brick stated that prior to the hearing, he had never seen Exhibit JJ, the DEA report of his interview.

### 2.    Jenny Menzel

Denne's next witness was Jenny Menzel.  She testified that neither Brett nor Cory had ever purchased methamphetamine from her, and to her knowledge, they did not sell methamphetamine.  According to Menzel, she had purchased the drugs the police found in her purse on August 25, 2001, in Sioux Falls on the day before her arrest.  After she was arrested, she was interviewed by Detectives Craig Price and Brian Locke, and she told them the drugs belonged to her.  They tried to get her to blame the Kameruds for the meth-amphetamine, but she told them repeatedly that she took full responsibility for the drugs

and the Kameruds did not even know the drugs were in her purse.  She gave an affidavit to that effect to the lawyer representing Brett on the South Dakota charges, and provided a copy of the affidavit to Brett's and Cory's attorneys in the federal case.  *See* Def. Hr. Ex. RR.

Menzel testified that she had known Billy Oldenkamp for a number of years before she had met either Brett or Cory.  When the detectives searched her house after her arrest, they took some letters Oldenkamp had written to her.  She testified that Oldenkamp never sold drugs to Brett, and she would have been in a position to know of any such transactions because she was with Oldenkamp all the time during that period.  She stated that Oldenkamp did not even know Brett or Cory before April 2001.

Prior to the Kamerud trial, Menzel was contacted by Cory's attorney, but not by Brett's.  After Brett and Cory were convicted on the federal charges, she wrote a letter to Judge Longstaff.  *See* Def. Hr. Ex. PP.

Pamela Wingert, Cory's lawyer at the section 2255 hearing, had Menzel explain the confusion that led to her not appearing in person in Sioux City to testify at the Kamerud trial.  Menzel testified that when she spoke with McMinn to prepare for her testimony, McMinn suggested she might want to "plead the Fifth," but Menzel told her she did not want to because it would look bad for Brett and Cory.  Hr. Tr. 36[6].  Menzel's attorney in state court also had advised her not to testify in federal court or to give an affidavit because of the risk that she could be prosecuted in federal court, but she did not follow his advice. Menzel stated she never received a subpoena to testify at the Kameruds' trial, although she agreed to appear and testify.

On cross-examination, the prosecutor pointed out that Menzel had, in fact, testified in the Kamerud trial by telephone, and during her testimony she stated the drugs in her purse were hers and neither Brett nor Cory had anything to do with them.  She made it

---

[6]References to "Hr. Tr." are to the transcript of the section 2255 hearing.

clear to the officers from the time of her arrest, and continuously thereafter, that the drugs found in her purse were hers and not Brett's or Cory's.

Menzel testified that she had had a relationship with Billy Oldenkamp for a couple of months beginning in March or April 2001. In fact, in May 2001, Oldenkamp had gotten her started using drugs. Menzel continued to see Oldenkamp after he was arrested on July 9, 2001, but she stopped seeing him when she learned he had stolen $2,000 from her to buy drugs. Hr. Tr. 37. She then started seeing Cory as a friend, and she later became Brett's girlfriend. She had no knowledge of what the Kameruds were doing in the summer of 2000.

### 3.  *Stacey Bitz*

Denne's next witness was Stacey Bitz. Denne questioned Bitz about a statement she had given to officers Troy Hansen, Craig Price, and Brian Locke on or about August 28, 2001. *See* Def. Hr. Ex. NN. She stated she had reviewed the statement and it was accurate. She testified she knew Billy Oldenkamp, and he was not around during any of the trips to Sioux City in the summer of 2000. She first saw Oldenkamp with the Kameruds in the summer of 2001.

Denne questioned Bitz about a letter she wrote to Brett on May 17, 2006. *See* Def. Hr. Ex. MM. In the letter, Bitz stated she had been mad at Brett for cheating on her, and she was sorry for what she had done. She clarified during her testimony that she was angry with Brett because he was seeing Jenny Menzel. In the letter, she also stated she had called the prosecutor and advised him that Billy Oldenkamp had lied. At the hearing, she admitted she had not, in fact, contacted the prosecutor about Oldenkamp lying, although she stated that Oldenkamp had lied about going to Sioux City with them in the summer of 2000. Bitz stated she did not even meet Oldenkamp until after the trips to

Sioux City that summer. Hr. Tr. 49. Bitz also testified she did not recall making any trips to Sioux City to purchase methamphetamine without the knowledge of Brett or Cory.

Bitz was never interviewed by the attorneys for Brett or Cory before her testimony at the Kamerud trial. She denied that anyone from law enforcement had ever told her to testify falsely at the trial.

In response to questions by Wingert, Bitz confirmed that she entered drug treatment in 2001. Bitz also admitted she wrote a letter to Cory to apologize for testifying against him.

In response to a question by the prosecutor, Bitz testified she was first provided with a copy of her statement, Def. Hr. Ex. NN, in the hallway just before the hearing that day. She had never seen it before. She testified she wrote the letter to Brett, Def. Hr. Ex. MM, because he had written her several harassing letters asking her to change her testimony.

### 4. _Geoff Baldridge_

Denne next called Geoff Baldridge, an inmate in the South Dakota State Penitentiary. Baldridge was serving a sentence after being convicted on state drug charges. He had been in prison continuously since December 25, 1999, except for the period between May 9, 2000, and about October 31, 2000. He testified he was good friends with Brett and Cory, and they had hung around together while he was out of custody in 2000. During that time period, Baldridge was at the Kameruds' apartment almost every day for several hours each day. Stacey Bitz and Russell Brick came to the apartment on occasion. When they came, Brett would go into his room and stay away from them.

Baldridge testified that Brett and Cory were not selling drugs that summer, although they both were methamphetamine users. He never bought methamphetamine from them. He testified that Cory was too much of a junkie to sell anything.

Baldridge stated that Brick had a reputation as a liar, thief, and back stabber, and Brick was the only person selling methamphetamine at the Kameruds' apartment. He was selling to Brett, Cory, and Baldridge.

Baldridge recalled an occasion when Bitz and Brick disappeared that summer, and he called around and eventually learned they had been arrested in Sioux City. Baldridge did not know Billy Oldenkamp, and has never seen him before. Baldridge was never contacted by Brett's or Cory's attorneys about testifying at the Kamerud trial.

The prosecutor brought out on cross-examination that Baldridge had an extensive criminal record, most of it involving the distribution of drugs, usually methamphetamine. Baldridge testified that he, Brett, Cory, and several other people bought methamphetamine from Brick at the Kameruds' apartment and then used the drugs there.

### 5. *Debra Menzel*

Denne's next witness was Debra Menzel, Jenny Menzel's mother. When Jenny was arrested on August 25, 2001, Debra was called, and she went down to the juvenile detention center to talk with her daughter. Jenny told her that the drugs the police found in her purse belonged to her. Debra believed that Detectives Craig and Locke were present when Jenny made these statements.

Debra identified a letter she wrote to Judge Longstaff in December 2001, in which she explained what had happened on the day Jenny was supposed to come to Sioux City to testify. *See* Def. Hr. Ex. QQ. A large part of the problem was that a severe snow storm in South Dakota made travel unadvisable. Debra testified she has never "officially" met Brett or Cory. Hr. Tr. 78.

Denne also questioned Debra about odometer readings her husband took from Jenny's car just before the weekend of her arrest and again after her arrest. Jenny put about 460 miles on her vehicle that weekend. Debra testified the round-trip distance

between Aberdeen and Sioux City is 560 miles, which was consistent with a representation by Jenny that she had purchased the methamphetamine in Sioux Falls, South Dakota, and had not traveled to Sioux City, Iowa.

### 6.    *Bill Menzel*

Denne's next witness was Bill Menzel, Debra's husband and Jenny's father. He provided no meaningful testimony.

### 7.    *Larry Wenger*

Denne called Larry Wenger as his next witness. Wenger had known Brett for five or six years. In about 2000, he regularly went to Brett's apartment so they could play guitar music together. Wenger was at the apartment once or twice a month for an hour or so each time. He never saw anyone use or sell methamphetamine at the apartment. He did not know Russell Brick, but he did know Stacey Bitz. He thought Bitz was Brett's girlfriend. Other than Bitz, he never saw anyone else at Brett's apartment during the five or six months he went over to the apartment.

Wenger never purchased methamphetamine from Brett. In fact, he denied using any illegal drugs. He was never contacted by anyone and asked to testify at the Kamerud trial.

### 8.    *Ross Kelly*

Denne's next witness was Ross Kelly. Kelly was a witness at the original trial, but testified only concerning Russell Brick's lack of credibility. Before being questioned at the section 2255 hearing, Kelly exercised his rights under the Fifth Amendment. In response to questions by the prosecutor, Kelly stated that his testimony at the original trial was limited to Brick's lack of credibility because he had told Cory's counsel he would exercise his rights under the Fifth Amendment if he was questioned about other subjects.

## 9.    *Brett Kamerud*

Brett Kamerud testified at the hearing on his own behalf.  Denne's first question to his client was, "Mr. Kamerud, did you want to testify at your trial?"  Hr. Tr. 139.  Brett's response was "Yes, I did."  *Id*.

Brett stated that before the trial, he met with his attorney, Douglas Roehrich, at Roehrich's office, and asked whether his prior drug distribution conviction was going to be brought up if he testified.  According to Brett, Roehrich responded, "No," explaining that the conviction was too old and involved a different drug, LSD.  One evening during trial, Brett and Cory talked with Ross Kelly about how the trial was going, and Brett and Cory decided they were going to testify.  Hr. Tr. 139.  The next day, Brett told Roehrich he had decided to testify, and Roehrich told him to "wait a second."  Hr. Tr. 140.  Roehrich left, presumably to speak with the prosecutor, and then returned and said, "You can't testify; you're going to be convicted on your priors alone."  *Id*.  Brett testified, "I didn't know anything about the law.  I didn't know that it was my right that I could have said, No I am testifying; I don't care if the prosecutor's bringing out my priors.  I was given the impression that I couldn't testify."  Hr. Tr. 141.  According to Brett, Roehrich never interviewed him to determine what his testimony would have been.  "I think his – his whole thing was if you got priors you don't testify.  That's his policy.  That's what I got from him."  Hr. Tr. 144.

Brett testified he moved into his apartment in Aberdeen on June 9, 2000.  Cory was living in the Sioux City area at the time.  Brett talked Cory into moving in with him to share the rent.  Cory moved in with Brett in the middle of June 2000.  Later, Brett and Cory went to South Sioux City, Nebraska, to pick up a friend of Cory's and bring him back to Aberdeen to "hang out" with them for a while.  Hr. Tr. 145.

On July 3 or 5, 2000, Brett decided to take Cory's friend back to the Sioux City area.  He did not think Cory's car would make it, so he asked Stacey Bitz if they could

take her car. Russell Brick was present when they were discussing these travel arrangements, and Brick told them he knew someone in Sioux City who could get them some methamphetamine. Brett testified, "I'm like, well, whatever, you know." *Id*. Brett, Bitz, Brick, and Cory's friend then left for Sioux City.

When they got to Sioux City, Brick got in touch with his contact, Kurt Undine. They met Undine in a supermarket parking lot in Sioux City. Bitz and Brick got in a car with Undine and left. Brett took Cory's friend to Nebraska, where Brett purchased some marijuana and then dropped his passenger off. Brett testified, "my whole purpose for going down there was getting marijuana." Hr. Tr. 146. Brett then called Brick, and Brick gave him directions to a house in Sioux City. Brett went to the house, and he and Brick went into the basement, where they met with Undine. Bitz and Brick also were in the basement, using methamphetamine. Bridget McClure, Undine's girlfriend, was upstairs with her children. Brett bought a half ounce of methamphetamine from Undine, and used some of it. He did not see Brick buy anything. Later, Brett, Bitz, and Brick returned to the Kameruds' apartment in Aberdeen. Brick left, and Brett went to his room and weighed his methamphetamine.

Brett testified they made a total of eight trips to Sioux City to buy methamphetamine that summer. He was involved in the first three trips. The second trip was about a week after the first one, and he went along with Bitz and Brick. Brett bought a half ounce of methamphetamine and some marijuana. When they returned to the Kameruds' apartment in Aberdeen, someone came to the apartment looking for Brick. Brett told Brick that he had his own house, and if he wanted to sell methamphetamine, he would have to do it there rather than at the Kameruds' apartment. After that, Brick sold his drugs elsewhere, unless he was selling it to Brett or Cory "or something along those lines." Hr. Tr. 148-49. Brett and Brick went on the third trip, and during this trip, Brett and Brick discussed Brick's relationship with Bitz. Bitz and Brick took the fourth trip by themselves. Brick, Bitz, and

Cory went on the fifth and sixth trips. Bitz and Brick took the last two trips by themselves. Brett never got more than a half ounce of methamphetamine from these trips, and he only bought drugs for his personal use. Before the last trip, he gave Brick $200 for an eightball of methamphetamine, and he gave Bitz $100 to buy some cocaine for him.

Brett testified he was in California and Arizona for the first three months of 2001, and he did not meet Billy Oldenkamp until after he returned to South Dakota.

Brett first met Roehrich at his arraignment on August 8, 2001. Roehrich left immediately after the arraignment, so Brett had no chance to speak with him. He had no further discussions with Roehrich until after he was arrested with Cory and Jenny Menzel in South Dakota on August 25, 2001. Brett called Roehrich to tell him about the arrest, and Roehrich told him the incident required a continuance of the trial, which was then set to commence October 1, 2001. Brett did not want to agree to the continuance, but Roehrich persuaded him to agree to it. Brett testified he believes the continuance gave the Government time to find additional witnesses, and to file the superseding indictment and section 851 notice. Hr. Tr. 156.

Roehrich never reviewed the Government's discovery file with Brett, although Martha McMinn, Cory's attorney, provided Brett with a copy of the file. Hr. Tr. 178. Brett gave Roehrich a list of tasks to perform to prepare for trial, in the form of notes and a letter. *See* Def. Hr. Exs. GG & HH. When Brett met with Roehrich about these proposed tasks, Roehrich was dismissive and seemed uninterested.

Brett asked Roehrich to contact a number of witnesses, including Amber Miller, Kim Ackerson, Larry Wenger, Kevin Richter, Geoff Baldridge, Jenny Beckel, and Jenny Menzel, but Roehrich did not contact any of them. *See* Hr. Tr. 162, 165, 169, 177. Roehrich did not want to call any witnesses, not even Jenny Menzel. When Brett asked Roehrich about these witnesses, he responded that "these people aren't going to say what we want them to say." Hr. Tr. 181. "Roehrich's whole deal was they [the Government]

got nothing; there's no evidence; I will impeach them; don't worry about it; there's nothing to worry about; they never caught you with anything." Hr. Tr. 180.

Brett testified he wanted to attend the deposition of Craig Price, but he could not because he needed to attend a preliminary examination in South Dakota state court. Hr. Tr. 303. Roehrich told Brett that he should be present for the deposition, and Brett told him he could not attend. Hr. Tr. 304. There was no discussion about rescheduling the deposition. Hr. Tr. 304-05.

### 10.    *Kimberly Ackerson*

Pamela Wingert, Cory's attorney, called Kimberly Ackerson as a witness. In the 2000-2001 time frame, Ackerson was Stacey Bitz's best friend. She and Bitz would "hang out" at the Kamerud apartment almost every day. Hr. Tr. 92. She never saw Brett or Cory sell methamphetamine during that time. When Denne questioned Ackerson, she testified she was assaulted by Bitz after telling Brett that Bitz and Brick were having a relationship. Ackerson knew Russell Brick, and believed he was not trustworthy.

Ackerson moved to Arizona in November 2000, and Bitz wrote several letters to her saying that "she was going to be doing what she had to not go to jail." Hr. Tr. 93. Ackerson gave this information to Brett and Cory before their trial, and told them she would be available to testify. She was contacted by a man from Cory's lawyer's office and she told him what she knew, but she was not asked to be a witness at trial.

Denne asked Ackerson if she knew Billy Oldenkamp, and she testified she did not know him.

In response to cross-examination by the prosecutor, Ackerson stated there was a lot of methamphetamine being used at the Kamerud apartment while she was there, mostly by injection, and she participated in this usage. She did not know how the methamphetamine

got to the apartment. No one talked about how the drugs arrived there, and she never saw money change hands.

## 11.     *Wendy Kamerud*

Wingert's next witness was Wendy Kamerud, the mother of Brett and Cory. Wendy was present for most of her sons' trial, and she observed that Cory was not happy with the performance of his attorney. Both Brett and Cory wanted to testify because "they had a lot to say, but they were getting kind of pushed down on that idea for whatever the reasons were." Hr. Tr. 105. Cory and Brett both told her their lawyers had told them they could not testify at trial.

Brett and Cory wanted their lawyers to offer into evidence the video recording of the arrest of Brett, Cory, and Jenny Menzel on August 25, 2001, but McMinn told them she did not want to because it showed Brett and Cory acting belligerently. When Wendy eventually watched the video, she was upset because she did not believe it showed Brett or Cory acting belligerently.

## 12.     *Brian Kamerud*

Wingert next called Brian Kamerud, the father of Brett and Cory. Brian testified that before the trial, Brett and Cory got together and typed a letter setting forth how they felt the case should be defended. *See* Def. Hr. Ex. H. Brian sent the letter to McMinn. He also testified that Brett and Cory were not satisfied during the trial with the way they were being represented. They would tell their lawyers how they thought the witnesses should be handled, and would write out questions for their attorneys to ask, but the attorneys apparently were not following their suggestions. He heard McMinn speaking with Cory, and she told him he did not have much to worry about because the Government did not have a good case.

<u>**13.**</u>     <u>*Cory Kamerud*</u>

Cory Kamerud testified on his own behalf.  When he met with his lawyer, Martha McMinn, to prepare for trial, Brett was usually present.  McMinn never told him this might create a conflict of interest.

Cory did not recall specifically discussing with McMinn the possibility of pleading guilty, but he did recall generally some discussions about this topic.  "The gist of what she told me was if you cooperate, you will get less than ten years.  If you don't, you will get around ten years, and if you take it to trial, you might get more than ten years."  Hr. Tr. 199.  She never mentioned the possibility of his cooperating against his brother Brett.

She also never discussed with Cory the sentencing guidelines or the mandatory minimum penalties.  The first time he heard of the 20-year mandatory minimum was at the arraignment on the superseding indictment.  Even by the time of his sentencing, he still did not understand he was facing a 20-year mandatory minimum sentence.

When Cory reviewed the Government's discovery file with McMinn, he asked her for her evaluation of the Government's case.  She responded, "They really don't have a whole lot of evidence on you.  I'm surprised you were indicted.  It looks like a pretty weak case."  Hr. Tr. 202.

Cory knew that Brick was going to identify people who allegedly bought drugs from him.  Cory told McMinn he never sold drugs to these people, and he asked her to talk with them about testifying at the trial.  None of them were called as witnesses.

Wingert asked Cory if he talked with McMinn about whether he should testify at trial.  He explained:

> I'll be completely honest.  Initially I thought we could get things out through our witnesses.  I watched enough law shows to know that juries look at the guy who sold drugs in the past and that maybe yeah, well, he could do it again.  I understood that.  So I told her I didn't – it wasn't that I didn't want to

testify. It's just that I thought the prior might be bad initially. I said, But, however, it depends on how the case is going. If the case is really going bad and I have to testify, especially when it comes to my ideas and my testimony about what drug amounts were involved that would bring me down below that 500 grams, if they're gong to find me guilty anyway – I saw that look on a couple jurors' faces during the trial, especially when Billy and Jen – you know, the Jenny thing was coming out. They were looking over there like you guys are some scoundrels. So I'm like, I need to get my side of the story out. It's never – they're never going to hear – I felt that I would have been a more believable witness than Russ Brick.

Hr. Tr. 209-10. According to Cory, McMinn never prepared him to testify at trial. When the case started going badly, he again talked with her about testifying, but, "She said I couldn't basically. I mean, I wasn't really given much of an option." Hr. Tr. 213. She never discussed with him his right to choose whether or not to testify. Hr. Tr. 214. He had the impression he did not have that right.

When Cory sat down to meet with McMinn the night before trial, she was angry with him for being late, and they had no meaningful discussions. She waived opening statement at the beginning of the case, and when he asked her why, she told him she would give it later, after she heard what the Government had to say. However, after the Government rested, she again waived her opening statement. She did not explain to Cory why she did this.

In response to a question from Denne, Cory stated that during the trial, he heard Brett tell Roehrich he wanted to testify, and he heard Roehrich respond, "You cannot testify." Hr. Tr. 226-27.

### 14. _Douglas Roehrich_

The Government's first witness was Douglas Roehrich, Brett's trial attorney. Roehrich testified that before trial, he investigated the Government's discovery file and

discussed his investigation with his client. He developed a defense strategy of (1) focusing on the fact that "the government's case was made up primarily of cooperating witnesses," and (2) impeaching the credibility of these witnesses based upon their prior criminal histories and the fact that they all had something to gain from testifying against his client. Hr. Tr. 243. During trial, he followed other strategies. He emphasized the lack of evidence to corroborate the testimony of the Government's cooperating witnesses. He pointed out that his client was not present when Brick and Stacey Bitz were arrested with drugs in Sioux City, and neither Brett nor Cory was ever found with any drugs. To discredit Russell Brick, he focused on the fact that Brick was dishonest in his dealing with his father and with his probation officer.

Roehrich consulted with Cory's trial counsel, Martha McMinn, about the testimony of Jenny Menzel, and he left it to McMinn to arrange for Menzel to testify at the trial. In response to Brett's claim that he wanted Roehrich to call Menzel's parents as witnesses at trial, Roehrich testified Brett never asked him to do this.

Roehrich commented on Brett's claim that he had given Roehrich the names of several other witnesses who would testify they had never purchased drugs from him. Roehrich testified the names of two of the proposed witnesses, Kevin Richter and Larry Wenger, were not provided to him prior to trial.[7] Hr. Tr. 247-48. As to the other proposed witnesses, Roehrich testified that because Brett had insisted on an early trial date, he did not have time to investigate them as potential witnesses. Hr. Tr. 248. He also expressed concern that if he called them to testify they had not purchased drugs from Brett, this might somehow open the door to questions about Brett's prior felony drug distribution conviction. Roehrich testified, "I just didn't feel that it would in any way benefit him even

---

[7]On cross-examination, Roehrich admitted he had, in fact, been given Richter's name, but he stated the name had been given to him on an unrelated subject. Hr. Tr. 262.

if they did come in and testify as he wanted them to.  We had our defense.  We had our argument." *Id*.

Roehrich did not want to call witnesses to testify about the romantic relationship between Brick and Bitz in an effort to establish a possible motive for Brick and Bitz to testify falsely.  He believed such evidence would have detracted from his trial strategy of focusing on their other motives for testifying falsely.

Roehrich was asked if he recalled talking with Brett about the testimonial deposition of Craig Price.  He responded,

> Mr. Kamerud absolutely was notified of the date, time, and place of the deposition.  He was advised that he should be present, although, of course, he was not required to be present, that he should be there, and he didn't show up.  He indicated in his 2255 petition that he had contacted me and said that he had some other proceeding someplace else.  I don't recall any such communication from him, and I have no record of him contacting me and saying such a thing.

Hr. Tr. 249.

Roehrich testified Brett was not prevented from testifying at trial, although he did recommend that Brett not testify at trial.  He stated,

> Well, there's always the danger of the prior felony drug conviction coming into evidence.  I felt if that would have come into evidence that it would have severely damaged any possibility of acquittal.  Plus after meeting with Mr. Kamerud for a period – quite a bit of period of time before this, I don't think that he'd be a very good witness.  He had a hard time staying focused on the issues, and he tended to be all over the place.

Hr. Tr. 250.  Roehrich denied ever telling Brett the Government's case was so weak they did not need any witnesses, or that there was nothing to worry about.  He also denied telling Brett the prosecutor had promised that if Brett testified, he would not cross examine him about his priors because they were too old or because they involved a different drug.

46

On cross-examination by Denne, Roehrich admitted he had not interviewed any of the Government's witnesses, nor had he interviewed any of the potential defense witnesses suggested by his client. He testified, "It's just not viable to go and question each and every one of them to see if they actually were customers of the Kameruds." Hr. Tr. 260. He also did not review with Brett the materials in the Government's discovery file. Instead, he made notes, and from his notes "reviewed what was in the file with [Brett]." Hr. Tr. 254.

Roehrich reemphasized that he had notified Brett about the Price deposition. Although he had no independent recollection of what he told Brett about the deposition, he was certain he talked with Brett about what he expected would be covered in the deposition. He also was certain that he had encouraged Brett to attend, and he had told Brett "he had a right to be there if he wanted to be present." Hr. Tr. 269-70.

Roehrich testified that he did not recall specifically discussing with Brett what Brett's testimony would have been if Brett had testified at trial. Roehrich testified,

> I was pretty clear that he was saying that he was innocent, that he didn't do this, that these people are lying, and he had numerous theories . . . , but I don't recall sitting down and him saying – and us going through this is what I'll say, this is what I'll say. That could have happened, but I don't recall it.

Hr. Tr. 271.

Roehrich was never asked by either party to describe what he told Brett about his right to testify at trial, or whether he had discussed with Brett the potential benefits and detriments of testifying.

### 15. *Martha McMinn*

The Government's second and final witness was Martha McMinn, Cory Kamerud's trial attorney. McMinn testified her trial strategy was (1) to present Cory as a user of

methamphetamine, and not someone involved in a drug distribution conspiracy, and (2) to raise reasonable doubt about the Government's case against her client.

McMinn reviewed the Government's discovery file with her client immediately after his arraignment. Cory suggested she contact various witnesses, and she and her legal assistant, Andy Bagley, followed up on those requests. McMinn was not able to contact all of these potential witnesses, but she "contacted everybody that we could possibly find or any names that were given to us." Hr. Tr. 283. Of the potential witnesses she was able to contact, she decided some of them would have provided testimony that "negatively reflected" on her client. Hr. Tr. 281. For example, Cory wanted her to call Billy Oldenkamp's sister, but when McMinn spoke with her, she said, "Cory hasn't given Billy any drugs since last Thanksgiving." Hr. Tr. 284. McMinn concluded this testimony would have been damaging to her client. McMinn testified she did arrange for the appearance at trial of the witnesses she thought might be helpful to her client.

During trial preparations, McMinn and Bagley had numerous contacts with Cory, both in person and by telephone. Brett Kamerud was present for many of their meetings, but according to McMinn, "even when Brett was with him, my consultation was with Cory." Hr. Tr. 280.

McMinn recommended to Cory that he not testify at trial, but she left the final decision up to him, and he decided not to testify. Hr. Tr. 288-89. When things were not going well during the trial, they again discussed whether he should testify, and he again decided not to testify. Hr. Tr. 294.

In response to Cory's allegation that McMinn failed to negotiate a plea agreement on his behalf, she stated, "Cory wasn't interested in any pleas." Hr. Tr. 290. She felt the best she could do was possibly to get the Government to withdraw the section 851 enhancement, which would have resulted in Cory getting a 10-year sentence instead of a 20-year sentence, but "he wasn't interested in it. He was convinced he'd be found not

guilty." *Id*. McMinn never discussed with Cory the possibility of testifying against Brett because, "He was absolutely devoted to his brother and always wanted his brother present." Hr. Tr. 297.

In response to Cory's allegation that she failed to raise a conflict of interest question about the Federal Defender's representation of Ross Kelly, McMinn testified she was not aware of any such conflict.

## IV. ANALYSIS

### A. Identification of Issues Presented

Brett and Cory both argue they are entitled to relief under section 2255. In his post-hearing brief,[8] Brett argues first that his trial counsel was ineffective because he failed to prepare properly for trial. Doc. No. 375 at 9. According to Brett, his trial counsel failed to (1) review the Government's evidence with him, (2) investigate the case, (3) interview witnesses, and (4) call witnesses on behalf of the defense. Second, Brett argues his trial counsel ineffectively cross-examined the prosecution's witnesses. *Id*. at 23. Third, Brett argues his trial counsel was ineffective because he failed to discuss adequately with Brett his right to testify at trial. *Id*. at 28. Fourth, he argues his trial counsel was ineffective in failing to seek to have the evidence from the Menzel arrest in Aberdeen, South Dakota, excluded at trial. *Id*. at 37. Fifth, he argues his trial counsel was ineffective because he failed to ensure that Brett was present for a pretrial testimonial deposition. *Id*. at 38. Sixth, Brett argues his trial counsel was ineffective because he failed to challenge the one-year expansion of the time-period covered by the conspiracy in the superseding indictment. *Id*. at 40. Seventh, he argues his trial counsel and his appellate counsel were ineffective because they failed to raise properly issues of prosecutorial misconduct. *Id*. at 44.

---

[8]At the conclusion of the section 2255 hearing, the court specifically ordered the defendants to raise in their post-hearing briefs any issues they wished to pursue. Hr. Tr. 327. The court considers any issues not raised in the post-hearing briefs to have been abandoned.

Finally, Brett incorporates any pertinent issues raised by Cory that were not raised separately by Brett. *Id*. at 5.

In his post-hearing brief, Cory argues first that his trial counsel was ineffective because she had a conflict of interest arising out of the assistance she provided to Cory's brother, Brett, during the course of the case. Doc. No. 376 at 8. Second, Cory argues his trial counsel was ineffective because she failed to advise him correctly concerning his right to testify at trial. *Id*. at 9. Third, he argues his trial counsel was ineffective because she failed to have a trial strategy or to provide him with any defense. *Id*. at 10. Fourth, he argues his trial counsel was ineffective because she failed to give him competent advice concerning plea negotiations. *Id*. at 13. Fifth, he argues his trial counsel was ineffective because she did not seek to have the evidence from the Menzel arrest in Aberdeen, South Dakota, excluded at trial. *Id*. at 14. Sixth, Cory argues his trial counsel was ineffective because she failed to seek an order precluding the Government from using his prior drug conviction to impeach him in the event he decided to testify at trial. *Id*. at 15. Seventh, he argues his trial counsel was ineffective because she did not conduct a proper investigation to locate witnesses to support his defense. *Id*. at 16. Finally, Cory incorporates any pertinent issues raised by Brett that were not raised separately by Cory. *Id*. at 17.

## B. Standards for Relief Pursuant to Section 2255

Judge Bennett described the standards applicable to motions pursuant to 28 U.S.C. § 2255 in *United States v. Luna*, 455 F. Supp. 2d 885 (N.D. Iowa 2006):

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground [1] that the sentence was imposed in violation of the Constitution or laws of the United States, or [2] that the court was without jurisdiction to impose such sentence, or [3] that the sentence was in excess of the maximum authorized by law,

or [4] is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence. 28 U.S.C. § 2255; *Bear Stops v. United States*, 339 F.3d 777, 781 (8th Cir. 2003) ("To prevail on a § 2255 motion, the petitioner must demonstrate a violation of the Constitution or the laws of the United States."). Thus, a motion pursuant to § 2255 "is 'intended to afford federal prisoners a remedy identical in scope to federal habeas corpus.'" *United States v. Wilson*, 997 F.2d 429, 431 (8th Cir. 1993) (quoting *Davis v. United States*, 417 U.S. 333, 343 (1974)); *accord Auman v. United States*, 67 F.3d 157, 161 (8th Cir. 1995) (quoting *Wilson*). On the other hand, Section 2255 relief is not available to correct errors which could have been raised at trial or on direct appeal, absent a showing of cause and prejudice, *United States v. Frady*, 456 U.S. 152, 167-68, 102 S. Ct. 1584, 1594-95, 71 L. Ed. 2d 816 (1982), or a showing that the alleged errors were fundamental defects resulting in a complete miscarriage of justice. *See United States v. Smith*, 843 F.2d 1148, 1149 (8th Cir. 1988) (per curiam). *Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993) (per curiam); *accord Jones v. United States*, 278 F.3d 839, 844 (8th Cir. 2002) ("In order to obtain collateral review of a procedurally defaulted issue, [a § 2255 movant] must show 'either cause and actual prejudice, or that he is actually innocent.'") (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998), with citations omitted).

The "cause and prejudice" that must be shown to resuscitate a procedurally defaulted claim may include "ineffective assistance of counsel." *See Becht v. United States*, 403 F.3d 541, 545 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1346 (2006). Otherwise, "[t]he Supreme Court recognized in *Bousley* that 'a claim that "is so novel that its legal basis is not reasonably available to counsel" may constitute cause for a procedural default.'" *United States v. Moss*, 252 F.3d 993, 1001 (8th Cir. 2001) (quoting *Bousley*, 523 U.S. at 622, with emphasis added, in turn quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)). "Actual prejudice" requires a showing that the alleged error "'worked to his actual and substantial disadvantage, infecting his entire trial with error of

constitutional dimensions.'" *Jones*, 278 F.3d at 844 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1981), and explaining, further, that the movant must show that there is a substantial likelihood that, absent the error, a jury would have acquitted him of the charged offense). To establish "actual innocence," as an alternative way to resuscitate a procedurally defaulted claim, a "'petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Id.* (quoting *Bousley*, 523 U.S. at 623). "'This is a strict standard; generally, a petitioner cannot show actual innocence where the evidence is sufficient to support a [conviction on the charged offense].'" *Id.* (quoting *McNeal v. United States*, 249 F.3d 747, 749-50 (8th Cir. 2001)).

*Luna*, 455 F. Supp. 2d. at 890-91.

### C. Ineffective Assistance of Counsel

In *Luna*, Judge Bennett also set out the standards applicable to claims of ineffective assistance of counsel under section 2255:

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. Thus, a criminal petitioner is constitutionally entitled to the effective assistance of counsel both at trial and on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003). By the same token, "ineffective assistance of counsel" could result in the imposition of a sentence in violation of the Constitution or laws of the United States. 28 U.S.C. § 2255; *Bear Stops*, 339 F.3d at 781 ("To prevail on a § 2255 motion, the petitioner must demonstrate a violation of the Constitution or the laws of the United States."). The Eighth Circuit Court of Appeals has expressly recognized that a claim of ineffective assistance of counsel should be raised in a § 2255 proceeding, rather than on direct appeal, because it often involves facts outside of the original

record. *See United States v. Hughes*, 330 F.3d 1068, 1069 (8th Cir. 2003) ("When claims of ineffective assistance of trial counsel are asserted on direct appeal, we ordinarily defer them to 28 U.S.C. § 2255 proceedings.").

\* \* \*

As the Eighth Circuit Court of Appeals has explained, "'The applicable law here is well-established: post-conviction relief will not be granted on a claim of ineffective assistance of trial counsel unless the petitioner can show not only that counsel's performance was deficient but also that such deficient performance prejudiced his defense.'" *United States v. Ledezma-Rodriguez*, 423 F.3d 830, 836 (8th Cir. 2005) (quoting *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001), in turn citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Davis v. Norris*, 423 F.3d 868, 877 (8th Cir. 2005) ("To prove that his counsel rendered ineffective assistance in violation of the Sixth Amendment, [the movant] must satisfy the two prong test outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)," which requires the movant to "show that his counsel's performance was deficient" and that he was "prejudice[d]").

The "deficient performance" prong requires the movant to "show that his 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment.'" *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 687). That showing can be made by demonstrating that counsel's performance "'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (quoting *Strickland*, 466 U.S. at 688). There are two substantial impediments to making such a showing, however. First, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 690). Second, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at

689); *Davis*, 423 F.3d at 877 ("To satisfy this prong [the movant] must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance."). If the movant fails to show deficient performance by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

Even if counsel's performance was deficient, the movant must also establish "prejudice" to overcome the presumption of reasonable professional assistance. *Ledezma-Rodriguez*, 423 F.3d at 836; *Davis*, 423 F.3d at 877. To satisfy this "prejudice" prong, the movant must show "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [,] a reasonable probability [meaning] a probability sufficient to undermine confidence in the outcome.'" *Rice*, 449 F.3d at 897 (again quoting *Strickland*, 466 U.S. at 694); *Davis*, 423 F.3d at 877 (same). Thus, "'[i]t is not enough for the petitioner to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005) (quoting *Strickland*, 466 U.S. at 693). Although the two prongs of the "ineffective assistance" analysis are described as sequential, courts "do not . . . need to address the performance prong if petitioner does not affirmatively prove prejudice." *Boysiewick v. Schriro*, 179 F.3d 616, 620 (8th Cir. 1999) (citing *Pryor v. Norris*, 103 F.3d 710 (8th Cir. 1997)).

*Luna*, 455 F. Supp. 2d. at 892-94.

## D. Failure of Counsel to Prepare Properly for Trial

### 1. Brett Kamerud's argument

Brett Kamerud argues his trial counsel, Douglas Roehrich, was ineffective because he failed to prepare the case properly for trial. According to Brett, Roehrich failed to (1) review the Government's evidence with him, (2) investigate the case, (3) interview

witnesses, and (4) call witnesses on behalf of the defense.  The record supports the last three of these claims, but not the first.

The court finds Roehrich adequately reviewed the Government's evidence with Brett.  Roehrich reviewed the Government's discovery file, made notes from his review of the file, and from those notes, he discussed the contents of the file with Brett. Furthermore, Brett had his own copy of the file, which was provided to him by Cory's attorney, Martha McMinn, and he was able to review the file personally and make detailed suggestions to Roehrich from his review of these materials.  Brett has not shown that Roehrich failed to review the Government's evidence with him, or that he was prejudiced in any way from being denied access to the information in the Government's discovery file.

However, the court finds Brett has established that Roehrich's performance was deficient in the remaining three areas.  Roehrich conducted no investigation of the facts in the case other than to review the Government's discovery file; he did not attempt to interview any of the Government's witnesses; and he did not identify any potential witnesses for the defense, either from his own review of the Government's discovery file or by interviewing any of the witnesses suggested by his client.

In *United States v. Hernandez*, 450 F. Supp. 2d 950 (N.D. Iowa 2006), Judge Bennett explained the standards for evaluating the "deficient performance" prong of the "ineffective assistance" analysis:

> On the "deficient performance" prong of the "ineffective assistance" analysis, the Eighth Circuit Court of Appeals has repeatedly stated that "'[r]easonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories.'" *Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005) (quoting *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir.1 993)).  As a corollary of that principle, courts have also recognized that "'[s]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable.'" [*United States v.*] *Rice*, 449 F.3d [887,] 897 [(8th Cir. 2006)] (quoting *Strickland* [*v. Washington*], 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). The strength of the presumption that counsel's performance was reasonable "turns on the adequacy of counsel's investigation." *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005). Where, for example, counsel's investigation was "too superficial" to reveal the strengths or weaknesses of testimony supporting the government's or the defendant's case, or to discover evidence providing powerful support for the defendant's version of events, "the presumption of sound trial strategy founders . . . on the rocks of ignorance." *Id.*

*Hernandez*, 450 F. Supp. 2d at 970.

Of course, for counsel to perform proficiently, he is not required to interview every possible witness. *Owens v. United States*, 483 F.3d 48, 69 (1st Cir. 2007) (citing *Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003); *Lema v. United States*, 987 F.2d 48, 55 (1st Cir. 1993) ("The decision to interview potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case.")). The decision not to call a witness is a virtually unchallengeable decision of trial strategy. *United States v. Watkins*, 486 F.3d 458, 465 (8th Cir. 2007) (citing *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005)). Nevertheless, counsel's investigation must be sufficient to "reveal the strengths or weaknesses of testimony supporting the government's or the defendant's case," and to discover evidence relevant to the defense. *Hernandez*, 450 F. Supp. 2d at 970.

Applying these principles, the court finds Roehrich's failure to prepare this case properly for trial was "deficient performance" under Sixth Amendment standards. He knew before trial that several of the Government's cooperating witnesses would be testifying the Kameruds had sold drugs, and would identify some of the Kameruds' alleged customers. Brett asked Roehrich to investigate these alleged customers to see if they

would testify that they had not, in fact, purchased drugs from the Kameruds. Roehrich did not do this.

Roehrich explained that he did not interview the alleged customers because this evidence would not have advanced his trial strategy. He testified, "We had our defense," which was to attack the Government's witnesses and point out the weaknesses in the Government's case. Hr. Tr. 248. He stated he did not feel the witnesses suggested by Brett would have helped the case even if they had testified as Brett "wanted them to." *Id*. This explanation is, in reality, no explanation at all. Although strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable, *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 2066, 80 L. Ed. 2d 674 (1984), "counsel's decisions resulting from failure to investigate are not entitled to the presumption of competent performance[.]" *Marcrum v. Luebbers*, ___ F.3d ___, ___, 2007 WL 4270781 at *15 (8th Cir. Dec. 7, 2007). "[A]n attorney must engage in a reasonable amount of pretrial investigation and 'at a minimum, . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances in the case.'" *Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994) (citing *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1992)). Roehrich did not do this. "'We have stated that failing to interview witnesses or discover mitigating evidence may be a basis for finding counsel ineffective within the meaning of the Sixth Amendment right to counsel.'" *United States v. Vazquez-Garcia*, 211 Fed. Appx. 544, 546 (8th Cir. 2007) (quoting *Kramer v. Kemna*, 21 F.3d 305, 309 (8th Cir. 1994)). *See Marcrum, supra*, 2007 WL 4270781 at *12-13.

The court is at a loss to understand why anyone would have hesitated at least to contact the potential witnesses in this case to determine what testimony they could offer. *See Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir. 1990) (*en banc*) ("The decision to interview a potential witness is not a decision related to trial strategy. Rather, it is a decision related to adequate preparation for trial."). "Counsel can hardly be said to have

made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir. 1991) (internal quotation marks, citations omitted); *see Marcrum*, 2007 WL 4270781 at *12 ("[C]ounsel who conducted no discovery could not have known what the relative importance of the different kinds of evidence would be[.]") (citation omitted). Roehrich cannot claim that making an effort to find witnesses favorable to his client's case would have been inconsistent with his trial strategy. There is nothing inconsistent between challenging the credibility of the Government's witnesses and calling witnesses to testify that the Government's witnesses were testifying falsely. In fact, such evidence would have been both consistent and corroborative.

Roehrich also claims he was afraid to call witnesses to testify they had not purchased drugs from Brett because this evidence might somehow have opened the door to questions about Brett's prior felony drug distribution conviction. Hr. Tr. 248. Evidence of other crimes may be admissible to prove such things as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *Id.* The Eighth Circuit Court of Appeals has established a four-part test to determine when Rule 404(b) evidence is admissible, as follows:

> Such evidence is admissible if it is "(1) relevant to a material issue; (2) of crimes similar in kind and reasonably close in time to the crime charged; (3) sufficient to support a jury finding that the defendant committed the other crimes; and (4) more probative than prejudicial." *United States v. Yerks*, 918 F.2d 1371, 1373 (8th Cir. 1900). Additionally, this court views Rule 404(b) as a rule of inclusion, "permitting admission of other crimes evidence unless it tends to prove only the defendant's criminal disposition." *United States v. Dobynes*, 905 F.2d 1192, 1195 (8th Cir.), *cert. denied*, 498 U.S. 877, 111 S. Ct. 206, 112 L. Ed. 2d 167 (1990). The trial court has

> broad discretion in admitting such evidence and the trial
> court's decision will be overturned only when it is clear that
> the evidence has no bearing on the case. *Id.*

*United States v. Sykes*, 977 F.2d 1242, 1246 (8th Cir. 1992). "[A]lthough references to other crimes generally are inadmissible, the prosecution is entitled to explain the circumstances surrounding the investigation and arrest of a defendant." *United States v. Harris*, 956 F.2d 177, 180 (8th Cir. 1992) (citations omitted).

Brett's prior conviction occurred in April 1992. *See* Doc. No. 40. Evidence regarding the 1992 conviction was wholly unrelated to the present charges and would not meet any of the four criteria established by the Eighth Circuit. *See Sykes, supra.* Although the evidence could have been admissible to impeach Brett's testimony if he had testified, *see* Fed. R. Evid. 609(a)(1), the evidence would not have been admissible simply because witnesses testified they never purchased drugs from Brett. In any event, Roehrich should not have made a decision not to call such witnesses on the basis of a potential evidentiary problem without at least researching the applicability of the evidentiary rules to see if there was, in fact, a problem.

Roehrich also explained his failure to make more of an effort to prepare for trial by claiming there was insufficient time. According to Roehrich, his client demanded an early trial date, and because of this, "time was limited." *Id.* This explanation is both insufficient and unpersuasive. Roehrich had 110 days between the date of his appearance in this case and the start of the trial. This was more than enough time to do the work required to prepare the case properly for trial. Furthermore, Roehrich did not need his client's agreement to request a continuance. If Roehrich could not prepare properly for trial in the time allowed, he had a duty to request a continuance, regardless of the views of his client. The time from his motion to continue to the date of trial would have been excluded for purposes of speedy trial calculations even if the defendant did not agree to a continuance. *See* 18 U.S.C. § 3161(h)(1)(F) & (8)(B)(iv) (court considers whether failure

to continue trial will deny counsel "the reasonable time necessary for effective preparation, taking into account the exercise of due diligence"); *United States v. Daychild*, 357 F.3d 1082, 1094-95 (9th Cir. 2004) (excluding time for speedy trial purposes even when defendant objected to attorney's motions to continue trial, citing 18 U.S.C. § 3161(h)(1)(F)); *see also ABA Standards for Criminal Justice: Prosecution and Defense Function*, Standard 4-5.2 (3d ed. 1993) (strategic and tactical decisions ultimately are to be made by defense counsel, not by the accused); *United States v. Hodges*, 259 F.3d 655, 659 (7th Cir. 2001) (court observed that without more, it would be "peculiar" for counsel's assistance to be ineffective where counsel asked for continuance to be better prepared for trial).

In any event, the court finds that if Roehrich had explained fully to Brett that he needed a continuance to prepare the case properly, Brett would have consented to a continuance. The record shows that as trial was approaching, Brett was desperately attempting to get Roehrich's attention, and Roehrich was ignoring all of his efforts. The court finds that if Roehrich had told Brett he was willing to do what was necessary to prepare the case properly for trial but he needed more time to do so, Brett would have agreed to a continuance. Roehrich did not do this.

The court has examined Roehrich's billing records for the time period leading up to the trial on November 26, 2001. *See* Def. Hr. Ex. T. Roehrich made entries for "trial preparation" totaling 34 hours. He made no entries for any type of investigation. On his CJA fee claim statement, Roehrich claimed 50.7 hours for "Investigative and Other work." *See* Def. Hr. Ex. X. At the section 2255 hearing, he testified this entry was for "preparing for trial and any kind of investigation." Hr. Tr. 246. Because he did not do any investigation, and he filed no motions, called no witnesses, and conducted only a

standard "cooperating witness" cross-examination, all of the 50.7 hours must have been spent on other types of "trial preparation."[9]

Nothing in these records suggests that in the weeks before trial, Roehrich was too busy to prepare for trial. If Roehrich, in fact, spent 50.7 hours preparing for trial, he would have had ample time to conduct an investigation of the facts in this case, interview the Government's witnesses, and talk with the potential witnesses. Instead, all he apparently did to prepare for trial was to review the Government's discovery file. This was deficient performance for purposes of a Sixth Amendment right-to-counsel analysis. *See Thomas v. Lockhart*, 738 F.2d 304, 308 (8th Cir. 1984) (counsel's investigation deficient where he did nothing beyond reading police file). As the court held in *United States v. Gray*, 878 F.2d 702 (3rd Cir. 1989), the "failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness," because, "in the context of complete failure to investigate . . . [,] counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Id.*, 878 F.2d at 711 (citing *Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066).

Even though the court has found that Roehrich's trial preparations were deficient, a defendant seeking section 2255 relief also must show "prejudice." *Hernandez*, 450 F. Supp. 2d at 970 (citing *United States v. Ledezma-Rodriguez*, 423 F.3d 830, 836 (8th Cir. 2005); *Davis v. Norris*, 423 F.3d 868, 877 (8th Cir. 2005)); *see also White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005) (requiring proof of "prejudice" on an "ineffective assistance" claim based on deficient performance). In *Hernandez*, Judge Bennett

---

[9]"Investigative and Other Work" did not include in-court time or time spent in interviews or conferences, obtaining or reviewing records, or legal research and brief writing, all of which were claimed under separate headings on the CJA fee claim statement. The court notes the apparent discrepancy between the 34 hours for trial preparation noted on Roehrich's billing records, and the 50.7 hours on the CJA fee claim statement for what he said was "preparing for trial and any kind of investigation." *Compare* Def. Hr. Ex. T *with* Def. Hr. Ex. X.

commented, "To demonstrate 'prejudice' in the context of a claim of failure to investigate, the defendant cannot rely on general allegations of what a proper or reasonable investigation would have revealed, but must show specifically what would have been revealed by further investigation and how the further evidence would have made a different outcome to the trial a reasonable probability." *Hernandez*, 450 F. Supp. 2d at 970 (citing *Palmer v. Clarke*, 408 F.3d 423, 445 (8th Cir. 2005); *Nooner v. Norris*, 402 F.3d 801, 810 (8th Cir. 2005)). "To prove prejudice from a trial attorney's failure to investigate potential witnesses, a petitioner must show that the uncalled witnesses would have testified at trial and that their testimony would have probably changed the outcome of the trial." *Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994).

Brett argues Roehrich should have called Geoff Baldridge, Kim Ackerson, Larry Wenger, and Jenny Menzel as witnesses at trial to deny allegations that the Kameruds were selling drugs to them.[10]  Doc. No. 375 at 13.  Brett believes this testimony would have rebutted the testimony of several of the Government's witnesses.  Neither Kurt Undine nor Bridget McClure named any customers of the Kameruds, so Brett's proposed witnesses could not have rebutted their testimony.  Russell Brick did not name any customers of the Kameruds during his direct examination, although on cross-examination by McMinn, he did name a "Jeff" as a drug customer of the Kameruds.  Tr. 86.  Presumably, Geoff Baldridge could have rebutted this testimony.  Stacey Bitz testified that Geoff Baldridge, among others, was a customer of the Kameruds (Tr. 179), so Baldridge could have rebutted this testimony.  Billy Oldenkamp named Larry Wenger, among others, as a

---

[10]In the course of his argument, Brett names several other potential witnesses, but he never establishes that they would have been available to testify at trial or, if available, that they would have provided testimony helpful to his case. *See, e.g.*, Doc. No. 375 at 10 & 15, discussing Kevin Richter and Jenny Beckel.  Accordingly, the failure to call these witnesses will not be addressed separately in this ruling. *See Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994) (petitioner must show uncalled witnesses would have testified and their testimony likely would have changed the trial's outcome); *cf. United States v. Eldeeb*, 20 F.3d 841, 843 (8th Cir. 1994) ("[A] party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue.") (internal quotation marks, citation omitted).

customer of the Kameruds (Tr. 281), so Oldenkamp's testimony possibly could have been rebutted by Wenger. Ackerson testified she was at the Kamerud apartment "almost every day" in the summer of 2000, and she never saw the Kameruds sell drugs, so she presumably could have rebutted the testimony of Brick and Bitz. Jenny Menzel could have rebutted Oldenkamp's testimony in several respects.[11] Baldridge, Wenger, and Ackerson were not called as defense witnesses at trial. Jenny Menzel was called as a defense witness by Cory's attorney.

The first problem with Brett's argument is that Baldridge, Wenger, and Ackerson were not identified in any of the written pretrial communications between Brett and Roehrich. They were not listed in the detailed notes, Def. Hr. Ex. GG, or in the letter Brett sent to Roehrich, Def. Hr. Ex. HH, prior to trial. Instead, in those communications, Brett listed many other potential witnesses, most of whom, based on what Brett represented they would say, would have been unable to provide any helpful testimony. Furthermore, Roehrich specifically denied that Brett ever told him Wenger was a potential defense witness. Hr. Tr. 247-48. Counsel does not have an obligation to call witnesses he has never heard of or witnesses he could not have discovered with an independent investigation. *See Battle v. Delo*, 19 F.3d 1547, 1555 (8th Cir. 1994) (holding counsel was not deficient in failing to call a witness where the defendant never provided the witness's name to counsel and no evidence existed that counsel had any notice of the witness's identity). Nevertheless, the court will address how each of these witnesses likely would have affected the outcome of the trial.

At the section 2255 hearing, Brett called Geoff Baldridge as a witness. Baldridge testified that he was an inmate in the South Dakota State Penitentiary serving a sentence on a state drug conviction. He had been in prison continuously since December 25, 1999,

---

[11]Menzel testified at the section 2255 hearing that she had no knowledge of the Kameruds' activities in the summer of 2000, so she could not have rebutted the testimony of Undine, McClure, Brick, or Bitz concerning the Kameruds' activities that summer.

except for the period between May 9, 2000, and about October 31, 2000. During that brief interlude from prison, he hung around with Brett and Cory, who were his good friends. Baldridge was at the Kameruds' apartment almost every day that summer for several hours each day. He never bought methamphetamine from Brett or Cory, and he did not see them sell drugs, although he saw them use methamphetamine.

The prosecutor brought out on cross-examination that Baldridge has an extensive criminal record, most of it involving the distribution of drugs, usually methamphetamine. Baldridge admitted that he, Brett, Cory, and several other people bought methamphetamine from Brick at the Kameruds' apartment and then used the drugs there.

Baldridge's testimony, on balance, likely would have been much more harmful to the Kameruds than helpful. He had an extensive criminal record, most of it involving the distribution of drugs. His presence at trial as a defense witness would have emphasized to the jury that the Kameruds were associating with drug dealers on a daily basis during the summer of 2000. Although Baldridge testified he did not purchase any drugs from the Kameruds that summer, the credibility of his testimony would have been doubtful. In fact, the court believes his testimony could have gone a long way toward establishing that the Kameruds were involved in a drug distribution conspiracy in the summer of 2000. Baldridge, a convicted drug dealer, spent every day that summer, during his brief interlude from serving time in prison on drug distribution charges, at the Kameruds' apartment. While there, he purchased and used drugs. He also saw Brick selling drugs, and he observed people using drugs there. Other evidence in the case established that at least some of the drugs being sold in the Kameruds' apartment had been purchased during trips to Sioux City, and the Kameruds sometimes went along on the trips.

Brett has not shown that Baldridge's testimony would have changed the verdict at trial. To satisfy the "prejudice" prong, Brett is required to show a reasonable probability exists that if Roehrich had called Baldridge to testify, the result of the trial would have

been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068 (defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). A reasonable probability means a probability sufficient to undermine confidence in the outcome. He has not made this showing.

Larry Wenger testified that in about 2000, he regularly went to Brett's apartment so they could play guitar music together. While there, he never saw anyone use or sell methamphetamine. He denied he had ever purchased methamphetamine from Brett. In fact, he denied ever using any illegal drugs.

This testimony might have been helpful to the defense because, if believed, it could have rebutted testimony by Bitz and Oldenkamp that Wenger was a customer of the Kameruds. However the value of the testimony would have been reduced by the fact that Wenger testified he never saw *any* evidence of drug use at the apartment. Numerous other witnesses testified the apartment was a regular location for drug distribution and use. Wenger's testimony that he saw no evidence of any of this seems to prove too much.

The court is not convinced that Brett brought this witness to Roehrich's attention prior to trial. In any event, Brett has not shown this testimony would have had much of an impact, and he certainly has not shown that if Roehrich had called Wenger to testify at trial, it would have made a different outcome a reasonable probability. *See id.;* *Hernandez*, 450 F. Supp. 2d at 970.

Kim Ackerson actually was listed as a witness by Martha McMinn, and the court authorized the issuance of a subpoena at Government expense to compel Ackerson's testimony at trial. Nevertheless, she did not testify at the trial.

At the section 2255 hearing, Ackerson testified that in the 2000-2001 time frame, she was Stacey Bitz's best friend, and they would "hang out" at the Kameruds' apartment almost every day. She never saw Brett or Cory sell methamphetamine during that time.

In response to cross-examination by the prosecutor, Ackerson admitted that a lot of meth-amphetamine was being used at the Kamerud apartment while she was there, mostly by injection, and she participated in this usage, although she did not know how the metham-phetamine got to the apartment. No one talked about how the drugs were brought there, and she never saw money change hands.

She also testified that she moved to Arizona in November 2000, and Bitz wrote several letters to her saying that "she was going to be doing what she had to do to not go to jail." Ackerson gave this information to Brett and Cory before their trial, and told them she would be available to testify. She was contacted by someone from Cory's lawyer's office, and she told him what she knew, but she was not asked to be a witness at trial. The letters from Bitz were not produced at the section 2255 hearing.

The court easily can understand why McMinn decided not to call this witness to testify for the defense. The impression left by her testimony was that the Kameruds' apartment was a drug den, and she was a part of it. Rather than contradicting the testimony of the Government's cooperating witnesses, she would have corroborated their testimony. The fact that she did not see money change hands likely would have been immaterial. Her testimony concerning the letters from Bitz would have been inadmissable. *See* Fed. R. Evid. 1002 ("To prove the content of a writing . . . , the original writing . . . is required . . . .").

Finally, although Jenny Menzel was called as a witness at trial, Brett complains about the way her testimony was handled. At trial, Menzel testified that the drugs found in her purse on August 25, 2001, belonged to her and had not been provided to her by Cory or Brett. She admitted she was Brett's girlfriend beginning in the middle of July 2001, and she admitted that she used methamphetamine until the day she was arrested, August 25, 2001, but she testified she never used drugs with Brett or Cory.

At the section 2255 hearing, Menzel testified that she purchased the drugs found in her purse on August 25, 2001, in Sioux Falls, on the day before her arrest. She testified that neither Brett nor Cory ever purchased methamphetamine from her, and to her knowledge, they did not sell methamphetamine. She also testified that Oldenkamp never sold drugs to Brett, and she would have been in a position to know of any such transactions because she was with Oldenkamp all the time during that period. She stated that Oldenkamp did not even know Brett or Cory before April 2001.

On cross-examination, the prosecutor pointed out that Menzel had, in fact, testified by telephone in the Kamerud trial, and during her testimony she stated that the drugs in her purse were hers and neither Brett nor Cory had anything to do with them. She also admitted that she had no knowledge of what the Kameruds were doing in the summer of 2000.

Brett argues that further examination of Jenny Menzel, as demonstrated in the section 2255 hearing, would have affected the outcome of the trial. The court finds it would have made no difference. Menzel comes across as someone anxious to help Brett, her former boyfriend, get out of trouble. At the time of trial, Jenny Menzel was a 17-year-old methamphetamine user in a relationship with Brett, another methamphetamine user. She testified at trial that the drugs seized from her purse were hers, and the Kameruds had nothing to do with them. This was the only useful testimony she had to offer. To the extent she could have rebutted the testimony of Billy Oldenkamp, the court finds that his credibility was effectively destroyed at trial anyway. The court does not believe any further examination of Menzel at the trial would have been fruitful for the defense.

The court is somewhat troubled by the fact that Jenny Menzel's testimony was presented by telephone, and not in person. *See United States v. Jacobs*, 97 F.3d 275, 280-83 (8th Cir. 1996) (holding trial court erred in allowing cross-examination of government witness by telephone without identifying important state interests justifying exception to

Confrontation Clause, but finding error harmless where telephonic testimony was cumulative and remaining evidence was sufficient to convict defendant). However, because Menzel was a witness called by the defense and not the prosecution, and because the Kameruds' attorneys both agreed to this procedure, any error in allowing Menzel's testimony to be by telephone was harmless. *Id.* Furthermore, for purposes of the present inquiry, the Kameruds have not shown that allowing Menzel to testify by phone made a difference in the outcome of the trial. Again, to satisfy this "prejudice" prong, Brett was required to show a reasonable probability exists that, but for this error, the result of the proceeding would have been different. He has not made this showing.

Brett complains about the fact that Roehrich did not call Debra Menzel or Bill Menzel to testify at trial. In particular, Brett wanted the Menzels to corroborate the testimony of their daughter, Jenny, that she obtained the drugs found in her purse on August 25, 2001, during a trip she made to Sioux Falls earlier that weekend. This apparently was for the purpose of showing that she did not get the drugs in Sioux City, or from the Kameruds. The problem with this argument is Jenny did not testify at the trial that she purchased the drugs in Sioux Falls, and there was no evidence offered that she had purchased the drugs from the Kameruds. Whether she obtained the methamphetamine in Sioux Falls or Sioux City was not significant. The proposed testimony of Jenny Menzel's parents, as presented at the section 2255 hearing, was inconsequential.

Furthermore, there is nothing in the record to suggest that Brett asked Roehrich to call Jenny Menzel's parents as witnesses at trial. In any event, most, if not all, of the proposed testimony by Jenny Menzel's parents likely would have been inadmissable on hearsay and foundation grounds.

In sum, Brett has put forth no more than speculation to support his contention that the testimony of these witnesses would have changed the outcome of the trial. Indeed, the court finds that offering the testimony of these witnesses, on balance, likely would have

hurt Brett's chances at trial more than it would have helped. Thus, the court cannot say Brett has shown that but for his attorney's "deficient" conduct in failing to elicit testimony from these witnesses, a different outcome of the trial would have been a reasonable probability. *See*, e.g., *Palmer*, 408 F.3d at 555-45. As a result, this claim fails on the "prejudice" prong.

## 2. *Cory Kamerud's argument*

Cory Kamerud argues his trial counsel, Martha McMinn, was ineffective because she failed to prepare properly for trial. Doc. No. 376 at 16-17. This argument consists primarily of an unsupported statement that McMinn "failed to adequately investigate this case and Cory was prejudiced as a result." *Id*. at 17. There is nothing in the record to support this claim.

Cory also argues McMinn should have called Larry Wenger, Kim Ackerson, and Geoff Baldridge as witnesses at trial. Any claim of prejudice from not calling these witnesses has been addressed above, but more importantly, the record establishes that McMinn was not deficient in her trial preparations. She attempted to contact all of the witnesses identified to her by Cory, and then she made a decision not to call some of them. This was a strategic decision, and is virtually unchallengeable. *See Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066.

Cory has failed to establish this claim.

## E. Failure of Cory's Trial Counsel to Present a Defense

Cory argues his trial counsel, Martha McMinn, was ineffective because she failed to present a defense. Doc. No. 376 at 10-13. Cory points out that although McMinn's professed trial strategy was to argue Cory was a drug user but not a drug dealer, she never advanced this argument to the jury, either in an opening statement (which she waived) or

in closing arguments. Cory also complains that McMinn did not address quantities in her closing argument, and she never attempted to contrast the case against Cory from the case against Brett.

The court finds the record generally does not support a claim that McMinn's trial preparations were inadequate. To the contrary, the evidence establishes that she put substantial thought and effort into preparing the case for trial. She presented five witnesses on behalf of her client, including Jenny Menzel, who testified that the Kameruds were not at all involved with the drugs seized from her purse on August 25, 2001. She also adequately cross-examined the Government's witnesses.

The court is troubled, however, by the fact that McMinn deferred her opening statement at the beginning of the case, and then waived her opening statement before presenting her case. At the section 2255 hearing, she had no explanation, strategic or otherwise, for passing on her opportunity to present her theory of the case to the jury in an opening statement.

The court also is troubled by the content of her closing argument. The two prongs of McMinn's trial strategy, as explained in her testimony at the section 2255 hearing, were (1) to present Cory as a user of methamphetamine, and not someone involved in a drug distribution conspiracy, and (2) to raise reasonable doubt. In her closing argument, she made no reference whatsoever to the first prong, and she referenced the second prong only once. *See* Doc. No. 152 (transcript of closing arguments) at 31. She spent almost her entire argument discussing the fact that the Government's cooperating witnesses all had a strong motive to testify favorably for the Government,[12] and pointing out that the Government had not called any of the Kameruds' customers as witnesses, with the exception of Billy Oldenkamp, whom she emphasized was not credible. She never argued

---

[12]Roehrich, who gave his closing argument before McMinn, did an excellent job of attacking the credibility of the Government's witnesses. In her closing, McMinn basically revisited the same subject with less effect.

that Cory was a mere user of methamphetamine. Her only comment on the issue of drug quantity was, "I didn't try to add up the amounts they're saying." *Id*.

The question is whether McMinn's unexplained decision not to take advantage of the opportunity to address the jury in an opening statement, together with her lackluster closing argument, constituted a denial of Cory's right to effective representation of counsel at trial.

Courts have recognized that although opening statement should not be waived lightly, "it is well-settled that the decision to waive an opening or closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of counsel." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). *See also Huggington v. Nuth*, 140 F.3d 572, 583 (4th Cir. 1998) ("Although it may be unusual to waive an opening statement, such a decision is essentially tactical in nature, and not objectively unreasonable."); *Hunt v. Nuth*, 57 F.3d 1327, 1332 (4th Cir. 1995) (holding that even when trial strategy expert testified that "reserving opening statement is uncommon and highly criticized by experts in trial advocacy, . . . such a decision is fundamentally tactical and within the range of reasonably competent representation.") (internal quotations marks, citation omitted). In *United States v. Salovitz*, 701 F.2d 17 (2d Cir. 1983), the court observed:

> It is common knowledge that defense counsel quite often waive openings as a simple matter of trial strategy. [Citations omitted.] Such a waiver has been held to be "trivial", *United States ex rel. Crispin v. Mancusi*, 448 F.2d 233, 237 (2d Cir.), *cert. denied*, 404 U.S. 967, 92 S. Ct. 346, 30 L. Ed. 2d 288 (1971); *United States v. Robinson*, 502 F.2d 894, 896 (7th Cir. 1974), a "tactical decision", *United States v. Decoster*, 624 F.2d 196, 213-14 (D.C. 1979) (en banc), a "matter of professional judgment", *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965), "particularly within the realm of trial strategy", *Commonwealth v. Tarver*, 253 Pa. Super. 185, 190, 384 A.2d 1292, 1295 (1978), and ordinarily will not form the

> basis for a claim of ineffective assistance of counsel, Finer,
> *Ineffective Assistance of Counsel*, 58 Cornell L. Rev. 1077,
> 1093-94 (1973).

*Salovitz*, 701 F.2d at 20-21.

If counsel waives opening statement for strategic purposes, but then does a competent job of confronting the evidence and attacking the prosecution's case during summation, then counsel's strategic choice may be reasonable under the circumstances and may not constitute deficient performance. *See id.*; *cf. Taylor v. Sirmons*, slip op., 2007 WL 778043 at *16 (E.D. Okla. Mar. 12, 2007) (addressing allegation "that counsel's waiver of opening statement . . . and his anemic closing argument left the defendant with only a warm body to stand next to him," court held review of entire record indicated "in light of [the defendant's] own actions, there was nothing else counsel could have done to maintain credibility with the jury").

Regarding closing arguments, counsel's strategic decisions regarding what type of summation to make, or even whether to make a closing argument at all, also are difficult to challenge as objectively unreasonable. *See Hovey v. Ayers*, 458 F.3d 892, 9096 (9th Cir. 2006) (observing that the Supreme Court has stressed "the deference owed to the choices made by defense counsel in crafting summations," citing *Bell v. Cone*, 535 U.S. 685, 701-02, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Yarborough v. Gentry*, 540 U.S. 1, 7-10, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 192, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004)). Through her cross-examination of the Government's witnesses, McMinn was able to discredit Billy Oldenkamp, and point out the questionable motives of the other Government witnesses. She pointed out in her summation that the Government had failed to call any credible witness who testified he or she was a customer of the Kameruds. Despite the fact that the theory of defense McMinn described in her hearing testimony does not coincide with what she presented to the jury at trial, the court cannot say McMinn "entirely fail[ed] to subject the prosecution's case

to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047, 80 L. Ed. 2d 657 (1984).

Even if the court were to find McMinn erred in waiving opening statement and in failing to make a stronger closing argument, Cory has failed to meet his burden to show McMinn's "'representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'" *Marcrum*, 2007 WL 4270781 at *12 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 3588, 91 L. Ed. 2d 305 (1986). In other words, Cory has failed to prove he was prejudiced by McMinn's tactical decisions.

### F. Failure to Cross-Examine Prosecutions's Witnesses Effectively

Brett argues Roehrich failed to cross-examine the Government's witnesses effectively because he did not use "important impeachment evidence" that would have been available to him if he had "conducted a competent investigation." Doc. No. 375 at 23. Brett contends that if his attorney had conducted proper cross-examinations of the Government's witnesses, he could have undercut the Government's overall case, or at the very least, he could have countered the allegation that he was responsible for 500 grams or more of methamphetamine. *Id.*

According to Brett, in Brick's initial debriefing, he attributed 591.5 grams of meth-amphetamine to the conspiracy. In his grand jury testimony, Brick attributed a total of 651 grams to the conspiracy. At trial, he attributed a total of 777 grams to the conspiracy. Brett argues his lawyer was ineffective in not confronting Brick with these discrepancies. The court has reviewed Brick's statements and testimony carefully, and does not agree that there are significant discrepancies in the amounts of methamphetamine he attributed to the conspiracy. Most of the amounts recited by Brick were estimates and approximations, and even so, the amounts remained relatively consistent throughout his statements and

testimony. The court does not believe there was any effective or meaningful way for Roehrich to have exploited the minor discrepancies that did exist.

Even if the discrepancies between Brick's drug quantity estimates had been significant, Brett has not shown it would have been productive for Roehrich to have engaged Brick in a detailed cross-examination on the subject. Quibbling over discrepancies in drug amounts could have come across as a sign of desperation on the part of defense counsel, and could have taken away from the overall defense strategy. Such an examination also could have had the effect of emphasizing to the jury that the Kameruds were involved in numerous transactions involving large quantities of methamphetamine over an extended period of time.

The court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Certainly, not pursuing this line of questioning was an acceptable trial strategy. Also, and notably, even the lowest calculations by Brett's post-conviction counsel exceeds the 500-gram threshold for the imposition of the 20-year mandatory minimum sentence.

Brett points out McClure testified that on one occasion, she sold Brick "like an ounce-and-a-half" of methamphetamine, and on a second occasion, she sold Brick an ounce of methamphetamine, stating, "I think it was an ounce. It was an ounce[.]" However, Brick testified the quantity he bought from McClure was two-and-a-half ounces on both occasions. Brett argues Roehrich should have confronted Brick with this inconsistency. The primary problem with this argument is that Brick was the Government's first witness at trial, and McClure testified later. The only way to have confronted Brick with this discrepancy would have been to recall him, which would have been a risky proposition. It could have been extremely damaging to the Kameruds' chances at trial if Roehrich had

recalled Brick, tried to confront him with McClure's testimony, and Brick had insisted that the quantities were, in fact, the higher amounts.

In his post-hearing brief, Brett cites several other alleged inconsistencies in the testimony of Brick and Bitz, and areas where he argues different avenues of cross-examination should have been pursued.[13] *See* Doc. No. 375 at 25-28. None of the cited "inconsistencies" was significant, and the additional avenues of cross-examination all were problematic. The court finds that if Roehrich had focused on the issues suggested by Brett, it only would have hurt Brett's chances at trial. Roehrich's decision not to pursue the defense tactics suggested by Brett clearly fell within the realm of sound trial strategy to which the presumption of effectiveness applies. Brett has failed to "overcome the presumption that, under the circumstances, [Roehrich's] challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83 (1955)).

Roehrich's decision not to attempt to impeach the cooperating witnesses on insignificant details was not without a reasonable strategic basis. Strategic choices such as these are virtually unchallengeable. *See Hernandez*, 450 F. Supp. 2d at 970. The court finds Roehrich did an effective job of confronting the Government's witnesses on cross-examination. *See also United States v. Watkins*, 486 F.3d 458, 466 (8th Cir. 2007) ("Because . . . counsel impeached [the] witnesses with their plea agreements and felony convictions, any impeachment with prior inconsistent statements would have been cumulative.") (citing *Hall v. Luebbers*, 296 F.3d 685, 694 (8th Cir. 2002)).

---

[13]For example, Brett believes Roehrich should have explored the romantic relationships between Brett, Brick, and Bitz.

### G. Denial of Sixth Amendment Right to Testify

*1.     Brett Kamerud's argument*

Brett claims he was denied his Sixth Amendment right to testify at his trial. A criminal defendant has a constitutional right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49-53, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). This right is derived from both the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's prohibition of compelled testimony. *Frey v. Schuetzle,* 151 F.3d 893, 897 (8th Cir. 1998). The American Bar Association's Standards for Criminal Justice, in Standard 4-5.2(a), and Model Rules of Professional Conduct, in Rule 1.2(a), both require counsel to consult with defendants regarding their right to testify. *See Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (noting the importance of ABA standards "as 'guides to determining what is reasonable.'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)).

Only the defendant may waive his right to testify, and the waiver must be made voluntarily and knowingly. *Frey*, 151 F.3d at 898. "[A] knowing and voluntary waiver of the right may be found based on a defendant's silence when his counsel rests without calling him to testify." *Id*. "[U]nder such circumstances the defendant must act affirmatively rather than apparently acquiescing in his counsel's advice that he not testify, and then later claiming that his will to testify was overcome." *Id*. (internal quotation marks, citation omitted).

There is no bright-line rule requiring all defendants who do not testify to waive their right to testify on the record. *Berkovitz v. Minnesota*, 505 F.3d 827, 828 (8th Cir. 2007) (declining to adopt such a rule; citing decisions from every other circuit). In fact, some courts discourage the practice. *See Brown v. Artuz*, 124 F.3d 73, 79 (2d Cir. 1997) (judicial interference with counsel's strategic decision not to place his client on the stand poses a danger that the judge will appear to encourage the defendant to invoke or waive

this right even when it is unwise to do so). Trial counsel is not required to go through any specific routine or formal waiver process. *See Taylor v. United States*, 287 F.3d 658, 662 (7th Cir. 2002) ("Nothing in the Constitution . . . justifies meddling with the attorney-client relationship by requiring advice to be given in a specific form or compelling the lawyer to obtain a formal waiver."). Ineffective assistance of counsel in advising a client of the right to testify is reviewed under the two-part test from *Strickland*. *Frey*, 151 F.3d at 899; *see Washington v. Kemna*, 16 Fed. Appx. 528, 530 (8th Cir. 2001) (applying *Strickland* two-pronged test to evaluate claim that counsel was ineffective in failing to advise defendant properly of his right to testify); *El-Tabech v. Hopkins*, 997 F.2d 386, 389 (8th Cir. 1993) (holding lack of affirmative on-the-record waiver by defendant of his right to testify "is wholly unrelated to the elements of an ineffective assistance of counsel claim") (citing *Strickland*, 466 U.S. at 687-88, 104 S. Ct. at 2064-65).

At the section 2255 hearing, Denne's first question to Brett was, "Mr. Kamerud, did you want to testify at your trial?" Brett's response was, "Yes, I did." According to Brett, he met with Roehrich before trial and asked whether his prior convictions were going to be brought up if he testified, and Roehrich responded "No," explaining that the convictions were too old and involved a different drug, LSD. At the section 2255 hearing, Brett testified that during trial, he told Roehrich he had decided to testify, and Roehrich responded, "Wait a second." Roehrich spoke with the prosecutor, and then told Brett, "You can't testify; you're going to be convicted on your priors alone." At the 2255 hearing, Brett testified, "I didn't know anything about the law. I didn't know that it was my right that I could have said, 'No I am testifying; I don't care if the prosecutor's bringing out my priors.' I was given the impression that I couldn't testify." Brett testified that Roehrich never interviewed him to determine what his testimony would be. "I think his – his whole thing was if you got priors you don't testify. That's his policy. That's

what I got from him." Cory confirmed Brett's account, testifying he had heard Brett tell Roehrich that he wanted to testify, and he heard Roehrich respond, "You cannot testify."

Brett claims Roehrich failed to explain to him why he should not testify and misled him into believing that the ultimate decision on whether or not he would testify was Roehrich's, not Brett's. Brett also argues that any concern about his prior convictions coming into the record was misplaced after Oldenkamp let the jury know Brett had been in prison. Tr. 282-84.

Roehrich denied telling Brett the prosecutor had promised that if Brett testified, he would not cross-examine him about his prior convictions because they were too old or because they involved a different drug. Roehrich also denied telling Brett he could not testify at trial, although he admitted he recommended that Brett not testify. Roehrich felt that if Brett testified, his prior drug distribution felony would come into evidence, which would have been severely damaging to his case. Roehrich also felt that Brett would be a poor witness. "He had a hard time staying focused on the issues, and he tended to be all over the place."

The court finds Roehrich discussed with Brett his right to testify. He never told Brett he could not testify, or that his prior drug conviction would not be used against him if he did testify. He also did not mislead Brett into thinking that the ultimate decision on whether he could testify belonged to his lawyer. Brett knew he had the right to testify, and he knew how to express his views to his attorney. If he had wanted to testify at trial, he would have made it clear to Roehrich. He did not do this. The court finds that Brett knowingly and voluntarily waived his right to testify.

Roehrich was justified in being concerned about Brett's demeanor on the witness stand if he had been called as a witness at trial. The court has reviewed the *pro se* materials submitted by Brett to the court and has participated in numerous hearings at which Brett either has made statements or has testified. From these observations, the court

can only conclude that Brett would have been an uncontrollable witness at trial. Putting him on the witness stand would have been dangerous, if not foolhardy.

Roehrich also was legitimately concerned that the jury would have learned of Brett's prior drug distribution conviction if he testified. Brett argues this was the chief reason for his not testifying, and the reason disappeared when Oldenkamp told the jury he had been in prison. While Oldenkamp's gaff was unfortunate, his remark was promptly stricken by the judge, and jury was instructed that stricken testimony "is not evidence and must not be considered." Doc. No. 105, Instr. No. 4, ¶ 3. "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 733, 145 L. Ed. 2d 727 (2000). In any event, the jury only knew, at the worst, that Brett had been in prison; the jury did not know Brett had been convicted of distributing drugs. This damaging information would have come out if Brett had testified at trial.

Because the court finds Brett knowingly and voluntarily waived his right to testify, it follows that Roehrich's advice to Brett that he should not testify was objectively reasonable and competent. *See Strickland*, 466 U.S. at 688-89, 104 S. Ct. at 2065. Having so found, the court does not need to address whether Brett was prejudiced by Roehrich's advice that he not testify. *Id.*, 466 U.S. at 697, 104 S. Ct. at 2069 (court does not need to address both components of *Strickland* analysis if defendant makes insufficient showing on one prong). Nevertheless, the court makes the further finding that any deficiency in counsel's advice to Brett concerning his right to testify at trial did not prejudice him. The court agrees with Roehrich's assessment that Brett would have been a poor witness if he had been called to testify at trial. Not only was his demeanor demonstrative and argumentative, his testimony, as presented at the section 2255 hearing, would have constituted a virtual confession to the charge against him.

In his testimony, Brett described the events of the summer of 2000, as follows. In early July, Brett decided to make a trip to Sioux City with Stacey Bitz and a friend of

Cory's.  Russell Brick was present when they were discussing travel arrangements, and Brick told them he knew someone in Sioux City who could get them methamphetamine. Brett responded, "[W]ell, whatever, you know."  They drove to Sioux City, where Brick met with his contact, Kurt Undine, in a parking lot.  Brick and Bitz got in a car with Undine and left.  Brett took Cory's friend to Nebraska, where Brett purchased some marijuana and dropped his passenger off.  Brett then called Brick, and Brick gave him directions to a house in Sioux City.  Brett went to the house, and he and Brick went into the basement, where they met with Undine.  Brett bought a half ounce of methamphetamine from Undine, and used some of it.

Brett was aware of eight trips to Sioux City that summer to buy methamphetamine, and he admitted he was involved in the first three.  The second trip was about a week after the first.  Brett, Bitz, and Brick came along on the trip, and Brett bought a half ounce of methamphetamine and some marijuana.  When they returned to the Kameruds' apartment in Aberdeen, someone came to the apartment looking for Brick, and Brett realized Brick was selling methamphetamine from the apartment.  Brett told Brick that he had his own house, and if he wanted to sell methamphetamine, he would have to do it there.  After that, according to Brett, Brick sold the drugs he got from Undine elsewhere, although he continued to sell drugs to Brett and Cory at their apartment.  Brett went along on the third trip, but after that, he sent money with Brick or Bitz to purchase methamphetamine.  Brett emphasized in his testimony that these purchases were for his personal use.

In his testimony, Brett admits that on three occasions he traveled to Sioux City with Brick and/or Bitz to purchase methamphetamine from Undine.  He knew that Brick also was purchasing methamphetamine on these trips.  He admits that after the first three trips, he sent money along with Brick and Bitz when they went to Sioux City so they could purchase methamphetamine for him.  He knew that Brick was selling at least some of the methamphetamine he was purchasing on these trips.

80

Brett's testimony does not, as he insists, establish that he was just a drug user who was merely present when drug distribution activities were occurring. He admits he arranged and participated in trips from Aberdeen to Sioux City, for the purpose of purchasing methamphetamine. He admits he was involved in eight of these trips, and that he went on three of the trips himself. On the trips when he did not travel to Sioux City himself, he sent money along for the purchase of drugs, with the understanding that the drugs would be returned to Aberdeen and delivered to him. He knew that some of the methamphetamine purchased by others on these trips was to be brought back to Aberdeen for resale (although he denies that any of the methamphetamine purchased by him was for resale). In fact, he admits Brick brought methamphetamine back to Aberdeen from Sioux City, and he and Cory purchased some of those drugs from Brick. All of this evidence establishes that Brett knowingly and intentionally entered into an agreement or understanding to assist in the transportation of methamphetamine from Sioux City to Aberdeen, so that at least some of the drugs could be redistributed. These are the elements of a conspiracy to distribute methamphetamine.

The court finds Roehrich's performance in advising Brett of his right to testify at trial, and recommending that he not do so, was competent and objectively reasonable. Further, even if there was any error in Roehrich's advice to Brett regarding his right to testify, the court finds Brett was not prejudiced.

## 2. *Cory Kamerud's argument*

Cory claims he was denied his Sixth Amendment right to testify on his own behalf at trial. Cory explained he initially decided not to testify because he felt the jury would convict him after learning of his prior drug distribution felony. However, when he saw how the trial was progressing, he changed his mind. He decided, "I need to get my side of the story out. . . . I felt that I would have been a more believable witness than Russ

Brick." When he told McMinn he wanted to testify, "She said I couldn't basically. I mean, I wasn't really given much of an option." According to Cory, McMinn never discussed with him his right to choose whether or not to testify, and in fact, Cory had the impression he did not have that right.

McMinn testified she recommended to Cory that he not testify at trial, but she left the final decision up to him, and he decided not to testify. According to McMinn, when things were not going well during the trial, they again discussed whether he should testify, and he again decided not to testify.

The court finds McMinn properly advised Cory concerning his right to testify at his trial, but she persuaded him that it was not in his best interest to do so. Again, the court agrees with counsel's assessment that it would have been inadvisable for Cory to testify. As with Brett, Cory's testimony, as presented at the section 2255 hearing, would have constituted a virtual confession to the charge against him.

The court finds Cory knowingly and voluntarily waived his right to testify.

### H. Failure to Have Menzel Drug Evidence Excluded at Trial

Brett and Cory both argue their trial attorneys were ineffective in not seeking to have the evidence seized in connection with their arrest in Aberdeen, South Dakota, excluded from evidence at trial. *See* Doc. No. 375 at 37; Doc. No. 376 at 14-15. Neither Brett nor Cory states the grounds on which this evidence should have been excluded, and neither has cited any authorities in support of this argument.

In its brief response to this argument, the Government asserted the following:

> Again, this is a matter of trial strategy and tactics and not a proper claim for ineffective assistance of counsel.
>
> Defendant's trial counsel was aware that Jenny Menzel, a minor, who was being called as a witness for the defense . . . would effectively testify the methamphetamine seized from her purse was hers and not defendant's. Ms. Menzel

> testified in the manner anticipated and apparently effectively
> since defendants were not convicted of distributing metham-
> phetamine to a minor. . . . Therefore, trial counsel's tactic of
> contesting the government's evidence and use of co-defen-
> dant's witness was apparently effective in regard to this matter.

Doc. No. 381 at 13-14; Doc. No. 382 at 12.

Exactly what counsel's objection should have been is not stated by either defendant. Instead, they simply state that because Jenny Menzel testified the drugs were hers and the Kameruds knew nothing about them, the drugs should have been excluded from evidence at trial. Of course, whether to believe this testimony was within the province of jury, not the court. *See United States v. Clyde*, 168 Fed. Appx. 135, 138 (8th Cir. 2006) (jury weighs witnesses' credibility and is free to reject any testimony they regard as unbelievable); *United States v. Martinez*, 958 F.2d 217, 218 (8th Cir. 1992) ("It is the sole province of the jury to weigh the credibility of a witness."). Accordingly, the argument fails.

In a related argument, the Kameruds challenge the effectiveness of their counsel in responding to the superseding indictment. The court will address those arguments in subsection IV.J. of this Report and Recommendation, *infra*.

### I. Failure to Ensure Brett was Present at Deposition of Agent Price

Brett argues Roehrich was ineffective because he allowed the deposition of Agent Craig Price to be introduced at trial even though Brett was not present when the deposition was taken and, therefore, was not present for the cross-examination of the witness. Doc. No. 375 at 38.

Roehrich testified he notified Brett of the date, time, and place of the deposition, and he advised Brett of his right to be present for the deposition. Roehrich also advised Brett that he should attend the deposition. Roehrich's office records support this testimony. *See* Def. Hr. Ex. T, entry dated 11/19. Brett testified that he wanted to attend

the deposition, but he told Roehrich he could not because he needed to attend a preliminary examination in South Dakota state court. Roehrich disputes Brett's assertion, stating he has no record and no recollection that Brett told him he could not be present for the deposition. Brett testified there was no discussion about rescheduling the deposition, and Roehrich had no record of Brett asking him to reschedule the deposition.

The court finds Roehrich told Brett of the date, time, and place of the Price deposition, and advised Brett that he had the right to attend and he should attend. Brett responded that he wanted to attend the deposition, but he could not because he had to be in state court. Roehrich and Brett had no further discussion about the deposition. Roehrich attended the deposition, and Brett did not. At trial, the deposition was read to the jury without objection.

There is no question that Brett had the right to attend the deposition. The right to confront ones accuser's is "a fundamental trial right, 'with a lineage that traces back to the beginnings of Western legal culture, . . . "essential to a fair trial in a criminal prosecution."'" *Don v. Nix*, 886 F.2d 203, 206-07 (8th Cir. 1989) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1016-17, 108 S. Ct. 2798, 2800-01, 101 L. Ed. 2d 857, 865 (1988) (plurality), in turn quoting *Pointer v. Texas*, 380 U.S. 400, 404, 85 S. Ct. 1065, 1068, 13 L. Ed. 2d 923 (1965)). "The presence of the defendant enhances the accuracy of the testimony." *Id.* (citing *Coy* 487 U.S. at 1017-19, 108 S. Ct. at 2801-02, 101 L. Ed. 2d at 865-66).

Because the right of confrontation is "a personal right of the accused and . . . intended for his benefit," the right can be waived by the accused. *United States v. Carlson*, 547 F.2d 1346, 1357 (8th Cir. 1976) (citing, *inter alia*, *Brookhart v. Janis*, 384 U.S. 1, 4, 86 S. Ct. 1245, 1247, 16 L. Ed. 2d 314 (1966)). "To constitute a valid waiver there must be 'an intentional relinquishment or abandonment of a known right or privilege' by the accused." *Carlson*, 547 F.2d at 1357 (quoting *Johnson v. Zerbst*, 304 U.S. 458,

464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461 (1938)); *accord Clemmons v. Delo*, 124 F.3d 944, 956 (8th Cir. 1997) (citing *Johnson v. Zerbst*, and quoting *Brookhart*). "A waiver of the right of confrontation can take various forms," such as stipulating to the admission of evidence, entering a guilty plea, or sometimes even misconduct. *Id.* (citations omitted). The right may be waived, for example, "when a defendant is disruptive or seeks to intimidate a witness." *Carlson*, 886 F.2d at 206. However, an attorney cannot waive his client's fundamental trial right of confrontation. *See id.*, 886 F.2d at 207; *accord Clemmons*, 124 F.3d at 956 ("[I]n any event, the law seems to be clear that the right of confrontation is personal and fundamental and cannot be waived by counsel. *See, e.g.*, *Brookhart v. Janis*, 384 U.S. 1, 7, 86 S. Ct. 1245, 1248, 16 L. Ed. 2d 314 (1966).") If the defendant does not waive his right of confrontation, "no amount of showing of want of prejudice" will cure the constitutional error. *Brookhart*, 384 U.S. at 3, 86 S. Ct. at 1247. "There is a presumption against the waiver of constitutional rights[.]" *Id.*, 384 U.S. at 4, 86 S. Ct. at 1247.

Thus, the first question here is whether Brett intentionally relinquished or abandoned his known right to be present for Price's deposition. Considering the presumption against waiver of such a fundamental right, and the lack of clarity concerning Brett's statements to Roehrich, the court finds Brett did not waive his right to be present at the deposition. Having so found, the court next must consider whether Roehrich's failure to object to entry of the deposition into evidence at trial constituted ineffective assistance of counsel. To make this determination, the court must consider whether the admission of Price's deposition was harmless error beyond a reasonable doubt. *See Don*, 886 F.2d at 208 (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). Stated differently, the court must determine whether Price's deposition testimony was of such importance that without it, a reasonable probability exists that the

result of the trial would have been different.  *See Hook v. Iowa*, 307 F.3d 756, 759 (8th Cir. 2002).

Price testified regarding the presence of drugs and drug paraphernalia in the Kameruds' apartments.  He also testified he had witnessed come-and-go traffic at Brett's apartment, and he testified about items found in Menzel's residence.  To some extent, Price's testimony was cumulative of other witnesses' testimony.  The court is unable to say a reasonable probability exists that Price's testimony carried the day for the prosecution, or that it would have been error beyond a reasonable doubt for the trial court to admit Price's deposition into evidence over a proper objection by defense counsel.  Thus, the court concludes Brett has failed to show he was prejudiced by the admission of Price's deposition at trial.[14]

### J. Failure to Challenge the Superseding Indictment

The Kameruds argue their trial and appellate attorneys were ineffective in failing to challenge the superseding indictment.  They argue that while the superseding indictment charges a single conspiracy, the evidence at trial proved two distinct conspiracies.  They further argue venue was improper in this court for the second conspiracy, which occurred entirely in South Dakota.  *See* Doc. No. 375 at 40; Doc. No. 376 at 17.

The court first must determine whether the Kameruds are precluded from raising this issue by the ruling of the Eighth Circuit Court of Appeals on their direct appeal.  In their appeal, the Kameruds contended "the government failed to charge multiple conspiracies even though the evidence proved two separate conspiracies, one involving the events of the summer of 2000, and a second involving events which occurred in 2001."  The court reviewed this issue for plain error "because the Kameruds did not raise or

---

[14]Notably, however, this issue likely becomes moot based on the court's ruling in subsection IV.J, *infra*.

preserve the claim[ ] in the district court." *Kamerud*, 326 F.3d at 1013. The court explained, "Under the plain error standard, we will only reverse obvious errors which affect a defendant's substantial rights and seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id*. The court found no plain error, holding:

> Even if we assume the Kameruds' contention is true, there is no plain error. The Kameruds did not request a jury instruction on multiple conspiracies, and cannot show any prejudice because, if there were two conspiracies, the Kameruds were parties to both. *See United States v. Zimmerman*, 832 F.2d 454, 457 n. 2 (8th Cir. 1987) (rejecting a claim of prejudice where proof of multiple conspiracies varied from indictment charging single conspiracy, but evidence showed defendant was a party to each conspiracy).

*Id*.

In *United States v. Zimmerman*, 832 F.2d 454 (8th Cir. 1987), cited by the *Kamerud* court, the court observed in a footnote:

> 2/ Zimmerman also raises a related argument that the government's proof at trial of multiple conspiracies so varied from the proof of the single conspiracy alleged in the indictment that the resulting prejudice requires reversal as to Count I (the conspiracy count). Yet, even if there were only multiple conspiracies proved at trial, Zimmerman could not have been prejudiced because the evidence showed, and the jury certainly could have concluded, that Zimmerman was a party to each conspiracy. *See United States v. Scott*, 511 F.2d 15, 19-20 (8th Cir. 1975) (no prejudice in proof of multiple conspiracy where defendant was a member of each conspiracy); *United States v. Wilson*, 497 F.2d 602, 605 (8th Cir. 1974), *cert. denied*, 419 U.S. 1069, 95 S. Ct. 655, 42 L. Ed. 2d 664 (1975) (same).

*Id.*, 832 F.3d at 457.

However, the Eighth Circuit did not address the particular issue facing the court in this 2255 action, either in *Kamerud* or in the *Zimmerman* footnote. The issue here is

whether the Kameruds' attorneys were ineffective in failing to challenge the superseding indictment which charged the Kameruds in a single conspiracy count when, in fact, two separate conspiracies existed, and when the court has venue over the first conspiracy (occurring in Iowa and South Dakota) but does not have venue over the second (occurring in South Dakota only). Answering the question of whether or not the Kameruds were parties to both conspiracies does not resolve the challenge to this court's venue over the 2001 South Dakota conspiracy. Furthermore, the issue now before the court is whether the Kameruds' attorneys were ineffective in failing to address these issues at trial and on appeal, not whether the trial court committed errors that affected the Kameruds' "substantial rights and seriously affec[ed] the fairness, integrity, or public reputation of judicial proceedings." *Kamerud*, 326 F.3d at 1013. A review under *Strickland* requires a different analysis than a review for plain error. For these reasons, the court is not precluded by the Eighth Circuit's ruling on direct appeal from addressing the Kameruds' claim that their attorneys were ineffective in failing to challenge the superseding indictment.

Obviously, if the evidence proved the existence of a single conspiracy, rather than multiple conspiracies, then the Kameruds cannot show prejudice and their arguments would be unavailing. Accordingly, the court first will consider whether the evidence did, in fact, show two conspiracies rather than one. On July 19, 2001, the Kameruds were charged in this court with conspiracy to distribute methamphetamine between June 2000 and August 2000. On August 25, 2001, while Brett and Cory were on pretrial release, they were found with 17-year-old Jenny Menzel in a vehicle parked under an overpass in Aberdeen, South Dakota. Officers discovered methamphetamine inside Menzel's purse, and Brett, Cory, and Menzel all were arrested on state drug charges. From the beginning, Menzel consistently claimed that the methamphetamine belonged to her, and the Kameruds had nothing to do with it. In a search of Menzel's home after her arrest, officers discovered

drug packaging, and ledgers and notebooks containing records consistent with the distribution of methamphetamine.

On October 24, 2001, the grand jury in the Northern District of Iowa returned a one-count superseding indictment. In the superseding indictment, the date of the termination of the conspiracy was extended by one year, from August 2000 to August 2001, to include the events in Aberdeen, South Dakota, on August 25, 2001. Also, an allegation was added to the charge that the defendants "distribute[d] and possesse[d] with intent to distribute . . . methamphetamine to one or more persons under twenty-one years of age." The Kameruds argue there is no link between the methamphetamine found in Menzel's purse in South Dakota, and the conspiracy charged in the superseding indictment. They further argue there is no venue in Iowa over any criminal conduct related to the Menzel arrest. According to this argument, the conspiracy ended when Brick and Bitz were arrested in Sioux City on August 23, 2000, and any activities in South Dakota in 2001, were after the termination of the conspiracy.

The court finds it is clear from the record that the conspiracy, in fact, was disbanded after Brick and Bitz were arrested in Sioux City on August 23, 2000. The evidence at trial proved two distinct conspiracies, rather than the single conspiracy charged in the superseding indictment. Thus, the court next must consider whether the failure of the Kameruds' trial and appellate counsel to challenge the superseding indictment constituted ineffective assistance of counsel. To prevail on their argument, the Kameruds must satisfy the two-pronged test outlined in *Strickland*; that is, they must show their counsel's performance was deficient, and that they were prejudiced by their counsel's errors.

The Kameruds argue their lawyers should have challenged the superseding indictment as improperly including the August 25, 2001, incident in the alleged conspiracy. They contend that even though there might have been some overlap between

the members of the conspiracy and the participants in the Menzel incident[15], this does not prove the Menzel incident was part of the conspiracy. *See* Doc. No. 375 at 40 (citing *United States v. Morales*, 113 F.3d 116, 119 (8th Cir. 1997)). They further argue that because the Menzel incident was not part of the conspiracy, and it took place entirely in South Dakota, there was no venue for the charge in Iowa. *See id.* at 42 (citing *United States v. Durades*, 607 F.2d 818-20 (9th Cir. 1979) (conviction overturned because court found there were two conspiracies instead of one, and no venue for second conspiracy)). *See also* U.S. Const., art. III, § 2; U.S. Const. amend. VI; Fed. R. Cr. P. 18. They contend their lawyers were ineffective for not raising these issues. The record establishes that neither of the Kameruds' trial lawyers objected to the superseding indictment or the admissibility of the evidence related to the Menzel arrest, or in any other way presented these issues to the court, nor did their appellate attorneys properly raise these issues on appeal.

The Government responds to these arguments as follows:

> The superseding indictment in this case expanded the time frame in the conspiracy from June - August 2000 to include August 2001 and added the objective of distribution to a minor in the conspiracy. The amendments contained in the superseding indictment were based on the anticipated testimony of Billy Oldenkamp (and corroboration by other existing witnesses) and officers involved in the traffic stop of Jenny Menzel, defendant and his brother in August of 2001. At trial, little, if any, connection was able to be established between defendant (and his brother) and the methamphetamine seized from Jenny Menzel and similarly little evidence, if any, established defendant's (and his brother's) continuous involvement in drug trafficking with Billy Oldenkamp (either during original conspiracy time period or later expanded time frame). However, the jury declined to convict defendant (or

---

[15]The only overlap was that Brett and Cory were both alleged members of the conspiracy, and both were present at the time and place of the Menzel incident.

> his brother) of anything regarding this evidence since there
> was no finding of distribution to a minor objective of the
> conspiracy (Menzel and Oldenkamp were the only minors
> discussed in evidence). Therefore, trial counsel's strategy to
> attack the government's evidence was apparently effective in
> this regard and consideration of any other strategy (pre-
> trial/post-trial motions) is moot.

Doc. No. 381 at 14. The Government does not cite any legal authority in support of its argument.

The stated trial strategy of both attorneys was, in part, to challenge the credibility of the Government's informant-witnesses. This strategy was certainly a reasonable one. Until the Menzel incident, every Government witness accusing the Kameruds of dealing drugs was a cooperating informant hoping for a substantial reduction in his or her sentence. They all were presenting "historical" evidence. Except for the methamphetamine seized from Brick and Bitz in Sioux City on August 23, 2000, when the Kameruds were not even present, the Government had no physical evidence to offer in connection with their testimony. If the defense could discredit these witnesses, it would go a long way toward undermining the Government's case.

This changed when the ending date of the conspiracy was extended by a year, allowing the Government to offer the Menzel evidence as evidence of the conspiracy. With the expansion of the indictment, the Government was able to show that methamphetamine packaged for resale was seized from a vehicle occupied by the Kameruds. The Government was able to call police officers who testified to the arrest of the Kameruds and the search and recovery of evidence from Jenny Menzel's home. This was a powerful addition to the Government's case.

The court finds the record contains little or no evidence to connect the Menzel incident to the conspiracy that existed in South Dakota and Iowa in the summer of 2000. Incredibly, the Government seems to agree. In its post-hearing brief, the Government

virtually concedes there was no probative evidence connecting the Menzel evidence to the conspiracy, stating, "At trial, little, if any, connection was able to be established between defendant (and his brother) and the methamphetamine seized from Jenny Menzel and similarly little evidence, if any, established defendant's (and his brother's) continuous involvement in drug trafficking with Billy Oldenkamp (either during original conspiracy time period or later expanded time frame)." Doc. No. 381 at 15. The only evidence that even arguably supports such a connection is the testimony of Billy Oldenkamp and Stacey Bitz.

When Oldenkamp testified at trial, he was 17 years old, and was in the custody of South Dakota juvenile authorities. He testified that shortly before Brick and Bitz were arrested in Sioux City on August 23, 2000, he was arrested in South Dakota. He was released from custody in February 2001. In about March 2001, he started hanging out with Brett and Cory, mainly at Brett's and Cory's apartments. After awhile, he started using methamphetamine, some of which he got from Brett and Cory. He testified that during this period of time, he sometimes was a supplier of methamphetamine to Brett and Cory. Inexplicably, he also testified in detail to the events in the Kameruds' apartment in the summer of 2000. This seems to have been inconsistent with his testimony that he did not start hanging out with the Kameruds until 2001.

Oldenkamp was not a credible witness, but even if the jury believed his testimony, he provided no evidence to connect the events before Brick and Bitz were arrested in Sioux City in the summer of 2000, to what occurred in Aberdeen in 2001. His testimony did not support any connection between the conspiracy in South Dakota and Iowa in the summer of 2000, and events in South Dakota in 2001. In particular, his testimony did not connect the evidence from the Menzel arrest to the conspiracy in the summer of 2000.

Bitz testified that after she was arrested in Sioux City on August 23, 2000, and then was released from custody, she reestablished her relationship with the Kameruds.

According to Bitz, they continued to sell methamphetamine at least until June 2001, when she went back into custody. Again, this testimony did not connect the Menzel arrest to the conspiracy.

The jury returned verdicts finding both defendants guilty of conspiracy to (1) "distribute methamphetamine," (2) "possess with intent to distribute methamphetamine," and (3) "possess with intent to distribute methamphetamine to one or more persons under twenty-one years of age," but not guilty of conspiracy to "distribute methamphetamine to one or more persons under twenty-one years of age." Doc. No. 107. There were two minors allegedly involved in this conspiracy, Billy Oldenkamp and Jenny Menzel. Oldenkamp testified he was an important customer of the Kameruds in 2001. Because the jury did not convict the Kameruds of conspiracy to distribute methamphetamine to a minor, it is obvious the jury did not believe this testimony. Consequently, the conviction for conspiracy to possess methamphetamine with intent to distribute to a minor must have been based on the Menzel evidence, even though, as the Government admits, little or no connection had been established between the Kameruds and the methamphetamine seized from Jenny Menzel. *See* Doc. No. 381 at 15.

At the section 2255 hearing, neither Roehrich nor McMinn advanced any reason for failing to challenge the superseding indictment, whether in pretrial motions or at least before the case was submitted to the jury, and the court cannot discern any such reason. At the close of the Government's case, Roehrich's entire argument was as follows: "Under the rules of criminal procedure, I would move to dismiss the charge against Mr. Brett Kamerud based on the fact that the government has not presented a sufficient case to be submitted to the jury." Tr. 321-22. McMinn reserved her motion until the close of the Government's case, Tr. 322, and then stated, "[A]t this time I would like to make my motion for acquittal based on lack of evidence. The state (sic) has not presented evidence sufficient for this matter to go to the jury, and that's basically all I have to say." Tr. 369.

Had the Kameruds' attorneys raised the issues of venue and multiple conspiracies at the close of the Government's evidence, the court finds such arguments likely would have been successful. "'A variance results where a single conspiracy is charged but the evidence at trial shows multiple conspiracies.'" *United States v. Cain*, 487 F.3d 1108, 1113 (8th Cir. 2007) (quoting *United States v. Morales*, 113 F.3d 116, 119 (8th Cir. 1997)). However, "[v]ariances are not always fatal. To be so they should pertain to the essence of the offense charged, *or to the venue of the prosecution*." *Flack v. United States*, 272 F. 680, 681 (8th Cir. 1921) (emphasis added); *accord Cain*, 487 F.3d at 1113. Here, in addition to the impact on the venue of the prosecution, the variance also resulted in a "prejudicial spillover effect" from the introduction of evidence relating to the South Dakota conspiracy. *See Cain*, 487 F.3d at 1113; *United States v. Pizano*, 421 F.3d 707, 720 (8th Cir. 2005) (court will reverse "only if the variance infringed a defendant's substantial rights") (citing *United States v. Ghant*, 339 F.3d 660, 662 (8th Cir. 2003)); *see also United States v. Marulanda*, 972 F.2d 1345 (Table), 1992 WL 197401 (9th Cir. Aug. 18, 1992) ("A variance is shown when, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the elements of the crime charged beyond a reasonable doubt. . . . If the variance between the indictment and proof affects the substantive rights of the parties, then it is prejudicial and warrants reversal.") (citations omitted).

The Government bore the burden of proving by a preponderance of the evidence that venue was proper as to the conduct charged in the indictment. Here, where two distinct conspiracies were proved, the Government would bear the burden of proving venue as to each of them. *See United States v. Granados*, 117 F.3d 1089, 1091 (8th Cir 1997); *United States v. Bonadonna*, 775 F.2d 949, 955 (8th Cir. 1985). In addition, "The question whether a single conspiracy or multiple conspiracies exist is for the jury." *Zimmerman*, 832 F.2d at 457. In this case, the jury was never given the opportunity to

decide whether there was one conspiracy or more than one, and if the latter, whether venue was proper as to each. *Cf. Bonadonna*, 775 F.2d at 955 (noting "issues of venue and multiple conspiracies were submitted to the jury and decided in favor of the government").

These arguments were not inconsistent with the defense strategy and they should have been asserted by trial counsel. Simply stated, defense counsel had much to gain from asserting these arguments, and nothing to lose. It was a serious error not to make the arguments, and by not doing so, counsel's performance fell outside the wide range of reasonable professional assistance required by the Sixth Amendment. Compounding the error, appellate counsel should have raised these issues on direct appeal. The court finds it was deficient performance for counsel not to have asserted these arguments. The court further finds the Kameruds were prejudiced in two ways: first, because the damaging "spillover" evidence from the Menzel incident would have been excluded from the trial, and second, because their fundamental right to proper venue was violated. *See Granados*, 117 F.3d at 1091 (noting proper venue is a right guaranteed by Article III, section 2 of the United States Constitution, the Sixth Amendment, and Rule 18 of the Federal Rules of Criminal Procedure) (citations omitted).

The Kameruds have met their burden to show both that their attorneys' performance was deficient, and that they were prejudiced by their attorneys' errors. As a result, they are entitled to a new trial.

### K. Failure to Argue Prosecutorial Misconduct

Brett argues his trial counsel and his appellate counsel were ineffective in failing to claim the prosecutor committed misconduct during closing arguments. According to Brett, "The prosecutor, in his closing arguments, made several improper comments, referred to perjurious testimony as truthful, said witnesses testified to things they never testified to, inflated the amounts testified to by alleged coconspirators, and improperly used Bridget

McClure's last name in conjunction with Jenny Menzel's first name which mislead the jury regarding the source of that testimony." Doc. No. 375 at 44. This is one of several frivolous issues the Kameruds have continued to pursue in this matter, with the effect of bogging down the entire case.

A prosecutor must limit his closing arguments to "the evidence and reasonable inferences that may be drawn from it." *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001). However, "fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of a[ ] . . . judge's chambers." *United States v. Mullins*, 446 F.3d 750, 758 (8th Cir.), *cert. denied*, ___ U.S. ___, 127 S. Ct. 284, 166 L. Ed. 2d 217 (2006). As a result, a defendant must show exceptional circumstances to obtain reversal based on an arguably improper statement by a prosecutor during closing arguments. *Id.* An appellate court reviews comments made during closing arguments as to which no objections were made under the plain error doctrine. To obtain reversal on appeal, a defendant must show a plain error occurred that affected his substantial rights. *Id.*; *accord United States v. Smith*, ___ F.3d ___, 2007 WL 4105393 (8th Cir. Nov. 20, 2007). Thus, if plain error occurred in the prosecutor's closing arguments that affected Brett's substantial rights, then his counsel would have been ineffective in failing to make a timely objection to the prosecutor's statements, and Brett's appellate counsel would have been ineffective in failing to raise the issue on appeal.

Most of Brett's argument consists of nitpicking the descriptions of drug quantities and the prosecutor's characterization of the evidence. Nearly all of the comments by the prosecutor had some basis in the record, and constituted proper argument. To the extent the prosecutor may have summarized some of the evidence erroneously, any adverse effects were negligible, and the court cannot say the error was plain or affected Brett's substantial rights. *See United States v. Hance*, 501 F.3d 900, 908 (8th Cir. 2007).

Brett also complains about the fact that during the prosecutor's final argument, he referred to "Jenny McClure" when he obviously was referring to Jenny Menzel. Doc. No. 152 at 32; *see* Tr. 371.[16] This was a trivial matter of no consequence in the case. Furthermore, the jury was instructed correctly on what is and what is not evidence, and was advised specifically that arguments are not evidence. *See* Doc. No. 105, Instr. No. 4.[17]

Even if the misstatement had been more serious, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. [Internal quotation marks, citation omitted.] . . . The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)); *accord United States v. Johnson*, 495 F.3d 951, 978 (8th Cir. 2007). In the present case, the court finds that in its entirety, the prosecutor's final argument did not confuse or mislead the jury, or so infect the trial with unfairness as to deny the

---

[16]The following exchange occurred:

> (Argument by prosecutor) What is this case about? This case is about this. This is the five to six grams broken down into gram amounts and found in Jenny McClure's (sic) vehicle and her purse occupied by Brett and Cory Kamerud while they were out on release after being charged in this case.
>
> MR. ROEHRICH: Your Honor, I'll object. That's a misstatement of the evidence.
> THE COURT: Overruled. You may continue.

Tr. 371. After the closing arguments, Roehrich clarified that his objection was to the prosecutor's statement that the Kameruds were out on release at the time of their arrest. Tr. 372. He was not intending to object to the prosecutor's misstatement of Jenny Menzel's surname because he did not want to "help [the prosecutor] out." Tr. 373.

[17]In Instruction No. 4, the court explained what is and is not evidence. Among other things, the court instructed the jury that "[s]tatements, arguments, questions and comments by lawyers representing the parties in the case are not evidence." Doc. No. 105, Instr. No. 4.

defendants due process.  *See Pederson v. Fabian*, 491 F.3d 816, 829 (8th Cir. 2007) (quoting *Darden*).

Further, in this examination of whether Roehrich's failure to object to the prosecutor's closing arguments constituted ineffective assistance of counsel, it is significant that Roehrich decided not to object to the misstatement on strategic grounds.  *See* Tr. 373. Appellate counsel also made a strategic, and in the view of this court wise, decision not to raise the issue on appeal.  These were strategic choices that cannot, at least under these circumstances, be challenged.  *See Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066.


### L. Conflict of Interest of Cory's Trial Counsel

Cory argues McMinn had a conflict of interest because she consulted with Brett at the same time she was consulting with her client, Cory.  Doc. No. 376 at 8.  The facts developed at the section 2255 hearing do not support this claim.  McMinn testified that during trial preparations, she and her legal assistant had numerous contacts with Cory, both in person and by telephone.  Brett Kamerud was present for many of their meetings, but according to McMinn, "even when Brett was with him, my consultation was with Cory."  Hr. Tr. 280.  Cory did not dispute this testimony.

Now, Cory is arguing McMinn did not represent his interests, and his alone, because Brett participated in these meetings.  The record simply does not support this claim.  In support of his argument, Cory cites *United States v. Auerbach*, 745 F.2d 1157 (8th Cir. 1984), and *United States v. Unger*, 665 F.2d 251 (8th Cir. 1981).  Neither case is applicable here.

In *Auerbach*, a single attorney represented both a father and a son who were charged with certain firearms violations, and they presented a unified defense at trial.  The court found an actual conflict of interest existed, noting the joint representation "exacerbated a situation in which the sins of the son were visited on the father."

*Auerbach*, 745 F.2d at 1161. The court explained, "An actual conflict occurs when counsel cannot use his best efforts to exonerate one defendant for fear of implicating the other." *Id.* The court found the defendant had met his burden under the "competing interests" standard, showing not only that his attorney had "failed to advance the cause of one defendant, but also [did] so to protect the competing interests of a jointly represented codefendant[.]" *Id. Auerbach* presents a far different situation than the one here. McMinn never undertook to represent Brett. She represented only Cory. Brett's presence at some of her consultations with Cory did not rise to the level of joint representation.

Similarly, in *Unger*, one attorney represented a husband and wife who were charged with kidnappng a child and other offenses. The court held that in the absence of an objection to the joint representation, the defendant had to show an actual conflict of interest existed, and the conflict adversely affected the lawyer's performance. *Unger*, 665 F.2d at 255 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708. 1718, 64 L. Ed. 2d 333 (1980)). Cory has failed to show any actual conflict of interest in McMinn's representation of him. The court finds McMinn had no actual conflict of interest.


### M. Failure to Have Cory's Prior Conviction Excluded from Evidence

Cory argues McMinn should have filed a motion in limine to exclude his prior conviction so he could have testified at trial without being confronted with the conviction on cross-examination. Doc. No. 376 at 15. Cory did not testify at his trial, so his prior felony drug distribution conviction was not placed before the jury. If he had testified, his prior conviction would have been admissible to impeach him under Federal Rule of Evidence 609(a)(1), which provides, in relevant part, "[E]vidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Cory was convicted of distributing a controlled substance on January 31, 1992, in South Dakota state

court. *See* Doc. No. 39. If Cory had testified and denied his involvement in selling methamphetamine in connection with the charged conspiracy, his prior drug distribution conviction would have been highly probative impeachment evidence that undoubtedly would have been admitted into evidence.

In any event, on October 30, 2001, the Government filed a motion seeking to admit Cory's prior conviction on cross-examination of the defendants. Doc. No. 59. McMinn resisted the motion on November 21, 2001, and with her resistance, she filed a detailed brief. Doc. No. 84. On the same date, Roehrich resisted the motion on Brett's behalf. Doc. No. 86. After the conclusion of the trial, Judge Longstaff denied the Government's motion as moot, "as the defendants failed to testify." Doc. No. 99. Thus, McMinn did everything she could have done to exclude this evidence. The fact that the motion prompting her brief was filed by the Government rather than by McMinn is irrelevant.

The law and the facts do not support a claim that McMinn was ineffective in failing to obtain an order excluding Cory's prior conviction from evidence if he had testified at trial.


### N. Failure to Negotiate a Plea

Cory argues that if he had been advised properly, he would have pled guilty, and he could have avoided the 20-year mandatory minimum sentence if he had done so. Doc. No. 376 at 13 (citing *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995)).

McMinn testified, "Cory wasn't interested in any pleas." Hr. Tr. 290. If she had negotiated with the Government, the best she felt she could have done was to get the Government to withdraw the section 851 enhancement, which would have resulted in Cory's getting a 10-year sentence instead of a 20-year sentence. According to McMinn, "[H]e wasn't interested in it. He was convinced he'd be found not guilty." *Id*.

Cory testified he did not recall specifically discussing with McMinn the possibility of pleading guilty, but he did recall generally some discussions about this topic. "The gist of what she told me was if you cooperate, you will get less than ten years. If you don't, you will get around ten years, and if you take it to trial, you might get more than ten years." Hr. Tr. 199. According to Cory, McMinn also never discussed with him the Sentencing Guidelines or the mandatory minimum penalties. He claimed the first time he heard of the 20-year mandatory minimum was at his arraignment on the superseding indictment.

"The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case . . . [and] counsel may and must give the client the benefit of counsel's professional advice on this crucial decision." *Boria v. Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996). It follows that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (citing *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1991)). To prove McMinn was ineffective, Cory must show McMinn's advice, or lack of advice, regarding whether or not he should plead guilty was outside the range of competence demanded of attorneys in criminal cases. *See Strickland*, 466 U.S. at 687-88, 104 S. Ct. at 2064-65; *Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir. 1981) (citing *Tollett v. Henderson*, 411 U.S. 258, 266, 93 S. Ct. 1602, 1607, 36 L. Ed. 2d 235 (1973)). "A guilty plea must represent the informed, self-determined choice of the defendant among practicable alternatives; a guilty plea cannot be a conscious, informed choice if the accused relies upon counsel who performs ineffectively in advising him regarding the consequences of entering a guilty plea and of the feasible options." *Hawkman v. Parratt*, 661 F.2d 1161, 1170 (8th Cir. 1981) (citing *United States v. Cannon*, 553 F.2d 1052, 1056 (7th Cir. 1977)).

Significantly, in addition to demonstrating McMinn's performance fell below "an objective standard of reasonableness," Cory also must show that but for McMinn's erroneous advice, or lack thereof, he would have elected to plead guilty and would not have proceeded to trial. *See Hill v. Lockhart*, 474 U.S. 52, 57, 106 S. Ct. 366, 369-70, 88 L. Ed. 2d 203 (1985) (holding *Strickland*'s two-part standard applies to ineffective assistance of counsel claims arising out of the plea process).

The primary problem with Cory's argument is that he evidenced an unwillingness even to consider a guilty plea. McMinn testified she explained to Cory the benefit he might receive if he pled guilty, but Cory simply was not interested in considering a plea because he remained "convinced he'd be found not guilty." Hr. Tr. 290. Cory has not offered any credible, non-conclusory evidence that he would have pled guilty had he been properly advised. Furthermore, although a defendant may show prejudice if a plea bargain agreement would have resulted in a lesser sentence, *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995), the court finds Cory has failed to establish that he would have been offered a 10-year sentence in exchange for pleading guilty.

The court finds Cory has failed to show McMinn's assistance was ineffective in advising him regarding the potential benefits of entering a guilty plea. The court further finds that even if McMinn's advice had been deficient, Cory has failed to show he was prejudiced.

### *V. CONCLUSION*

For the reasons set forth above, **IT IS RESPECTFULLY RECOMMENDED** that defendant Brett Kamerud's motion pursuant to Title 28 U.S.C. § 2255 **(Doc. No. 221)** be **granted in part and denied in part**, and defendant Cory Kamerud's motion pursuant to section 2255 **(Doc. No. 229)** be **granted in part and denied in part**, as discussed above.

Any party who objects to this Report and Recommendation must serve and file specific, written objections by **January 7, 2008**. Any response to the objections must be served and filed by **January 28, 2008**.

**IT IS SO ORDERED.**

**DATED** this 20th day of December, 2007.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT