**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

BRETT KAMERUD and CORY
KAMERUD,

        Defendants.

No. CR 01-4060-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION ON
DEFENDANTS' § 2255 MOTIONS
AND PARTIES' OBJECTIONS AND
RESPONSES TO MAGISTRATE
JUDGE'S REPORT AND
RECOMMENDATION**

———————————

**TABLE OF CONTENTS**

*I. INTRODUCTION AND PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . 2

*II. LEGAL STANDARDS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *A. Section 2255* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *B. Ineffective Assistance Of Counsel* . . . . . . . . . . . . . . . . . . . . . 7
    *C. Review Of REPORT AND RECOMMENDATION* . . . . . . . . . . . . . . . 9

*III. ISSUES BEFORE THE COURT* . . . . . . . . . . . . . . . . . . . . . . . . . 13

*IV. UNOBJECTED TO ISSUE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*V. ISSUE OBJECTED TO BY PROSECUTION* . . . . . . . . . . . . . . . . . . . . 15
    *A. Summary Of Relevant Evidence* . . . . . . . . . . . . . . . . . . . . . . . 17
        *1. Russell Brick* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        *2. Kurt Undine* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        *3. Bridget McClure* . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   **4.** *Stacy Bitz* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   **5.** *Billy Oldenkamp* . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
  **B.** *Was There A Variance?* . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**VI.** **ISSUES OBJECTED TO BY CORY** . . . . . . . . . . . . . . . . . . . . . . . . 27
  **A.** *Failure To Present A Defense* . . . . . . . . . . . . . . . . . . . . . . . 27
  **B.** *Failure To Negotiate A Plea* . . . . . . . . . . . . . . . . . . . . . . . 28
  **C.** *Failure To Exclude Menzel Evidence* . . . . . . . . . . . . . . . . . . . 29
  **D.** *Denial Of The Right To Testify* . . . . . . . . . . . . . . . . . . . . . . 32
  **E.** *Conflict Of Interest* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
  **F.** *Failure To Argue Prosecutorial Misconduct* . . . . . . . . . . . . . . . . 36
  **G.** *Remaining Issues Objected To By Cory* . . . . . . . . . . . . . . . . . . 36

**VII.** **ISSUES OBJECTED TO BY BRETT** . . . . . . . . . . . . . . . . . . . . . . . 37
  **A.** *Failure To Prepare For Trial* . . . . . . . . . . . . . . . . . . . . . . . . 37
  **B.** *Failure To Cross-Examine Prosecution's Witnesses Effectively* . . . . . . 41
  **C.** *Denial Of The Right To Testify* . . . . . . . . . . . . . . . . . . . . . . 43
  **D.** *Failure To Exclude Menzel Drug Evidence* . . . . . . . . . . . . . . . . . 44
  **E.** *Failure To Ensure Brett Was Present At Deposition* . . . . . . . . . . . . 45
  **F.** *Failure To Argue Prosecutorial Misconduct* . . . . . . . . . . . . . . . . 47

**VIII.** **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

The brothers Kamerud, Brett and Cory, were found guilty of conspiracy to (1) "distribute methamphetamine," (2) "possess with intent to distribute methamphetamine," and (3) "possess with intent to distribute methamphetamine to one or more persons under twenty-one years of age," on November 29, 2001. Dkt. # 107. They were each sentenced by the undersigned to 240 months in prison. Brett filed a *pro se* motion to vacate his sentence under 28 U.S.C. § 2255 on September 7, 2004. Dkt. # 221. Cory filed his own *pro se* motion for relief under § 2255 on December 6, 2004. Dkt. # 229.

The undersigned initially reviewed Brett and Cory's pro se motions, and then referred the motions to Chief Magistrate Judge Paul Zoss for a report and recommendation (REPORT AND RECOMMENDATION). Dkt. #s 266, 268. Brett and Cory received court appointed attorneys, and Judge Zoss held a hearing on the defendants' motions in January of 2007. Dkt. #s 353, 363. At the conclusion of the hearing, Judge Zoss ordered the parties to file post-hearing briefs to frame the issues and their arguments. Dkt. # 363. Brett and Cory both filed their post-hearing briefs in support of their § 2255 motions on April 16, 2007. Dkt. #s 375, 376. The prosecution filed its briefs in resistance on June 18, 2007. Dkt. #s 381, 382. Brett and Cory then responded with their reply briefs on July 27, 2007. Dkt. #s 387, 388.

After receiving the parties' written and oral arguments, Judge Zoss issued his REPORT AND RECOMMENDATION on December 20, 2007. Dkt. # 389. Judge Zoss recommended the court grant Brett and Cory a new trial based on one of their arguments—that an impermissible and prejudicial variance occurred between the indictment and the proof at trial. On all other arguments, Judge Zoss recommended the court deny relief to Brett and Cory. Brett, Cory, and the prosecution all filed objections to Judge Zoss's REPORT AND RECOMMENDATION by January 22, 2008. Dkt. #s 392, 392, 394. Brett also filed a response to the prosecution's objections on February 12, 2008. Dkt. # 397.

The court now undertakes the enormous task of reviewing Judge Zoss's REPORT AND RECOMMENDATION, the parties' objections, and Brett's response—299 pages of legal argument and analysis—and also hundreds of pages of transcripts from the defendants' trial and § 2255 hearing. Because of the similarly large factual background that accompanies this case, the court will not now summarize the relevant factual

background.  The parties and court are well acquainted with this case,[1] and Judge Zoss dutifully recounted the trial and § 2255 hearing testimony in his REPORT AND RECOMMENDATION.  Therefore, the court incorporates Judge Zoss's summary of the evidence as written in his R&R—except, of course, those facts that are objected to—and will discuss the facts of this case as needed in the court's analysis.  However, before turning to the court's analysis, the court will first discuss the applicable standards for ruling on Brett and Cory's motions under § 2255.

## II.  LEGAL STANDARDS

There are three legal standards pertinent to the motions currently before the court.  Because Brett and Cory request relief under 28 U.S.C. § 2255, the court must necessarily apply the standards applicable under § 2255.  Because Brett and Cory's motions allege ineffective assistance of counsel, the court must also apply the standards applicable to ineffective assistance of counsel claims.  Finally, because Judge Zoss issued a REPORT AND RECOMMENDATION on the motions, the court applies standards applicable to the review of a magistrate judge's REPORT AND RECOMMENDATION.

### A.  Section 2255

Section 2255 of Title 28 of the United States Code provides the following standards for assessing Brett and Cory's claims:

---

[1] While the undersigned presided over the reading of the verdict and the defendants' sentencing hearings, Judge Zoss presided over jury selection and Senior Judge Ronald E. Longstaff, of the Southern District of Iowa,  presided over the trial.  At the time of trial, Judge Longstaff was Chief Judge of the Southern District of Iowa.

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground [(1)] that the sentence was imposed in violation of the Constitution or laws of the United States, or [(2)] that the court was without jurisdiction to impose such sentence, or [(3)] that the sentence was in excess of the maximum authorized by law, or [(4)] is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255; *Bear Stops v. United States*, 339 F.3d 777, 781 (8th Cir. 2003) ("To prevail on a § 2255 motion, the petitioner must demonstrate a violation of the Constitution or the laws of the United States."). A motion pursuant to § 2255 "is 'intended to afford federal prisoners a remedy identical in scope to federal habeas corpus.'" *United States v. Wilson*, 997 F.2d 429, 431 (8th Cir. 1993) (quoting *Davis v. United States*, 417 U.S. 333, 343 (1974)). Importantly, "[§] 2255 relief is not available to correct errors which could have been raised at trial or on direct appeal, absent a showing of cause and prejudice, or a showing that the alleged errors were fundamental defects resulting in a complete miscarriage of justice." *Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993) (*per curiam*) (citations omitted). In addition, the Supreme Court has permitted a movant to avoid procedural default by showing he or she is actually innocent. *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002) ("In order to obtain collateral review of a procedurally defaulted issue, [a § 2255 movant] must show 'either cause and actual prejudice, or that he is actually innocent.'" (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998), with citations omitted)).

The "cause and prejudice" that must be shown to resuscitate a procedurally defaulted claim may include "ineffective assistance of counsel." *See Becht v. United States*, 403 F.3d 541, 545 (8th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006).

Otherwise, "[t]he Supreme Court recognized in *Bousley* that 'a claim that "is so novel that its legal basis is not reasonably available to counsel" *may* constitute cause for a procedural default.'" *United States v. Moss*, 252 F.3d 993, 1001 (8th Cir. 2001) (quoting *Bousley*, 523 U.S. at 622, with emphasis added, in turn quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)). "Actual prejudice" requires a showing that the alleged error "'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Johnson*, 278 F.3d at 844 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1981), and explaining, further, that the movant must show that there is a substantial likelihood that, absent the error, a jury would have acquitted him of the charged offense). To establish "actual innocence," as an alternative way to resuscitate a procedurally defaulted claim, a "'petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Id.* (quoting *Bousley*, 523 U.S. at 623). "'This is a strict standard; generally, a petitioner cannot show actual innocence where the evidence is sufficient to support a [conviction on the charged offense].'" *Id.* (quoting *McNeal v. United States*, 249 F.3d 747, 749-50 (8th Cir. 2001)).

A defendant who petitions the court for § 2255 relief is not automatically entitled to a hearing on the issues presented. A defendant is entitled to a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *see United States v. Ledezma-Rodriguez*, 423 F.3d 830, 835-36 (8th Cir. 2005) (quoting 28 U.S.C. § 2255). Therefore, "[a] § 2255 motion can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005). Otherwise, "the court shall . . . grant a prompt hearing thereon, determine the issues and

make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255. In addition, even if the court grants a hearing, the "court may entertain and determine such motion without requiring the production of the prisoner at the hearing." *Id.*

## B. *Ineffective Assistance Of Counsel*

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." *U.S. Const. amend.* VI. The right extends to trial and on direct appeal, *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Bear Stops*, 339 F.3d at 780, but not during post-conviction relief, *Kitt v. Clarke*, 931 F.2d 1246, 1248 n.4 (8th Cir. 1991) (noting the guarantee of effective assistance of counsel "does not extend to representation in postconviction proceedings other than the direct appeal," but also stating "[t]his circuit has recognized that ineffective assistance of counsel in postconviction proceedings may be used to overcome a procedural bar to hearing a claim in federal court"). Assessing claims of ineffective assistance often involves facts outside of the original record, and therefore it is particularly appropriate to address such claims in post-conviction relief. *See United States v. Hughes*, 330 F.3d 1068, 1069 (8th Cir. 2003) ("When claims of ineffective assistance of trial counsel are asserted on direct appeal, we ordinarily defer them to 28 U.S.C. § 2255 proceedings.").

Certain "well established" principles govern claims of ineffective assistance of counsel on post-conviction relief: "post-conviction relief will not be granted on a claim of ineffective assistance of trial counsel unless the petitioner can show not only that counsel's performance was deficient but also that such deficient performance prejudiced his defense." *Ledezma-Rodriguez*, 423 F.3d at 836 (internal quotations omitted). Thus, a successful petitioner must show: (1) deficient performance, and (2) prejudice.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Davis v. Norris*, 423 F.3d 868, 877 (8th Cir. 2005) (requiring the movant to "satisfy the two prong test outlined in *Strickland*.").

The "deficient performance" prong requires the movant to "show that his 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 687). That showing can be made by demonstrating counsel's performance "'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (quoting *Strickland*, 466 U.S. at 688). There are two substantial impediments to making such a showing, however. First, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 690). Second, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689); *Davis*, 423 F.3d at 877 ("To satisfy this prong [the movant] must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance."). If the movant fails to show deficient performance by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

To satisfy the "prejudice" prong, the movant must show "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [,] a reasonable probability [meaning] a probability sufficient to undermine confidence in the outcome.'" *Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 694); *Davis*, 423 F.3d at 877 (same). Thus, "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"

8

*Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005) (quoting *Strickland*, 466 U.S. at 693). Instead, the defendant must show that counsel's "deficiencies actually affected" the outcome. *Id.* Although the two prongs of the "ineffective assistance" analysis are described as sequential, courts "do not . . . need to address the performance prong if petitioner does not affirmatively prove prejudice." *Boysiewick v. Schriro*, 179 F.3d 616, 620 (8th Cir. 1999) (citing *Pryor v. Norris*, 103 F.3d 710 (8th Cir. 1997)).

## C. Review Of REPORT AND RECOMMENDATION

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while de novo review generally entails review of an entire matter, in the context of § 636 a district court's *required* de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated de novo review is only required if objections are "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir.

1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a de novo review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide de novo review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give de novo review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the

record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and

12

recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

## III. ISSUES BEFORE THE COURT

At the conclusion of Brett and Cory's § 2255 hearing, Judge Zoss specifically ordered the brothers to file post-hearing briefs to raise any issues they wished to pursue in their § 2255 motions. In his post-hearing brief, Cory argues his trial counsel was ineffective for the following reasons:

1. representing Cory under a conflict of interest
2. failing to advise him of his right to testify
3. failing to have a trial strategy or defense
4. failing to negotiate a plea
5. failing to attempt to exclude certain evidence
6. failing to seek an order that would preclude the prosecution from using his prior drug conviction to impeach him in the event he testified, and
7. failing to conduct a proper investigation to locate witnesses.

Finally, Cory incorporates any pertinent issues raised by Brett that were not raised separately by Cory.

In his post-hearing brief, Brett argues his trial counsel was ineffective for the following reasons:

1. failing to properly prepare for trial
2. failing to effectively cross-examine prosecution witnesses

3.  failing to adequately discuss Brett's right to testify
4.  failing to attempt to exclude certain evidence
5.  failing to ensure Brett was present for a pretrial testimonial deposition, and
6.  failing to challenge the superseding indictment.

Brett also argues his trial *and appellate* counsel were ineffective for the following reason:

7.  failing to argue prosecutorial misconduct.

Finally, Brett also incorporates any pertinent issues raised by his brother Cory that were not raised separately by Brett.

Judge Zoss addressed each of these issues in his REPORT AND RECOMMENDATION.  The parties, in their objections, addressed and disputed all of these issues except one—Cory's sixth issue noted above.  As a result, the court will address this unobjected to issue first.

## IV.  UNOBJECTED TO ISSUE

Cory argues in his post-hearing brief that Cory's counsel should have moved in limine to prevent the prosecution from introducing Cory's prior conviction for the distribution of LSD as impeachment evidence in the event Cory testified.  Cory argues his prior conviction would have been excluded under Federal Rule of Evidence 404(b).  Judge Zoss determined the prior conviction would have been admitted under Federal Rule of Evidence 609(a)(1).  Judge Zoss also recommended that Cory's counsel was not ineffective because McMinn did, in fact, argue for the exclusion of Cory's prior conviction by resisting the prosecution's motion seeking to admit Cory's prior conviction.

The court is not left with a "definite and firm conviction" that Judge Zoss made a mistake in his recommendation on this point.  *United States v. U.S. Gypsum Co.*, 333 U.S. at 395.  McMinn did argue for the exclusion of Cory's prior conviction, and Judge

Longstaff ruled, at the conclusion of the trial, that the prosecution's motion to admit Cory's prior conviction was moot because Cory did not testify. The court is not willing to say McMinn rendered constitutionally deficient assistance of counsel by not securing the exclusion of Cory's prior conviction prior to trial. The court accepts Judge Zoss's unobjected to finding on this issue.

## V. ISSUE OBJECTED TO BY PROSECUTION

The prosecution objects to Judge Zoss's recommendation that Cory and Brett be given a new trial because their trial counsel failed to challenge the superseding indictment. On October 24, 2001, the grand jury returned a superseding indictment against Cory and Brett that read as follows:

> Between about June 2000, through August *2001*, in the Northern District of Iowa and elsewhere, [Brett and Cory], did knowingly and unlawfully combine, conspire, confederate and agree with other persons, known and unknown to the grand jury, to commit the following offenses against the United States:
> 1. To distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine.
> *2. To distribute and possess with intent to distribute a mixture or substance containing a detectable amount of methamphetamine to one or more persons under twenty-one years of age.*
> This was in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), 846, *and 859.*

Dkt. # 46 (emphasis added). The original indictment, returned on July 19, 2001, was identical to the superseding indictment except for the language in italics. Dkt. # 1. In the original indictment, Brett and Cory were charged with only one offense—the first offense

listed above. In addition, the original indictment only alleged a time period "through August 2000," not 2001. Finally, the original indictment did not include a reference to 21 U.S.C. § 859, which deals with the distribution of drugs to minors.

Brett specifically argues in his post-hearing brief that his "counsel was ineffective due to the failure to make a record regarding the lack of jurisdiction for the superseding indictment." Dkt. # 375. Brett argues there were two conspiracies proven, not a single or continuous conspiracy over the time charged in the superseding indictment, and that venue was improper under the evidence that established the second conspiracy. In his post-hearing brief, Cory did not add to Brett's argument on this point, but Cory requested the court to consider Brett's argument as a possible ground for relief for Cory, too. Dkt. # 376. Judge Zoss agreed with Brett's argument, finding "[t]he evidence at trial proved two distinct conspiracies, rather than the single conspiracy charged in the indictment." Dkt. # 389. As a result, Judge Zoss recommended Cory and Brett be awarded new trials because venue was improper in the Northern District of Iowa for the second conspiracy. The prosecution objects, arguing the evidence established a continuous conspiracy over the time charged in the superseding indictment. Brett and Cory, of course, do not object to Judge Zoss's finding in this regard.[2] In reviewing this issue de novo, the court will first

---

[2] Brett does, however, make three points of clarification regarding Jude Zoss's finding on this issue. First, Brett states that the defendants' argument was not that there were two conspiracies, but that "there was no conspiracy in the first place, and no agreement in 2001, either. Alternatively, if there was a conspiracy in 2000, it was in no way connected to the alleged events in 2001." Dkt. # 392. Second, Brett argues that it was speculation on Judge Zoss's part to find that the jury did not believe anything Billy Oldenkamp, a cooperating witness for the prosecution, said when Judge Zoss recommended two conspiracies were proven. Finally, Brett notes that Cory's counsel, and not Brett's counsel, raised the single conspiracy/multiple conspiracy issue on direct appeal.

summarize the relevant evidence, and then provide the legal standards and the court's analysis.

## A. Summary Of Relevant Evidence

Several co-conspirators testified that Brett and Cory used and distributed methamphetamine. These co-conspirators included Russell Brick, Kurt Undine, Bridget McClure, Stacey Bitz, and Billy Oldenkamp. Judge Zoss dutifully recounted the trial testimony of these individuals in his REPORT AND RECOMMENDATION. The court has reviewed both the REPORT AND RECOMMENDATION and the trial testimony extensively. Below, the court will only recount the testimony as it relates to the instant objection.

### 1. Russell Brick

The prosecution's first witness, Russell Brick, grew up in Aberdeen, South Dakota, and began using and selling drugs "[a]t about the age of 18." Tr. p. 15. Brick stated he had used methamphetamine, but he used marijuana more because methamphetamine was harder to obtain in Aberdeen. Tr. p. 15. Brick testified that he was incarcerated on drug charges in the late 1990s. Tr. pp. 16, 18. Brick met Kurt Undine in jail; Undine was incarcerated on similar charges. Tr. p. 16. In jail, Undine informed Brick that Undine could get Brick methamphetamine after they were out of jail. Tr. p. 17. Undine lived in Sioux City, Iowa, and gave Brick a phone number to call when they were both released from jail. Tr. pp. 16-17.

Brick was released on December 13, 1999, and began to hang out with his "same old crew" of Brett and Cory, Stacey Bitz, Trent Kavosnika, and Justin Lickfelt. Tr. p. 18. Brick informed his crew that he met Undine in jail, and that after Undine was released Brick "was going to be hooked up pretty good with some good deals on some

methamphetamine." Tr. p. 21. Brick's opportunity to get hooked up arose when Bitz, Brett, and a third person made arrangements to drive to Sioux City in Bitz's car in June of 2000. Tr. pp. 21, 29. Brick joined them, and called Undine just prior to their departure. Tr. p. 21. Undine informed Brick that Undine had methamphetamine available at $800 an ounce. Tr. p. 24.

Bitz, Brett, and Brick dropped off the other passenger in Sioux City and then proceeded to meet Undine. Tr. p. 25. The parties eventually met in the basement of Bridget McClure's home near Sioux City. Tr. p. 25. McClure was Undine's girlfriend. Tr. p. 25. Brick testified that Bitz, Brett, Brick, and Undine all used methamphetamine in the basement, and that Brett bought a half ounce, or $400 worth, of methamphetamine from Undine. Tr. p. 26. The party thereafter left to make the four-hour long trip back to Aberdeen. Tr. p. 26. Once back at Aberdeen, Brick testified that they "grammed up" their methamphetamine to prepare it for resale. Tr. p. 28.

Brick testified that after this first trip he made over ten more trips to various locations in Sioux City to buy methamphetamine from Undine or McClure. Tr. pp. 29, 46. Brick testified that they used Bitz's car, and that Brett and Cory sometimes came with them. Tr. p. 29. Even though Brett and Cory did not always travel to Sioux City, Brick testified the brothers consistently gave Brick and Bitz money to buy methamphetamine from Undine for Brett and Cory. Tr. p. 31. Brick also testified that the methamphetamine they purchased from Undine in Sioux City was often resold out of Brett and Cory's apartment. Tr. p. 35.

Brick only, however, testified about his involvement with Brett and Cory and a conspiracy to distribute methamphetamine from June of 2000 to August 23, 2000. Tr. p. 35. On August 23, 2000, Brick and Bitz were arrested while in Sioux City buying more methamphetamine from Undine. At no time did Brick testify that he was involved with

Cory and Brett in a conspiracy to distribute methamphetamine after August 23, 2000. Lastly, Brick testified that in terms of the conspiratorial hierarchy, Undine was above him because Undine was the source, and Brett and Cory were below him because they received their drugs from him. Tr. p. 88.

### 2. Kurt Undine

Undine testified that he met and became friends with Brick while they were inmates at the Redfield, South Dakota, penitentiary. Tr. p. 120. While inmates, Undine informed Brick that Undine could get Brick cheap methamphetamine after they were released because Undine was from Sioux City. Tr. p. 120. Brick and Undine agreed that they would get in touch after they were released to buy and sell methamphetamine. Tr. p. 121.

Undine then recounted the several trips that Brick and Bitz made to Sioux City from Aberdeen to purchase methamphetamine. Tr. p. 123. Undine also testified that he recalled Brett came on one of these trips, and that Cory came on about two or three of the trips. Tr. p. 125. Undine preferred when only Brick came because "the less people that know what you're doing the better it is." Tr. p. 132. Undine testified, however, that he knew Brick was buying methamphetamine with money from Cory and Brett. Tr. p. 132. Undine only testified as to his involvement selling methamphetamine to Brick, Bitz, Brett and Cory from June to August of 2000. Undine specifically stated he never saw Cory again after Brick and Bitz were arrested on August 23, 2000. Tr. p. 146.

### 3. Bridget McClure

McClure testified that she became friends with Undine after Undine was released from prison, and that McClure let Undine live in her basement in Sioux City. Tr. p. 149. McClure stated she learned Undine was using and selling methamphetamine in June or July of 2000, and that she, too, began using and selling methamphetamine at this time. Tr. pp. 150-51. McClure stated she knew Brett and Cory from their trips to Sioux City to buy

19

drugs from Undine, and from her when Undine was gone. Tr. p. 156. McClure only testified about her knowledge of a conspiracy to distribute methamphetamine in the summer of 2000. Tr. p. 151.

### 4. *Stacy Bitz*

Bitz testified about the trips she took with Brick, Brett, and Cory from Aberdeen to buy methamphetamine from Undine and McClure in Sioux City. Tr. p. 168-71. Bitz stated Brick, Brett, and Cory would take the methamphetamine back to Brett and Cory's apartment in Aberdeen to divide it up. Tr. p. 176. Bitz testified that Brett and Cory would sell grams or less of methamphetamine out of their apartment to several customers, including Ross Kelly, Quincy Carter, Kevin Rickster, a person named Jesse, Jason Goggles, Jeff Baldridge, and even Brick and Bitz when they were out of the drug. Tr. pp. 178-79. Bitz testified the trips to Sioux City began in June of 2000 and ended in August of 2000 when she was arrested with Brick. Tr. p. 168.

Bitz testified that after she was arrested, and then released on bond, she again made contact with Brett and Cory and became involved with drugs. Tr. p. 185. Bitz testified that Brett, Cory, and her involvement with methamphetamine at this time was not as frequent as before because "[w]e couldn't get [methamphetamine] all the time." Tr. p. 185. Bitz acknowledged that Undine was "the biggest source that the group had had for a while." Tr. p. 185. Nevertheless, Bitz testified that she witnessed Brett and Cory selling methamphetamine from their apartment "[w]henever [Brett] could get it." Tr. p. 186. Bitz also testified that she continued to observe customers coming to Brett and Cory's apartment to buy methamphetamine until June of 2001. Tr. pp. 187-88. Finally, Bitz testified that Brett was not working during the summer of 2001, and that Cory worked at a hotel until he quit. Tr. p. 187.

### 5.   *Billy Oldenkamp*

Oldenkamp was seventeen years old when he testified against Brett and Cory.  Tr. p. 263.  Oldenkamp grew up in Aberdeen and used drugs for most of his young life.  Tr. p. 264.  Oldenkamp knew Bitz "[f]or quite some time," but "mostly started hanging out with her since February of [2001]."  Tr. p. 270.  Oldenkamp also knew Brett and Cory since 1999 or 2000, when Oldenkamp lived with his sister and Cory in Sioux City for about three months.  Tr. p. 271.  Oldenkamp stated he dealt methamphetamine with Brett and Cory when Oldenkamp lived in Sioux City at this time.  Tr. p. 282.

Oldenkamp testified that he knew Brick, Bitz, Brett, and Cory would travel from Aberdeen to Sioux City to buy methamphetamine.  Tr. p. 272.  Oldenkamp also stated he knew Undine was the source of their methamphetamine, and saw Brett and Cory use it and sell it in Aberdeen after they received it from Undine.  Tr. pp. 272-73.

Oldenkamp testified he was arrested before Bitz and Brick were arrested (August 23, 2000), and that Oldenkamp was released from jail in February of 2001.  Tr. pp. 277-78.  Oldenkamp stated he started hanging out with Brett and Cory after he was released, and that he would buy methamphetamine from a lot of sources, including Brett and Cory.  Tr. p. 278.  Oldenkamp testified that he was a main customer of Brett and Cory's at the time, but that Bitz, Larry Wagner, Jason Goggles, and Jeff Bolcher were also customers.  Tr. pp. 281-85. Oldenkamp stated his drug activity with Brett and Cory continued until July of 2001 when he was arrested again.  Tr. p. 279.

### B. Was There A Variance?

To determine whether Brett and Cory received ineffective assistance of counsel for their counsel's failure to challenge the superseding indictment, the court must first determine whether a variance occurred, and, if so, whether that variance prejudiced Brett and Cory. If a prejudicial variance was present, then the court must determine whether counsels' failure to challenge the indictment on this basis was deficient performance and, if so, whether that failure resulted in prejudice that "actually affected" the outcome of this case. *Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005).

Variances are often addressed by the Eighth Circuit Court of Appeals, and well established principles inform the court of whether a variance occurred in the present case. *See, e.g.*, *United States v. Cain*, 487 F.3d 1108, 1112-14 (8th Cir. 2007).

> In determining whether a single conspiracy was proven by the evidence adduced at trial, we consider the totality of the circumstances, including the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred.

*United States v. Smith*, 450 F.3d 856, 860-61 (8th Cir. 2006) (quotations omitted); *see United States v. Radtke*, 415 F.3d 826, 838-39 (8th Cir. 2005) (same). "Whether the government's proof established a single conspiracy or multiple conspiracies is a question of fact for the jury," *United States v. Morales*, 113 F.3d 116, 118 (8th Cir. 1997), and "because it is a question of fact, we draw all reasonable inferences in favor of the verdict," *Radtke*, 415 F.3d at 838.

Courts often reference a "typical[] 'hub and spokes' conspiracy" to determine whether a variance occurred between an indictment charging a single conspiracy and the proof offered at trial. *Hill*, 410 F.3d at 472; *see United States v. Ramon-Rodriguez*, 492

F.3d 930, 941 (8th Cir. 2007) (referencing a "'wheel and spoke' conspiracy"). "In such a conspiracy, 'the hub constitut[es] the central figure, the spokes form[] its various branches and ramifications, and all [are] held together by the rim, which represents the agreement.'" *United States v. Slaughter*, 128 F.3d 623, 630 (8th Cir. 1997) (quoting *Hayes v. United States*, 329 F.2d 209, 214 (8th Cir. 1964)). The agreement, of course, is what creates the conspiracy, and must simply be "an agreement to do something illegal" or "to pursue a common, unlawful end." *Hill*, 410 F.3d at 471-72. Where "the evidence shows 'one overall agreement to commit an illegal act,' the evidence reveals a single conspiracy." *Slaughter*, 128 F.3d at 630 (quoting *Morales*, 113 F.3d at 119).

The analogy to this "conspiratorial wheel" can be applied to all of the events that happened between June of 2000 and August of 2001 in this case. According to the testimony received at trial, Brett and Cory at least had an agreement among themselves to possess and distribute methamphetamine during this time. *See United States v. Kamerud*, 326 F.3d 1008, 1013 (8th Cir. 2003) (holding that "even if there were two conspiracies, the Kameruds were parties to both"). In addition, Brett and Cory could be considered the hub of the conspiratorial wheel because they used their apartment in Aberdeen to use and distribute methamphetamine to their customers—both before August 23, 2000, and afterwards. Finally, the trips to Sioux City simply formed some of the spokes to the conspiratorial wheel.

The factors outlined by the Eighth Circuit case law support the finding of a single conspiracy in this case. First, the nature of the activities involved in this case is the use and distribution of methamphetamine. The trial testimony of Bitz and Oldenkamp revealed that Brett and Cory participated in this activity both before and after August 23, 2000. Bitz testified that after she was released from her arrest on August 23, 2000, she again hooked up with Brett and Cory and became involved with drugs, although

methamphetamine was harder to come by after the trips to Sioux City ended. Tr. p. 185. She testified that she witnessed Brett and Cory sell methamphetamine from their apartment in Aberdeen after August 23, 2000, "[w]henever [Brett] could get [methamphetamine]." Tr. p. 186. She also stated she saw Brett and Cory sell methamphetamine to customers until June of 2001. Tr. pp. 187-88. Like Bitz, Oldenkamp was also arrested in the summer of 2000, and, according to his testimony, he hooked up with Brett and Cory after he was released. Oldenkamp was released in February of 2001. Tr. pp. 277-78, 308. Oldenkamp stated that he and others would buy methamphetamine from Brett and Cory in Aberdeen after he was released, and that Oldenkamp continued his drug activity with Brett and Cory until July of 2001 when Oldenkamp was arrested again. Tr. pp. 279, 281-85.

Second, the alleged events of the conspiracy took place in two locales: Aberdeen, South Dakota, and Sioux City, Iowa. Even though the trips to Sioux City only occurred prior to August 23, 2000, Brett and Cory's apartment in Aberdeen acted as a "central location" to distribute methamphetamine from 2000 to 2001. *Smith*, 450 F.3d at 861; *see Radtke*, 415 F.3d at 839 (noting that all the illegal activity took place at certain locations). Bitz, Brick, and Oldenkamp testified that methamphetamine was grammed up for resale at Brett and Cory's apartment before August 23, 2000, and Bitz and Oldemkamp testified that Brett and Cory used their apartment for the same purpose after August 23, 2000. *See United States v. Cubillos*, 474 F.3d 1114, 1119 (8th Cir. 2007) (holding a single conspiracy existed because the conspirators were "working with each other to conduct the same activity, distribution of methamphetamine, in the same location, Norfolk, throughout the time frame alleged in the indictment, September 2004 through June 2005").

Third, the identities of the conspirators involved included Brett, Cory, Brick, Undine, McClure, Bitz, and Oldenkamp. Three of these persons—Brett, Cory, and Bitz—were intimately involved in the activities that occurred prior to August 23, 2000, and

remained involved in similar activity afterwards. It does not matter that Brick, Undine, and McClure failed to participate after August 23, 2000, as "[a] single conspiracy may exist even if the participants and their activities change over time, and even if many of the participants are unaware of, or uninvolved in, some of the transactions." *United States v. Contreras*, 283 F.3d 914, 916 (8th Cir. 2002); *see Hill*, 410 F.3d at 471 (noting that "it is not necessary that the participants or activities remain static throughout the duration of the conspiracy."). Moreover, Brett and Cory at least remained constant participants in the conspiracy from the summer of 2000 to the summer of 2001. *See United States v. Santisteban*, 501 F.3d 873, 881-82 (8th Cir. 2007) (holding the evidence at trial established a single conspiracy because the defendant's involvement "touched on each aspect of the conspiracy"); *United States v. Contreras*, 283 F.3d 914, 916 (8th Cir. 2002) (holding a single conspiracy existed because, *inter alia*, the "[defendant's] role remained the same throughout the period of the conspiracy").

Finally, the time frame in which the alleged conspiratorial acts occurred was from June 2000 to August of 2001. Of course, August 23, 2000, is certainly an important date in this case. It is important not only because Brick and Bitz were arrested on that date, but because there is very little evidence that Brett and Cory used or sold methamphetamine after that date. While Brick, Undine, McClure, Bitz, and Oldenkamp connect Brett and Cory to methamphetamine use and distribution prior to August 23, 2000, only Bitz and Oldenkamp connect Brett and Cory to methamphetamine use and distribution after August 23, 2000. August 23, 2000, is also important because there is no evidence that connects Brett and Cory to illegal activities in Sioux City after that date. Any evidence of methamphetamine use and distribution after August 23, 2000, took place in Aberdeen. Notwithstanding the changes that occurred on August 23, 2000, the evidence supports the conclusion that Brett and Cory were involved in methamphetamine use and distribution in

Aberdeen from the summer of 2000 to the summer of 2001. Therefore, the conspiracy did not cease to exist on August 23, 2000. The conspiracy continued operating out of Brett and Cory's apartment in Aberdeen after that date, just no longer as a result of receiving methamphetamine from Sioux City by conspiring with Brick, Undine, and McClure.

Although, as the court has noted, there is a break in the evidence on August 23, 2000, the court does not believe the evidence cannot show a continuous conspiracy from June 2000 to August 2001. In the light most favorable to the verdict, the testimony from Bitz and Oldemkamp reveal that Brett and Cory were using and selling drugs from their Aberdeen apartment before and after the trips to Sioux City ended. *Cf. United States v. Snider*, 720 F.2d 985, 988 (8th Cir. 1983) (finding "[t]he government proved two similarly motivated but distinct conspiracies" because "[n]o evidence link[ed] the[] two conspiracies"). Certainly, the evidence connecting Brett and Cory to the use and distribution of methamphetamine after August 23, 2000, is not as strong as the evidence before that date. Nevertheless, there was evidence presented to the jury that Brett and Cory were involved in a continuous conspiracy from the summer of 2000 to the summer of 2001. *See Cuervo*, 354 F.3d at 987 (stating the court could only reverse "if 'the evidence does not support the single conspiracy'" (quoting *United States v. Pullman*, 187 F.3d 816, 821 (8th Cir. 1999)); *United States v. Porter*, 441 F.2d 1204, 1213 (8th Cir. 1971) ("There exists no variance of proof where there is sufficient evidence to make the issue of one or more schemes a question of fact for the jury."). As a result, the evidence was consistent with, and not materially different from, the superseding indictment. *See United States v. Whirlwind Soldier*, 499 F.3d 862, 870 (8th Cir. 2007) ("'A variance arises when the evidence presented proves facts that are "materially different" from those [alleged] in the indictment.'" (quoting *United States v. Harris*, 344 F.3d 803, 805 (8th Cir. 2003), in turn quoting *United States v. Begnaud*, 783 F.2d 144, 147 n.4 (8th Cir. 1986))).

Therefore, there was no variance, and the court need not consider whether prejudice occurred.[3] *See Smith*, 450 F.3d at 861 ("Because we conclude the evidence adduced at trial did not vary from the conspiracy charged in the indictment, we need not address whether Smith suffered prejudice."). Because there is no variance, there also is no deficient performance by Brett or Cory's counsel in failing to argue for a variance earlier. Thus, Brett and Cory's claim of ineffective assistance of counsel for failing to challenge the indictment is denied.

## VI. ISSUES OBJECTED TO BY CORY

Cory filed specific objections to Judge Zoss's REPORT AND RECOMMENDATION. In his objections, Cory argues Judge Zoss erroneously recommended Cory failed to establish ineffective assistance of counsel regarding the following issues: (1) failure to present a defense, (2) failure to negotiate a plea, (3) failure to exclude certain evidence, (4) denial of the right to testify, (5) conflict of interest, and (6) prosecutorial misconduct. The court reviews each of these issues de novo.

### A. Failure To Present A Defense

Cory's trial counsel, Martha McMinn, explained at the parties' § 2255 hearing with Judge Zoss that her strategy at trial was to (1) present Cory as a user of methamphetamine,

---

[3] The court is well aware of the argument for prejudice, and Brett and Cory's reliance on *United States v. Durades*, 607 F.2d 818 (9th Cir. 1979), to show prejudice. If the court had determined there was a variance, then, like Judge Zoss, the court would have found the variance resulted in prejudice because venue in the Northern District of Iowa would not have been proper for the alleged second conspiracy that took place entirely in Aberdeen, South Dakota. None of the evidence concerning the events that took place after August 23, 2000 took place within the Northern District of Iowa.

and not someone involved in a drug distribution conspiracy, and (2) to raise reasonable doubt. McMinn waived her opening statement initially and after the close of the prosecution's case in chief. McMinn cross-examined the prosecution's witnesses, and presented five witnesses to testify on Cory's behalf. McMinn gave a closing argument, and focused her argument on the credibility of the prosecution's witnesses.

Like Judge Zoss, the court is troubled by McMinn's failure to give an opening statement, and lackluster closing argument. However, the court does not believe McMinn's representation rose to the level of constitutionally deficient performance, or that Cory suffered prejudice as a result. Cory's representation might not have been the best, but it is clear that McMinn provided a defense, and the court cannot say McMinn "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *United States v. Chronic*, 466 U.S. 648, 659 (1984). Therefore, the court overrules Cory's objection and accepts Judge Zoss's recommendation on this point.

### B. *Failure To Negotiate A Plea*

Cory argues McMinn rendered ineffective assistance of counsel by failing to negotiate a plea bargain. Judge Zoss disagreed with Cory's argument primarily because McMinn testified at the § 2255 hearing that Cory was not interested in a plea bargain because he was convinced he would be found not guilty. In his objection, Cory argues he had no understanding of conspiracy law or the consequences of losing at trial and, therefore, McMinn failed in her duty to competently inform Cory about the risks and benefits of a potential plea.

"When the defendant's claim is that counsel misadvised him of the relative advantages of pleading guilty rather than proceeding to trial, in order to show prejudice, the defendant 'must show that, but for his counsel's advice, he would have accepted the

plea.'" *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (quoting *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995)). Cory has not offered any evidence that he would have accepted a plea had it been negotiated and offered to him. Obviously now, after his conviction and sentence of 240 months imprisonment, Cory would have accepted a plea rather than proceed to trial. At the time, however, Cory was convinced he would be found not guilty, and therefore he has not shown that but for McMinn's advice—or lack thereof—he would have accepted a plea. *See also Hawkman v. Parratt*, 661 F.2d 1161, 1171 (8th Cir. 1981) ("[W]e do not hold that defense counsel always has a duty to initiate plea bargaining negotiations."). Corey's objection is reluctantly overruled. I have just recently affirmed Judge Zoss in another case finding McMinn's representation in an Iowa state court case to be ineffective and in violation of the Sixth Amendment of the United States Constitution. *Jones v. Wilder-Tomlinson*, No. C 06-4060-MWB, 2008 WL 4102440, at *20 (N.D. Iowa, September 4, 2008). Additionally, this court has observed McMinn on several prior occasions to epitomize the now famous line that the lawyer was a "walking violation[] of the sixth amendment." David Bazelon, *The Defective Assistance of Counsel*, 42 U.Cin. L. Rev. 1, 2 (1973).[4]

## C. Failure To Exclude Menzel Evidence

In his post-hearing brief, Cory argues his trial counsel should have moved to exclude from trial the methamphetamine and other evidence seized after the defendants' arrest with Jenny Menzel on August 25, 2001. On that date, South Dakota Highway Patrol officers observed Menzel, a minor, and Brett and Cory in Menzel's car parked underneath

---

[4] Bazelon served as Chief Judge of the United States Court of Appeals for the District of Columbia Circuit from 1962 to 1978. See http://www.bazelon.org/about/judgebazelon.htm.

an overpass that was closed for road construction. Menzel received a ticket for failure to obey a traffic control device and for failure to have her driver's license. In addition, the parties were arrested after a search of the vehicle uncovered eight individually packaged baggies containing methamphetamine, eight syringes, a knife, a spoon, a scale, and a box cutter. All of these materials were found in Menzel's purse in the center console of the car.

Judge Zoss recommended Cory's arguments on this issue be rejected. Judge Zoss emphasized that Cory failed to base his argument on any rule of evidence, and that he failed to cite any other authority in support of his argument. Judge Zoss also noted that the jury was free to weigh the credibility of Menzel's testimony, and thus the jury could have disbelieved Menzel's testimony that Brett and Cory had nothing to do with the drugs. *See United States v. Martinez*, 958 F.2d 217, 218 (8th Cir. 1992) ("It is the sole province of the jury to weigh the credibility of a witness.").

In Cory's objection to Judge Zoss's recommendation on this issue, Cory states his argument is based under Federal Rule of Evidence 403: counsel should have moved to exclude the Menzel evidence because its prejudicial effect substantially outweighs its probative value. *See* FED. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). The defendants' post-hearing briefs point out that defense counsel knew that Menzel would testify that Brett and Cory had nothing to do with the evidence seized from Menzel's purse, and, thus, it should have been obvious to defense counsel to try to exclude the Menzel evidence. Moreover, defendants argue it was highly prejudicial because it was the only hard drug evidence

against the defendants, it established a connection between the defendants and a drug-using minor, and the prosecution heavily relied on this evidence during closing arguments.

The court generally agrees with the defendants that it would have been wise of defense counsel to try to exclude this evidence. Moreover, if the defense had made a motion in limine to exclude the Menzel evidence, and no showing could be made to link the evidence to Brett or Cory, it is likely the evidence would have been excluded under Rule 403. But, as the prosecution points out in its post-hearing briefs, the defendants chose to attack the Menzel evidence by showing it had nothing to do with Brett and Cory. Cory's trial counsel, McMinn, subpoenaed Menzel to testify to that effect—which Menzel did. Of course, this strategy was probably not as good as the alternative strategy of excluding the evidence altogether. In fact, it does not appear that either of the defendants' trial counsel thought about the alternative strategy of trying to exclude the Menzel evidence. *See* Hr. pp. 266, 295. However, even if defense counsel failed to file, let alone think about, a motion in limine regarding the Menzel evidence, the court does not believe defense counsel rendered ineffective assistance of counsel by failing to file a motion in limine to exclude the evidence. For Cory to succeed on this argument, counsel's deficiency—the failure to file a motion in limine—must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The result in this case may have been unreliable had defense counsel failed to attack the Menzel evidence altogether. Defense counsel attacked the Menzel evidence by presenting testimony from Menzel that the drugs were solely Menzel's. As the prosecution notes, this strategy worked to the extent that the jury was unwilling to convict either brother of distributing methamphetamine to a minor. Attacking the evidence through a motion in limine would have been wise, but it would not necessarily have been successful, and the court is not willing to conclude it was constitutionally ineffective assistance of counsel in

failing to do so. As a result, the court overrules Cory's objections and accepts Judge Zoss's recommendation on this point.

### D. Denial Of The Right To Testify

In his post-hearing brief, Cory argues he was denied the right to testify at trial because he did not knowingly and voluntarily waive his right to testify. Cory argues he did not knowingly and voluntarily waive his right to testify because McMinn failed to discern what Cory would testify about, and nevertheless recommended to Cory that he not testify. Cory argues that because McMinn did not know what Cory would testify about, McMinn could not have competently advised Cory not to testify. Moreover, Cory argues that he was under the impression that he did not have a right to testify.

Judge Zoss recommended the court reject Cory's arguments. Judge Zoss believed McMinn's testimony at the § 2255 hearing that she advised Cory not to testify because of his criminal history, and Judge Zoss also agreed that it would have been bad advice to advise Cory to testify. Judge Zoss emphasized that Cory's testimony at the § 2255 hearing was a virtual confession to the charges against him.

Cory objects to Judge Zoss's recommendation, emphasizing similar arguments he made in his post-hearing and reply briefs. Cory argues he could not have made an informed decision to waive his right to testify because McMinn did not know what Cory would testify to. Thus, Cory argues, McMinn could not have advised Cory competently.

The court agrees with Judge Zoss's recommendation that Cory knowingly and voluntarily waived his right to testify, and that waiving such a right was good advice. First, the court adopts Judge Zoss's finding that McMinn's testimony at the § 2255 hearing was credible, i.e., that McMinn left the decision to testify up to Cory. Hr. p. 289. Second, even though McMinn did not know exactly what Cory would testify to, she

obviously knew Cory would attempt to testify favorably on his behalf, and McMinn was still in a position to recommend to Cory that he not testify based upon his prior criminal history.

Finally, as Judge Zoss indicated in his REPORT AND RECOMMENDATION, Cory's testimony at the § 2255 hearing was a virtual confession of the charges against him.[5] Cory did not object to this finding by Judge Zoss, and the court agrees with Judge Zoss that it was a "virtual confession," if by that terminology Judge Zoss meant Cory's testimony would have seriously hurt his case even if it did not amount to a confession of each element. Cory was charged with conspiracy to distribute and possession with intent to distribute methamphetamine, as well as possession with intent to distribute methamphetamine to minors. Cory testified at the § 2255 hearing that he was a drug addict, that he bought methamphetamine from Brick, that he shared drugs with someone involved in a conspiracy, that he was "involved in these trips [to Sioux City]," and suggested that he would have done drugs with a minor (Menzel). Hr. pp. 202, 207-08, 218, 224. At one point in his testimony, Cory related his involvement this way, "I'm a drug addict, and [Brick] has some drugs. I'm not going to not buy them." Hr. p. 224. Although this testimony may support a simple buyer-seller relationship or defense, it would also be potentially very dangerous to Cory's case. As a result, the court overrules Cory's objections and accepts Judge Zoss's recommendation on this point.

---

[5] The court does not mean to suggest that a harmless error analysis applies. The Eighth Circuit Court of Appeals has "note[d] that it is unclear if harmless error analysis applies to the denial of a defendant's right to testify." *See Frey v. Schuetzle*, 151 F.3d 893, 898 n.3 (8th Cir. 1998).

### E.  Conflict Of Interest

Cory argues in his post-hearing brief that McMinn represented Cory under a conflict of interest by providing "joint representation" and simultaneous consultation to Brett and Cory that worked to Cory's disadvantage.  Cory's argument is that McMinn counseled Cory on several occasions with Brett present, and that she had extensive communications with Brett.  But for McMinn's joint representation, Cory argues McMinn would have counseled Cory to possibly testify against his brother or at least attempt to distinguish Cory from Brett during trial.  Cory argues there is a clear distinction between his level of culpability and his brother's, and McMinn should have realized this distinction and emphasized the distinction when crafting her defense strategy.

Judge Zoss recommended the court reject Cory's arguments because he believed the evidence did not support Cory's theory that McMinn offered dual representation.  Judge Zoss also distinguished two cases Cory offered in support of Cory's argument, *United States v. Auerbach*, 745 F.2d 1157 (8th Cir. 1984), and *United States v. Unger*, 665 F.2d 251 (8th Cir. 1981), because in those cases the attorney actually represented both defendants, whereas in the present case Brett was represented by a different attorney, Douglas Roerich.  Cory objects to Judge Zoss's recommendation, arguing that even in the absence of a formal attorney-client relationship between McMinn and Brett, "there was evidence that Brett sought and received information about his case from McMinn," and that McMinn met with Brett without Brett's counsel present.  Dkt. # 393.  Cory further argues that prejudice resulted because McMinn failed to contrast the culpability of the defendants in failing to argue to the jury that Cory, unlike his brother, was responsible for less than 500 grams of methamphetamine.

Judge Zoss is correct that no actual conflict existed in this case.  *See United States v. Edelmann*, 458 F.3d 791, 807 (8th Cir. 2006) ("An actual conflict occurs 'when, during

34

the course of the representation, the attorney's and the defendant's interest diverge with respect to a material factual or legal issue or to a course of action.'" (quoting *United States v. Levy*, 25 F.3d 146, 155 (2d Cir. 1994))). McMinn represented Cory, and Roerich represented Brett. The § 2255 hearing indicates that although Brett was sometimes with Cory when Cory and McMinn met, McMinn only consulted with Cory. Hr. p. 280. McMinn may have provided informal help to Brett at times, e.g., allowing Brett access to the discovery file, but the court does not believe such contact created an impermissible actual conflict of interest. There is nothing inherent in the contacts McMinn had with Brett that creates an actual conflict of interest.

The court also does not believe a potential conflict existed. *See id.* (distinguishing between an actual and potential conflict). Of course, had McMinn taken on representing both Cory and Brett, then an actual conflict would exist. But in this case the only "dual representation" present is McMinn's occasional contacts with Brett while he was with Cory. This did not prevent McMinn from representing Cory competently, and the fact that McMinn failed to argue that Cory was less culpable than Brett does not turn McMinn's singular representation into simultaneous representation. In sum, McMinn's encounters with Brett do not present a situation whereby Cory's right to McMinn's "undivided loyalty" is questioned. *Bonin v. California*, 494 U.S. 1039, 1044 (1990). As a result, no potential conflict existed, and the court need not address whether prejudice resulted. *See United States v. Ramon-Rodriguez*, 492 F.3d 930, 944 (8th Cir. 2007) (recognizing prejudice is not presumed unless there is an actual conflict); *Edelmann*, 458 F.3d at 807 ("'[I]f a defendant establishes that her attorney has a potential conflict of interest, in order to prove that the conflict resulted in a violation of her Sixth Amendment right to effective assistance of counsel, she must demonstrate prejudice.'" (quoting *Levy*, 25 F.3d at 155)).

The court overrules Cory's objections and accepts Judge Zoss's recommendation on this issue.

### F. Failure To Argue Prosecutorial Misconduct

Cory did not specifically argue prosecutorial misconduct in his post-hearing brief, but did request the court to consider any arguments Brett raised that Cory did not. Brett, of course, raised the issue of prosecutorial misconduct in his post-hearing brief and reply brief. Cory now objects to Judge Zoss's recommendation that no prosecutorial misconduct occurred. Cory argues Judge Zoss failed to address the issue of the prosecution using Oldenkamp's perjurious testimony in the prosecution's closing argument. Cory's argument is limited his objections are general. Thus, like Cory did in his post-hearing briefs regarding this issue, Cory relies on Brett's objections for the substance of his argument. As a result, the court will consider Cory and Brett's arguments on this issue under the court's analysis of Brett's objections below.

### G. Remaining Issues Objected To By Cory

Cory makes three specific objections to Judge Zoss's REPORT AND RECOMMENDATION dealing with factual errors. Cory first argues that Judge Zoss erroneously stated that Geoff Baldridge has an extensive criminal record regarding the distribution of drugs. Instead, Cory asserts that Baldridge has only one prior conviction for distribution, and his other convictions were for ingestion. Second, Cory argues Judge Zoss erroneously found that Bill Menzel did not provide helpful testimony at the § 2255 hearing. Cory asserts Mr. Menzel's testimony was helpful because it corroborated the testimony of Jenny Menzel that she did not travel to Sioux City and that the methamphetamine found in her car had nothing to do with Brett and Cory. Lastly, Cory

argues Judge Zoss erroneously stated that Brett gave money to Brick to purchase methamphetamine on Brick's last trip to Sioux City. Cory argues the money was for cocaine, not methamphetamine.

The court has reviewed each of these errors, and agrees with Cory that Judge Zoss made a mistake according to the objections. Nevertheless, the court does not find that any of these minor factual mistakes change its analysis in this case. Therefore, even though the court sustains Cory's three factual objections, the court otherwise overrules Cory's substantive objections and accepts Judge Zoss's recommendation regarding the substantive issues Cory objected to.

## VII.  ISSUES OBJECTED TO BY BRETT

Brett filed specific objections to Judge Zoss's REPORT AND RECOMMENDATION. In his objections, Brett argues Judge Zoss erroneously recommended that Brett failed to establish ineffective assistance of counsel regarding the following issues: 1) failure of counsel to properly prepare for trial; 2) failure to cross-examine the prosecution's witnesses effectively; 3) denial of Brett's Sixth Amendment right to testify; 4) failure to have the Menzel drug evidence excluded at trial; 5) failure to ensure that Brett was present at the deposition of Agent Craig Price; and 6) failure to argue prosecutorial misconduct. The court reviews each of these issues de novo.

### A.  Failure To Prepare For Trial

Brett argues in his post-hearing brief that his trial counsel, Douglas Roehrich, was ineffective because he failed to properly prepare the case for trial. Brett claims Roehrich failed to 1) review the prosecution's evidence with him, 2) investigate the case, 3) interview witnesses, and 4) call witnesses on behalf of the defense. Judge Zoss found

Roehrich adequately reviewed the prosecution's evidence with Brett, but that Roehrich rendered deficient performance regarding items two, three, and four. Nevertheless, Judge Zoss did not recommend a finding of ineffective assistance of counsel because Judge Zoss did not find Brett showed prejudice under the second *Strickland* prong. Brett objects, arguing the outcome of the trial probably would have been different if Roehrich had adequately investigated the case, interviewed possible witnesses, and solicited testimony from certain witnesses that contradicted the prosecution's theory.

First, the court agrees with Judge Zoss that Roehrich rendered deficient performance. As Judge Zoss explained in his REPORT AND RECOMMENDATION, "Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993). In addition, although "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, "the presumption of sound trial strategy founders . . . on the rocks of ignorance," *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005), when, "for example, counsel's investigation was 'too superficial' to reveal the strengths or weaknesses of testimony supporting the government's or the defendant's case, or to discover evidence providing powerful support for the defendant's version of events," *United States v. Hernandez*, 450 F. Supp. 2d 950, 970 (N.D. Iowa 2006).

Although evidence from the § 2255 hearing indicates Roehrich may have reviewed the prosecution's evidence with Brett, *see* Hr. p. 254, the record clearly establishes that Roehrich failed to adequately investigate the facts of the case, failed to interview witnesses, and failed to call witnesses on Brett's behalf. Roehrich knew the prosecution would be presenting cooperating witnesses to testify that the Kameruds sold methamphetamine to several alleged customers. Roehrich testified at the § 2255 hearing

38

that he did not interview the alleged customers to see if they purchased drugs from the Kameruds because he "just didn't feel that it would in any way benefit [Brett] even if [the alleged customers] did come in and testify as [Brett] wanted them to." Hr. p. 248. To Roehrich, inquiry into these alleged customers was unnecessary because "[w]e had our defense," and "[w]e had our argument." Hr. p. 248. But Roehrich's strategy, as he summed up at the § 2255 hearing, depended on inquiring into these alleged customers: "So basically my strategy was to bring out the bias of the government's witnesses, their motivation to lie, their integrity." If these alleged customers testified as Brett informed Roehrich they would—that they were not customers and did not buy any drugs from the Kameruds—such testimony would have been critical in challenging the integrity of the prosecution's cooperating witnesses. As Judge Zoss noted, "There is nothing inconsistent between challenging the credibility of the Government's witnesses and calling witnesses to testify that the Government's witnesses were testifying falsely. In fact, such evidence would have been both consistent and corroborative." Dkt. # 389. Indeed, Roehrich testified that it would have been "viable" to question some of the alleged customers identified in the discovery file and named by Brett, although Roehrich failed to question any of them. Hr. pp. 250-51.

At the very least, Roehrich should have interviewed these alleged customers to determine what they had to say. The court does not believe the alleged time crunch or Rule 404(b) worries noted by Judge Zoss justify Roehrich's failure in this regard. Moreover, Roehrich's time records, as noted by Judge Zoss, highlight Roehrich's inadequate preparation and investigation into Brett's case. As a result, the court accepts Judge Zoss's recommendation that Roehrich rendered deficient performance in preparing and trying this case.

As for prejudice, "in the context of a claim of failure to investigate, the defendant cannot rely on general allegations of what a proper or reasonable investigation would have revealed, but must show specifically what would have been revealed by further investigation and how the further evidence would have made a different outcome to the trial a reasonable probability." *Hernandez*, 450 F. Supp. 2d at 970. Brett filed detailed objections concerning what each potential witness would have testified to if called by Brett. In sum, the testimony of these potential witnesses—Geoff Baldridge, Kim Ackerson, Larry Wenger, Jenny Menzel, Bill Menzel, and Debra Menzel—all would have helped the defense attempt to show that the prosecution's witnesses were making false accusations that certain individuals were customers of the Kameruds. Nevertheless, the court is not convinced a reasonable probability exists that the result of the proceeding would have been different. *Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994) ("To prove prejudice from a trial attorney's failure to investigate potential witnesses, a petitioner must show that the uncalled witnesses would have testified at trial and that their testimony would have probably changed the outcome of the trial."). Testimony from Baldridge and Ackerson would have shown the Kameruds were drug users and that people used drugs at the Kameruds' apartment, Hr. pp. 63, 66-67, 98-101, and although Wenger testified at the § 2255 hearing that he saw no drug activity at the Kamerud's apartment, Wenger only came over to the Kameruds' apartment once or twice a month to play the guitar when no one else was present, Hr. pp. 131-32. As for the Menzel testimony, Bill and Debra's testimony would have corroborated Jenny's testimony (Jenny testified over the phone at trial,[6] although called and examined by Cory's counsel), but it also would have been

---

[6] Like Judge Zoss, the court is concerned that Jenny's testimony came over the phone, but Jenny was not an adverse witness and the Kameruds agreed to the procedure.

(continued…)

cumulative of their daughter's testimony.  Bill and Debra's testimony (establishing that the drugs found in Jenny's purse were hers and not connected to Sioux City) could not have hurt, especially because the drugs seized from Jenny's purse were the only hard drug evidence introduced against the Kameruds, but the court does not believe such testimony would have created a reasonable probability that the outcome of the trial would have changed.  Therefore, the court overrules Brett's objections and accepts Judge Zoss's recommendation on this issue.

### B.  Failure To Cross-Examine Prosecution's Witnesses Effectively

Brett argues in his post-hearing brief that his trial counsel, Roehrich, failed to adequately cross-examine prosecution witnesses with impeachment material that was readily available to him.  Dkt. # 375.  Brett argues better cross-examination would have significantly undercut the prosecution's overall case and, at the very least, countered the allegation that Brett was responsible for 500 grams or more of methamphetamine. Regarding Brick's testimony, and among other things, Brett argues Roehrich should have confronted him with the inconsistent amounts of methamphetamine Brick reported in his debriefing ( ~ 590 grams), grand jury testimony ( ~ 650 grams), and trial testimony ( ~ 770 grams).  Brett argues Bitz and Oldenkamp should have been impeached with their debriefing testimony on inconsistent amounts of methamphetamine as well.  In addition, Brett argues Roehrich should have questioned Bitz on her motivation to lie (in light of the love triangle between Bitz, Menzel, and Brett), and impeached Oldenkamp with his custody and mental health records (because they contradicted his time line of events).

---

[6](…continued)
*See United States v. Jacobs*, 97 F.3d 275, 280-83 (8th Cir. 1996) (holding trial court erred in allowing cross-examination of *prosecution* witness by telephone).

Judge Zoss found neither deficient performance nor prejudice under the *Strickland* standards. Judge Zoss did not find any inconsistencies noted by Brett to be significant, and also found that focusing on these inconsistencies may actually have hurt Brett's case by emphasizing large amounts of methamphetamine—even if they were inconsistent accounts of the drug amounts.

Brett now objects to Judge Zoss's recommendation. Brett argues that pointing out these inconsistencies was critical to Brett's defense because their only defense was to attack the credibility of the prosecution's witnesses. Moreover, Brett argues it could not have been Roehrich's trial strategy not to point out these inconsistencies because Roehrich failed to even notice the inconsistencies. In support of this argument, Brett points to Roehrich's testimony at the § 2255 hearing: "I went through all the documents pretty thoroughly, and any significant conflicts I would have absolutely brought out." Hr. p. 269.

The court does not completely agree with Judge Zoss's recommendation on this issue because Brett's defense depended on impeaching the prosecution's witnesses, and all the avenues cited by Brett would have been additional ways, and not simply insignificant ways, to further the defense strategy. The problem for Brett is, however, that none of the possible avenues of significant impeachment would have reasonably resulted in a different outcome. Brick's testimony always revealed a higher than 500 gram amount of methamphetamine, and Oldenkamp's credibility was already all but eliminated at trial. Thus, even if Roehrich was deficient in his cross-examination, the court accepts Judge Zoss's recommendation that no prejudice is present. Brett's objections are overruled on this point.

## C. Denial Of The Right To Testify

Like Cory, Brett argues in his post-hearing brief and reply brief that he was denied his right to testify at trial. Brett claims he asked Roehrich if he could testify and Roehrich told him he could not. Judge Zoss found Roehrich's version of the events, as told in Roehrich's § 2255 hearing testimony, more credible. Thus, he found Brett voluntarily and knowingly waived his right to testify. In addition, Judge Zoss found Brett would have been an uncontrollable witness and his testimony would have been a virtual confession. Thus, Judge Zoss found Brett had failed to establish prejudice as well.

Brett now objects to Judge Zoss's recommendation. Brett argues he could not have knowingly and voluntarily waived his right to testify because Roehrich never really discussed his right to testify with him. In addition, Brett argues he would have made a good witness, as Judge Zoss's impression of Brett's demeanor was largely based on *pro se* encounters, and Brett testified as a defense witness in a previous trial which ended in an acquittal. Most importantly, Brett disputes Judge Zoss's characterization that his testimony would have been a virtual confession.

Like Cory's arguments on this issue, it is hard for the court to know for sure whether the defendants were informed of their right to testify, and that they knowingly and voluntarily waived their right to testify. Both claim they were not given an opportunity to testify because their attorneys told them they could not. Their attorneys, on the other hand, state the defendants were given an opportunity to testify, and that, as their trial counsel, they advised the defendants not to testify. The court has read the transcripts of the § 2255 hearing, and like its finding regarding Cory's argument on this issue, the court similarly finds that Brett was informed of his right to testify and that Roehrich advised Brett not to testify. The court does not find that Roehrich told Brett he could not testify.

In addition, the court finds that it was good advice for Roehrich to counsel Brett not to testify. The court acknowledges that Brett would have provided some information consistent with a simple buyer/seller defense, but, overall, Brett's testimony would have been very damaging to his case. Like Judge Zoss acknowledged at the hearing, Brett admitted voluntarily to a conspiracy to distribute cocaine in his trips to Sioux City. Hr. pp. 152-54. In addition, Brett's prior conviction for distribution of LSD would have been made known to the jury if Brett testified. Judge Zoss was "frankly flaberrgasted" that Brett believed his testimony would help his case. Hr. p. 176. The court feels likewise, and reiterates that if Brett would "have been testifying to that at trial, it would have been disastrous." Hr. p. 176. Thus, Brett's testimony would have also been a virtual confession, even if it was not a confession to every element of the charges brought against him. The court overrules Brett's objections and accepts Judge Zoss's recommendation on this issue.

### D. Failure To Exclude Menzel Drug Evidence

Brett also argues in his post-hearing and reply briefs, like Cory, that his trial counsel should have tried to exclude the Menzel drug evidence. Judge Zoss rejected the brothers' arguments because they failed to cite any case law or rule of evidence in support, and because trial counsel made a strategic choice to attack the Menzel drug evidence by having Jenny Menzel testify that the drugs belonged to her and not Brett or Cory.

Brett objects to Judge Zoss's recommendation. Brett argues it should have been obvious to Roehrich to try to exclude this evidence in a motion in limine because Roehrich knew there was not a shred of evidence, other than the Kameruds' presence in the car with Jenny, that Brett or Cory knew about the drugs. Brett argues the prejudice clearly

44

outweighed any possible relevance, and therefore the evidence was inadmissible under Rule 403.

The court examined this issue earlier when discussing Cory's objection to McMinn's failure to file a motion in limine to exclude the Menzel evidence. The court again notes here that it would have been wise to try to exclude this evidence under Rule 403, but the court does not believe it was constitutionally deficient performance to fail to do so. The drugs were certainly important to the prosecution's case—the prosecutor relied on the evidence in closing arguments and it was the only hard drug evidence against the defendants. Moreover, it does not appear that either Roehrich or McMinn thought about trying to exclude this evidence. But there is no guarantee the trial judge would have excluded the evidence under Rule 403, and McMinn successfully elicited testimony from Jenny Menzel that Menzel was solely and completely responsible for the drugs. The court is not convinced that Roehrich's failure to file a motion in limine to exclude the Menzel drug evidence was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. As a result, Brett's objections are overruled, and Judge Zoss's recommendation on this issue is accepted.

### E. Failure To Ensure Brett Was Present At Deposition

Agent Price testified by deposition because of a conflict in his schedule with the continued trial date. Roehrich attended the deposition, but Brett did not. At trial, the deposition was read to the jury without objection.

In his post-hearing and reply briefs, Brett argues Roehrich rendered ineffective assistance of counsel by allowing Agent Price's deposition to be introduced at trial when Brett was not present for the cross-examination of Agent Price. Brett argues that, although Roehrich informed Brett of the deposition date and that Brett should be there, Roehrich

would not reschedule the deposition when Brett informed him that Brett had to be in state court for a preliminary hearing at the same time.

Judge Zoss recommended rejecting Brett's arguments. Judge Zoss believed Roehrich's testimony at the § 2255 hearing that Roehrich had no record or recollection of Brett telling Roehrich that Brett could not attend the deposition. Judge Zoss found Roehrich advised Brett of the date, time, and place of the deposition, and advised Brett that he had a right to attend and that he should attend. Nevertheless, Judge Zoss did not find that Brett waived his right to be present at the deposition. Instead, Judge Zoss recommended rejecting Brett's arguments because Brett had not shown he was prejudiced by the introduction of the deposition.

Brett objects to Judge Zoss's recommendation, although not to Judge Zoss's finding that Brett did not waive his right of confrontation. Brett objects to Judge Zoss's finding that Roehrich's failure to object to the introduction of Agent Price's deposition was harmless.

As noted by Judge Zoss, the circumstances surrounding Brett's absence from the deposition of Agent Price are not clear. There is evidence that Brett may have simply chosen to skip the deposition in favor of his state court preliminary hearing. Hr. p. 249. There is also evidence that Brett notified Roehrich that he could not attend the deposition, that Brett wanted to be there, and that Roehrich made no attempt to reschedule the deposition. Hr. pp. 303-04. Under these circumstances, the court cannot say that Brett made "an intentional relinquishment or abandonment" of his right to confrontation. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

The court also agrees with Judge Zoss that Roehrich's failure to object to the admission of Agent Price's deposition was harmless error beyond a reasonable doubt. *See Clemmons v. Delo*, 124 F.3d 944, 956 (8th Cir. 1997) (applying the harmless error

standards announced in *Chapman v. California*, 386 U.S. 18 (1967), to the question of whether defense counsel's failure to object to the introduction of a deposition not attended to by the defendant was constitutional error). Obviously, as an adverse witness, Agent Price's deposition was prejudicial to Brett's defense. But Agent Price's deposition was, as Judge Zoss noted, somewhat cumulative of other evidence and did not, in the court's opinion, "carry the day for the prosecution" or otherwise establish Brett's guilt. As a result, the court rejects Brett's objection and accepts Judge Zoss's recommendation on this issue.

### F.   Failure To Argue Prosecutorial Misconduct

The defendants[7] argue prosecutorial misconduct occurred during the prosecutor's closing argument: "The prosecutor, in his closing arguments, made several improper comments, referred to perjurious testimony as truthful, said witnesses testified to things they never testified to, inflated amounts testified to by alleged coconspirators, and improperly used Bridget McClure's last name in conjunction with Jenny Menzel's first name which mislead the jury regarding the source of that testimony." Dkt. # 375. Judge Zoss rejected this argument, finding it frivolous. Cory objects to Judge Zoss's recommendation, arguing Judge Zoss failed to address the issue of the use of Oldenkamp's perjurious testimony in the prosecution's closing argument. Brett argues likewise and with more precision in his post-hearing and reply briefs, and also emphasizes in his objections that the prosecutor's closing crossed the line, and that Roehrich's decision not to object was not based on any strategic grounds.

---

[7] Because Cory's objections to Judge Zoss's report and recommendation on this issue largely hijacked Brett's arguments, the court addresses the brothers' arguments in support of prosecutorial misconduct together under Brett's objections.

The Eighth Circuit Court of Appeals recently explained the standards governing claims of prosecutorial misconduct during closing arguments:

> To determine whether prosecutorial misconduct has occurred, we apply a two-part test: first, the prosecutor's conduct or remarks must have been improper, and second, the remarks or conduct must have prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial. In order to determine whether the defendant was deprived of a fair trial, we consider the following three factors: (1) the cumulative effect of the misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions, if any, taken by the district court.

*United States v. Eagle*, 515 F.3d 794, 804-05 (8th Cir. 2008) (citation omitted); *see United States v. Hyles*, 521 F.3d 946, 958 (8th Cir. 2008) ("'To obtain a reversal for prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the defendant's rights in obtaining a fair trial.'" (quoting *United States v. DeGarmo*, 450 F.3d 360, 365 (8th Cir. 2006))). The Eighth Circuit Court of Appeals also recognized, as Judge Zoss did, that "[a] prosecutor must limit the closing argument to the evidence and the reasonable inferences that may be drawn from it." *Eagle*, 515 F.3d at 805 (citing *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001)). Obviously, if no prosecutorial misconduct occurred, then Cory's trial and appellate counsel could not have been ineffective in failing to object and preserve the issue.

The defendants' arguments of prosecutorial misconduct do not show "exceptional circumstances." *United States v. Mullins*, 446 F.3d 750, 758 (8th Cir. 2006). The statements Brett points the court to in his post-hearing brief and reply brief are not flagrant misstatements, even if they were intentional. They all had some kind of support in the record—considering prosecutors are allowed to make reasonable inferences from the record. *White*, 241 F.3d at 1023. Thus, the court does not find the prosecutor's remarks

or conduct improper, and even if some comments were improper (i.e., mixing up Jenny Menzel and Bridget McClure's names), the court does not find that those comments deprived the defendants of a fair trial. The defendants' objections are overruled, and Judge Zoss's recommendation on this issue is accepted.

## VIII. CONCLUSION

The defendants raised many arguments in their post-hearing briefs and reply briefs. Judge Zoss issued a REPORT AND RECOMMENDATION on these arguments and all parties issued certain objections to the REPORT AND RECOMMENDATION. Not all objections covered the details of the prior arguments the defendants made in their briefs. Nevertheless, in analyzing the parties' objections, the court has reviewed all of the parties' filings, and considered all arguments whether specifically mentioned in this memorandum opinion and order or not.

The only argument the court has left to specifically mention in this memorandum opinion and order is a "cumulative error" argument raised by Brett. Brett argues in his reply brief that he is entitled to a new trial as a result of the reasons he set forth in his briefs, "whether taken individually or on a cumulative error basis." Dkt. # 387. Brett objects to Judge Zoss's REPORT AND RECOMMENDATION because Judge Zoss did not address Brett's "cumulative error" argument. Dkt. # 392. Cory, of course, asked the court to consider all arguments Brett made to be made on Cory's behalf, too.

Brett sums up his "cumulative error" argument in his objections: "Essentially, Brett's position is that if there is not sufficient prejudice warranting a new trial on each ground individually, than when the issues are viewed as a whole, there is prejudice." Dkt. # 392. Brett cites the Ninth Circuit Court of Appeals's decision in *Harris v. Wood*, 64 F.3d 1432 (9th Cir. 1995), in support of his argument. In *Harris*, the Ninth Circuit Court

of Appeals found the defendant's counsel had rendered deficient performance in eleven different respects, and held that the cumulative prejudice resulting from these multiple deficiencies warranted habeas relief. 64 F.3d at 1438-39. The court did not analyze or attempt to find whether any one deficiency on counsel's part resulted in prejudice—instead it noted that "[b]y finding cumulative prejudice, we obviate the need to analyze the individual prejudicial effect of each deficiency." *Id.* at 1439.

Notably, Brett has not alerted the court to any similar Eighth Circuit law, and the court finds none. The court applauds Brett for raising this argument, as the court's review of this case and the parties' arguments clearly show that many things could have or should have been done better. Notably, 1) McMinn could have provided an opening statement, 2) Roehrich should have investigated the case better and interviewed possible witnesses, 3) Roehrich should have secured Brett's presence at Agent Price's deposition, 4) McMinn and Roehrich could have attacked the Menzel drug evidence more vigorously through a motion in limine, and 5) McMinn and Roehrich could have explained the right to testify more clearly to their clients. Nevertheless, the court does not believe any "cumulative prejudice" amounting to the deprivation of a fair trial occurred in this case. Thus, assuming the court was at liberty to use the Ninth Circuit's cumulative prejudice standard, the court does not find such standard met in this case. Prejudice requires the defendants to prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Certainly the defendants have proven that their counsel could have done more, but the court does not find that any deficiencies in their representation cumulatively left the defendants with a "fundamentally unfair" trial. *Id.* at 700. Thus, the court overrules Brett's objection and rejects his argument for cumulative prejudice.

The defendant must make a substantial showing of the denial of a constitutional right in order to be granted a certificate of appealability. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Garrett v. United States*, 211 F.3d 1075, 1076-77 (8th Cir. 2000); *Mills v. Norris*, 187 F.3d 881, 882 n.1 (8th Cir. 1999); *Carter v. Hopkins*, 151 F.3d 872, 873-74 (8th Cir. 1998); *Ramsey v. Bowersox*, 149 F.3d 749 (8th Cir. 1998); *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997), *cert. denied*, 525 U .S. 834 (1998). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox*, 133 F.3d at 569. Moreover, the United States Supreme Court reiterated in *Miller-El* that "'[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The court determines that defendants' applications do not present questions of substance for appellate review, and therefore, they do not make the requisite showing to satisfy § 2253(c). *See* 28 U.S.C. § 2253(c)(2); FED. R. APP. P. 22(b). As a result, the court shall not grant a certificate of appealability pursuant to 28 U.S.C. § 2253(c).

The court accepts in part and rejects in part Judge Zoss's REPORT AND RECOMMENDATION. The court rejects Judge Zoss's REPORT AND RECOMMENDATION on the variance issue. In all other respects on the substantive issues identified, the court accepts Judge Zoss's REPORT AND RECOMMENDATION. As a result, Brett and Cory's petitions for § 2255 relief are **denied**.

**IT IS SO ORDERED.**

**DATED** this 16th day of September, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA